**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: EBIX INC. SECURITIES LITIGATION | Master File No. 1:11-CV-02400-RWS<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      These are consolidated securities class actions on behalf of all persons who purchased or otherwise acquired the common stock of Ebix, Inc. ("Ebix" or the "Company") between May 6, 2009 and June 30, 2011 (the "Class Period") and suffered damages thereby, inclusive, against Ebix and certain of its officers and/or directors for violations of the Securities and Exchange Act of 1934 (the "Exchange Act").  Ebix and certain of its officers and/or directors made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filing with the U.S. Securities and Exchange Commission ("SEC").

2.      Ebix is a supplier of software and e-commerce solutions to the insurance industry, providing that industry with carrier systems, agency systems and exchanges.  The Company also purports to develop custom software for the insurance and financial industries.  Ebix is a "rollup," purchasing many smaller, related software companies in an attempt to create economies of scale and reduce costs.

3.      Throughout the Class Period, Ebix portrayed itself as a fast-growing leader in its industry.  It announced ever-increasing revenues and net income, bolstered by its torrid pace of acquisitions and extremely favorable tax situation which lowered its effective tax rate into the single digits.  As a result of its unabashedly positive outlook, during the Class Period, Ebix common stock traded at artificially inflated prices, reaching a high of $30.35 per share on March 24, 2011.

4.      On March 24, 2011, however, the truth began to seep into the market when *Seeking Alpha* published a report by Copperfield Research ("Copperfield"), carried by Bloomberg, titled *Ebix: Not a Chinese Fraud, but a House of Cards Nonetheless*.  In its analysis, among other issues of great concern to investors, Copperfield detailed myriad problems at Ebix, problems defendants had concealed, including:

(a)     Defendants caused Ebix to engage in a foreign tax gambit, transferring profits offshore to benefit from far lower tax rates in Singapore and India.  This tax gambit was an improper and potentially illegal means by which defendants caused Ebix to overstate materially its net income and diluted earnings per share ("EPS") throughout the Class Period;

(b)     The Company's internal controls were wholly inadequate in the face of its torrid acquisition pace.  The Company was unable to prepare materially accurate financial statements for its acquisitions or on a consolidated basis, including its inability to accurately account for accounts receivable adequately to reserve for doubtful accounts.  As a result, defendants caused Ebix to overstate its net income and diluted earnings per share throughout the Class Period; and

(c)     The Company's growth was due in large part to its acquisitions. Organic growth was slow or even negative with the majority of the Company's increased revenues coming from contracts the Company purchased.  Defendants' statements about organic growth were materially misleading in that they mischaracterized purchased contracts as "organic," a critical metric for investors to understand a roll-up such as Ebix.

5.      On this news, Ebix share price plummeted 25.8% from a March 24,

2011 intraday, class period high 30.35 to close that day at $22.52 per share on

heavy volume of nearly 15 million shares traded.[1]

6.      In addition, on June 30, 2011, it was disclosed that former shareholder

of a company Ebix had purchased in 2009 had sued the Company, claiming,

among other things, that a failure of Ebix's accounting systems had prevented it

from accurately accounting for an earn-out owed and from paying certain

receivables the former shareholders retained upon sale.  Essentially, the allegations

in that complaint confirmed several of the points raised in the Seeking Alpha

analysis on March 24, 2011.

7.      On this news, the stock price fell 9% from an intraday high of $20.93

on June 30, 2011 to close that day at $19.05 on heavy volume of over 5 million

shares traded.  As a direct result of defendants' wrongful acts and omissions,

plaintiffs and the members of the class have suffered significant damages.

## JURISDICTION AND VENUE

8.      Jurisdiction is conferred by §27 of the Exchange Act.  The claims

asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§

78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

---

[1] As of January 4, 2010, the Company affected a 3-for-1 stock split.  Ebix stock prices referenced before that time are all split-adjusted.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act. The violations of law complained of herein occurred in part in the District, including the dissemination of materially false and misleading statements complained of herein into this District. Ebix's principal executive offices are located at 5 Concourse Parkway, Suite 3200, Atlanta, Georgia.

10.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.  Ebix's stock trades in an efficient market on the NASDAQ Global Market.

## THE PARTIES

11.     Lead Plaintiff Dan Anghel ("Lead Plaintiff") purchased Ebix common stock during the Class Period as described in the certification attached hereto as Exhibit A and was damaged thereby.

12.     Representative Plaintiff Scott D. Fenske ("Fenske") purchased Ebix common stock during the Class Period as described in the certification attached hereto as Exhibit B and was damaged thereby.

13.     Defendant Ebix is a Delaware corporation, headquartered at 5 Concourse Parkway, Suite 3200, Atlanta, Georgia.  As stated above, Ebix is a

supplier of software and e-commerce solutions to the insurance industry, providing that industry with carrier systems, agency systems and exchanges. The Company also purports to develop custom software for the insurance and financial industries.

14. Defendant Robin Raina ("Raina") was, at all times relevant hereto, the Chief Executive Officer ("CEO") of Ebix. Raina joined Ebix in October, 1997, becoming President and CEO as of August 2, 1999 and September 23, 1999 respectively. He became Chairman of the Ebix Board in May, 2002. Defendant Raina purportedly holds an industrial engineering degree from Thapar University in Punjab, India. Appended to each periodic filing with the SEC during the Class Period, including annual reports and quarterly reports, the Company appended Raina's certification, attesting to the accuracy of the Company's financial statements. The following, filed with the SEC on May 10, 2011, is representative of that certification:

> I, Robin Raina, certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Ebix, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's

auditors and the audit committee of the registrant's board
of directors (or persons performing the equivalent
functions):

(a) All significant deficiencies and material
weaknesses in the design or operation of internal control
over financial reporting which are reasonably likely to
adversely affect the registrant's ability to record, process,
summarize and report financial information; and

(b) Any fraud, whether or not material, that
involves management or other employees who have a
significant role in the registrant's internal control over
financial reporting.

15.     Defendant Robert Kerris ("Kerris") was, at all times relevant hereto,

the Chief Financial Officer ("CFO") of Ebix.  Kerris joined Ebix as CFO and

Corporate Secretary on October 22, 2007.  Kerris is a licensed certified public

accountant, holding an accounting and economics degree from North Carolina

State University.  Appended to each periodic filing with the SEC during the Class

Period, including annual reports and quarterly reports, the Company appended

Kerris's certification, attesting to the accuracy of the Company's financial

statements.  The following, filed with the SEC on May 10, 2011, is representative

of that certification:

I, Robert Kerris, certify that:

1. I have reviewed this quarterly report on Form 10-Q of
Ebix, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an

annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

16.    In addition, both Raina and Kerris certified each financial result pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, stating:

In connection with the Quarterly Report on Form 10-Q of Ebix, Inc. (the "Company") for the period ended March 31, 2008 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robin Raina, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to 906 of the Sarbanes-Oxley Act of 2002, that:

      1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

      2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

17.    Defendants Raina and Kerris (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Ebix's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional and individual investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

18.     Defendants are liable for: (i) making false statements of material fact; or (ii) failing to disclose adverse material facts known to them about Ebix. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Ebix common stock was a success, as it: (i) deceived the investing public regarding the financial results, prospects and operations of Ebix; (ii) artificially inflated the prices of Ebix common stock; and (iii) caused Plaintiffs and other members of the Class to purchase Ebix common stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

19.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Ebix common stock during the Class Period between May 6, 2009 and June 30, 2011, inclusive and suffered damages thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of March 14, 2011, Ebix had 39,708,750 shares of commons stock issued and outstanding, owned by hundreds if not thousands of persons.

21.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether defendants violated the Exchange Act and the rules promulgated thereunder;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Ebix common stock was artificially

inflated; and

(f)     The extent of damage sustained by Class members and the

appropriate measure of damages.

22.     Plaintiffs' claims are typical of those of the Class because plaintiffs

and the Class sustained damages from defendants' wrongful conduct.

23.     Plaintiffs will adequately protect the interests of the Class and has

retained counsel who are experienced in class action securities litigation.  Plaintiffs

have no interests which conflict with those of the Class.

24.     A class action is superior to other available methods for the fair and

efficient adjudication of this controversy.

## BACKGROUND TO FALSE AND MISLEADING STATEMENTS

25.     Ebix touts itself as "a leading international supplier of software and e-

commerce solutions to the insurance industry."[2]  In its stable of software solutions,

Ebix "provides a series of application software products for the insurance industry

ranging from carrier systems, agency systems and exchanges to custom software

development for all entities involved in the insurance and financial industries."[3]

According to the Company, the insurance industry's "desire to reduce paper based

---

[2] Quarterly Report on Form 10-Q, filed with the SEC on May 8, 2009, at 16.
[3] *Id.*

processes and improve efficiency both at the back-end side and also at the

consumer end side" has spurred its growth.  Again, according to the Company:

> Management believes the insurance industry will
> continue to experience significant change and increased
> efficiencies through online exchanges and reduced paper
> based processes are becoming increasingly a norm across
> the world insurance markets.  Changes in the insurance
> industry are likely to create new opportunities for the
> Company.[4]

26.     The Company claimed to be expanding "both internally as well as

through a series of acquisitions."[5]  As of the start of the Class Period, Ebix was

growing at a fast pace, but overwhelmingly through acquisitions.  In 2008, for

example, Ebix purchased three companies.  On November 24, 2008, Ebix acquired

ConfirmNet Corporation ("ConfirmNet") for $7.4 million, plus an additional earn

out for meeting revenue objectives.   On August 1, 2008, Ebix acquired

Acclamation Systems, Inc.  for $22 million plus a up to $3 million in additional

cash consideration over the two year period following the effective date of the

acquisition if specific revenue targets of Ebix's Health Benefits division are

achieved.  Then on January 2, 2008 Ebix completed the acquisition of Australian-

based Telstra eBusiness Services Pty Limited ("Telstra") for $43.8 million.

---

[4] *Id*.
[5] *Id*. at 17.

27.     As of December 31, 2008, Ebix reported pro forma earnings – those earnings including its 2008 acquisitions as if they had been part of Ebix since January 1, 2008 – of $86.177 million, 15.3% greater than the $74.752 million of revenue it reported without the acquisition-based adjustments.

28.     In 2009, Ebix increased the stakes with purchases of even greater value.  On October 1, 2009, Ebix acquired E-Z Data, Inc. ("E-Z Data"), a leading a leading industry provider of on-demand customer relationship management ("CRM") solutions for insurance companies, brokers, agents, investment dealers, and financial advisors for $50.5 million.  Also on October 1, 2009, Ebix acquired Peak Performance Solutions, Inc. ("Peak"), a provider of comprehensive, end-to-end insurance software and technology solutions to insurance companies and self-insured entities for workers' compensation claims processing, risk management administration, and managed care tracking, for $8 million in cash plus an earn-out based on defined revenue targets after the acquisition.  On May 1, 2009, Ebix acquired Facts, Inc. ("Facts"), a leading provider of fully automated software solutions for healthcare payers specializing in claims processing, employee benefits, and managed care, for $7.0 million in cash for all of Facts' stock.

29.     As of December 31, 2009, Ebix reported pro forma earnings – those earnings including its 2009 acquisitions as if they had been part of Ebix since

January 1, 2009 – of $118.433 million, 21% more than the $97.685 million of revenue it reported without the acquisition-based adjustments.

30.     In 2010, Ebix continued its acquisition spree.  In the third quarter of 2010, Ebix acquired (a) Brazilian-based USIX Technology, S.A. ("USIX"), a provider of broker systems and related services for insurance carriers across Latin America, and (b) Singapore based E-Trek Solutions PTE Ltd, ("E-Trek") a provider of underwriting and claims processing services for the insurance industry in Singapore for a total of $8.5 million in cash, plus additional earn outs for meeting revenue targets.  During the second quarter or 2010, Ebix acquired (a) Connective Technologies, Inc. ("Connective Technologies") a provider of on-demand software solutions for property and casualty insurance carriers in the United States, and (b) Australian based Trades Monitor, a provider of insurance related software services for the Australian insurance industry.  Ebix paid a total of $4.1 million in cash for these two businesses, plus additional earn outs for meeting revenue targets.  During the first quarter of 2010, Ebix acquired Brazilian-based MCN Technology & Consulting ("MCN") a provider of software development and consulting services for insurance companies, insurance brokers, and financial institutions in Brazil, for $3.1 million in cash plus an earn out for meeting certain revenue targets.

31.     As of December 31, 2010, Ebix reported pro forma earnings – those earnings including its 2010 acquisitions as if they had been part of Ebix since January 1, 2010 – of $139.047 million, 5.2% more than the $132.188 million of revenue it reported without the acquisition-based adjustments.

32.     Thus, over the past three years, Ebix has had to integrate numerous acquisitions that have dramatically increased the size of the company in terms of head-count and revenues, its product offerings, and its geographic reach. Defendants were forced to integrate these acquisitions and to impose sufficient internal controls over its operations to provide investors with accurate financial statements, to report organic growth accurately and generally to convey a materially accurate portrait of the Company with respect to its operations, liquidity and finances.  Defendants failed on all counts

### *Defendants Failed to Disclose that Ebix Lacked Adequate Internal Controls, Resulting in its Inability Both to Maintain Materially Accurate Accounts Receivable and to Report a Materially Accurate Allowance for Doubtful Accounts Receivable*

33.     Over the previous seven years, Ebix has retained a series of independent auditors each smaller than the last.  By letter dated July 7, 2004, after reporting on Ebix's 2002 and 2003 consolidated financial statements, KPMG informed the SEC that it had resigned its engagement as of June 30, 2004.  In its letter, KPMG agreed with Ebix's statement that it had "no disagreements with

KPMG on any matter of accounting principles or practices, financial statement

disclosure, or auditing scope or procedure which, if not resolved to KPMG's

satisfaction, would have caused them to make reference to the subject matter in

connection with their report on the Company's financial statements. . . ."

34.     In Ebix's Annual Report on Form 10-K for the year ended December

31, 2003 ("2003 10-K"), Ebix included disclosures about its controls and

procedures.  According to defendants, Ebix management evaluated "the design and

operation of the Company's disclosure controls and procedures," concluding that

Ebix's internal controls "were effective to provide reasonable assurance that the

information required to be disclosed by the Company in the reports filed or

submitted under the Securities Exchange Act of 1934 is recorded, processed,

summarized and reported within the time periods specified in the SEC's rules and

forms."  KPMG, however, disagreed, informing defendants that it had identified

"reportable conditions" with respect to Ebix's internal controls.

35.     The reference in the 2003 10-K to KPMG's identifying reportable

conditions to Ebix's control lacks specifics.  It was not until Ebix filed with the

SEC its Annual Report on Form 10-K for the year ended December 31, 2004

("2004 10-K") that the Company described the reportable conditions.  "According

to KPMG," the 2004 10-K related, "the communication of the reportable

conditions was based on their professional judgment, taking into consideration

audit differences that required adjustment to the Company's financial statements,

as well as the underlying causes for such adjustments, and KPMG's observations

about the Company's internal control processes, but did not arise from any

particular transaction or event." Thus, KPMG made clear that the Company's

internal controls caused Ebix to err materially in the preparation of its financial

statements, errors that KPMG auditors found and caused Ebix to correct.

36.     In the 2004 10-K, Ebix further acknowledged details of the reportable

conditions that KPMG identified, stating:

> KPMG presented to the audit committee the details of the
> reportable conditions noted during the 2003 audit, which
> included (1) delegation of authority and what KPMG
> considered to be inadequate reviews by a person other
> than the preparer of accounting information, (2) the lack
> of a formalized contract review process to ensure proper
> revenue recognition, (3) the lack of a complete
> understanding of the Company's income tax positions
> and related accounts, (4) inadequate documentation for
> certain unusual transactions (including the basis for the
> Company's accounting conclusions), and (5) internal
> control matters (documented and testable control
> environment) under the Sarbanes-Oxley Act, Section 404
> (together with applicable regulations, "SOX 404").

37.     In response to KPMG's alerting it to these conditions, the Company

claimed to have taken action, changing "its reporting structure within the financial

accounting group and redistributed responsibilities among the financial accounting

group to create improved checks and balances." Ebix changed the reporting structure in its finance department, designating the controller as the direct report for members of the finance department. In addition, Ebix claimed to have created a formalized contract review process, and, notably, a process whereby Ebix's CFO and Controller undertook responsibility for reviewing income tax provisions quarterly and for analyzing and documenting unusual transactions. Ebix claimed to have hired additional staff to insure documentation of control matters, claiming to have "strengthened the overall capabilities of the accounting group and allowed the further reallocation of responsibilities, enabling the corporate controller to devote additional time to the Company's consolidated tax provision and accounting for income taxes." Ebix also promised to employ an outside consultant to assist it with reviewing its internal controls, "perform more detailed quarterly reconciliations and analyses of the Company's revenue accounts," and to bolster its staff and resources to meet its goals with respect to internal controls and reporting.

38. Notwithstanding all of its purported efforts in response to KPMG's identifying reportable conditions and resigning, Ebix failed to ameliorate significant internal control deficiencies. In fact, in the same 10-K the Company disclosed that its new auditor, BDO Seidman LLP ("BDO"), in the course of its

audit of the Company's 2004 financial statements, "identified certain significant deficiencies relating to the Company's internal control over financial reporting."

39.    A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects the Company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of the Company's annual or interim financial statements that is more than inconsequential will not be prevented or detected." The 2004 10-K further disclosed that "[t]he details of the significant deficiencies relate[] to the lack of accounting knowledge and leadership at foreign locations, inadequate documentation for certain accounting transactions, insufficient analysis and review of domestic account reconciliations, lack of documentation of development costs and related agreements, and the lack of documentation to support the Company's income tax provisions and related accounts.  Although Ebix purportedly improved its internal controls in response to the reportable conditions noted by KPMG, it did not disclose that it addressed the significant deficiencies noted by BDO stating only that it "will evaluate what steps it needs to take to address these significant deficiencies."

40.     In the very next paragraph in the 2004 10-K, however, Ebix described management's evaluation of the Company's internal controls in which defendant Raina participated.  Defendant Raina and others concluded "the Company's disclosure controls and procedures were effective to provide such reasonable assurance."  Thus, management, including defendant Raina, was incapable of discerning whether the Company's internal controls were adequate or to discover and correct significant deficiencies.

41.     BDO served as Ebix's independent auditor for the years 2004, 2005 and 2006.  As noted above, it reported "significant deficiencies" in Ebix's internal controls in 2004.  In 2005 and 2006, however, BDO did not audit Ebix's internal controls.  As it stated in its audit opinions dated March 10, 2006 and April 9, 2007:

> The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.[6]

42.     Thus, in 2005 and 2006, BDO did not perform the same assessment of internal controls as both KMPG and it had performed respectively in 2003 and

---

[6] In Ebix's Annual Report on Form 10-K for the year ended December 31, 2006 ("2006 10-K"), BDO's report contained the exact same language, expressing no opinion on Ebix's internal controls.

2004 respectively.  Rather, in its Annual Report on Form 10-K for the year ended December 31, 2005, Ebix management once again opined that "the Company's internal control over financial reporting is effective."  In so concluding, management focused on the supposed financial expertise of and communications among its accounting staff and that Ebix was a "relatively small organization."

43.    Ebix, however, was growing rapidly in the middle to the end of the last decade.  Total revenues grew from $19.983 million in 2004 to $29.253 million in 2006.  In 2006 alone, Ebix merged with Finetre Corporation and acquired all the assets of Infinity Systems Consulting, Inc., expending nearly $16 million in cash on those two transactions.

44.    Then, just as it was expanding by acquisition and increasing revenue exponentially, in a Current Report on Form 8-K, filed with the SEC on April 27, 2007, Ebix disclosed that on April 23, 2007, it had dismissed BDO as its independent auditor.  Ebix hired Miller Ray Houser & Stewart a small accounting firm with a fraction of BDO's resources.  That firm merged with Habif, Arogeti & Wynne, LLP ("Habif"), a larger firm, but still materially smaller than BDO.

45.    In its 2007 audit report, as BDO had disclosed before it, Habif stated that Ebix was not required to have an audit of its internal controls, and Habif did not perform one.  Once again, the assessment of Ebix's internal controls was left to

management which, in the Company's Annual Report on Form 10-K for the year ended December 31, 2007 ("2007 10-K") pronounced those controls "effective to ensure, among other things, that the information required to be disclosed by us in the reports that we file or submit under the Securities and Exchange Act of 1934 is accumulated, recorded, processed, and communicated accurately." In discussing why Habif did not audit Ebix's internal controls, management stated that its internal controls report "was not subject to attestation by the company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the company to provide only management's report in this annual report." Thus, in 2005, 2006 and 2007, Ebix's independent auditors did not audit it internal controls because they were not required to provide any assurances thereon. By the end of 2007, however, with the $11.25 million acquisition of Jenquest, Inc., Ebix had grown its revenues to $42.841 million a 46% increase over 2006.

46.     Beginning in 2008, however, the SEC's temporary suspension of its internal controls audit requirement was lifted. By Current Report on Form 8-K, dated December 19, 2008, Ebix disclosed that on December 12, 2008 Habif alerted Ebix that it would "not stand for re-appointment as Ebix's independent registered public accountant. . . ." Purportedly interested in exploring "reductions in the audit

cost structure," Ebix's Audit Committee had not approved the reappointment of

Habif.  Instead, defendants hired the relatively small firm of Cherry, Bekaert &

Holland, LLP ("CBH"), a southeast-based firm with no office located outside of

that geographic region and only 20 issuer clients as of September, 2007.[7]

47.     Strikingly, as Ebix has grown its revenue from $14.433 million in

2003 to $132.188 million in 2010, as it has acquired companies at a fast clip, and

as it has expanded its geographic reach well beyond the United States to India,

Singapore, Australia and Brazil, its audit fees have increased by only

approximately $50,000 from $290,000 for KPMG's 2003 audit to $339,600 for

CBH's 2010 audit.

48.     According to a July 16, 2011 article in *Barrons.com*, titled *Prolonging a Foreign Tax Holiday*, CBH's corporate-audit clients are mostly penny stocks and micro-cap companies.  About the Company's choice of CBH as independent auditor, defendant Raina stated in an email to *Barrons*, "[t]he Ebix audit committee reviews auditors every year.  For the sake of continuity, our audit committee has preferred not to change to a Big Three firm too suddenly."

49.     More, according to *Barrons*, Baweja & Kaul ("B&K"), a small Indian accounting firm, located in Delhi, audits Ebix's Indian subsidiaries.  The Public

---

[7] *See* PCAOB *Inspection of Cherry Bekaert & Holland, LLP*, September 24, 2007.

Company Accounting Oversight Board ("PCAOB") inspects foreign firms, including those in India, but has never inspected B&K.  CBH relied on B&K notwithstanding that the audit of Ebix's India subsidiaries' with a purported $38 million in revenue cost only $9,000.  *Barrons* noted that the PCAOB has recently expressed "great concern about the ability of small U.S.-based auditors to properly audit businesses in distant parts of the world."  When Barrons questioned him about CBH's supervision of B&K, defendant Raina replied, "[a]ll auditors test the work of overseas auditors."

50.     In 2008, notwithstanding that Ebix had dismissed Habif, the Company paid it $313,848 in "audit fees."  In 2008, however, Habif audited neither Ebix's financial statements nor its internal controls.  CBH, however, did.

51.     In fact, for the past three years, in 2008, 2009 and 2010, CBH audited Ebix's internal controls, opining that Ebix "maintained, in all material respects, effective internal control over financial reporting as of [the end of this fiscal year], based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)."

52.     CBH, however, is not without its own problems.  On September 24, 2007, the Public Company Accounting Oversight Board ("PCAOB") issued an

inspection report, noting deficiencies in a CBH audit, relating to its failure to "obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements. That deficiency was the failure to perform sufficient audit procedures to evaluate and assess revenue recognition." On December 16, 2010, the PCAOB issued another inspection report on CBH in which it identified another deficiency, relating to CBH's failure to obtain sufficient competent evidential matter relating to its use of a specialist, or non-accountant, in the course of its audit.

53. As the Class Period began, the Company's internal controls could not keep pace with its robust growth-by-acquisition. This would ultimately lead to the inability of the Company to record and disclose accurate financial statements to investors. More, the Company's growth was fueled by acquisitions while "organic" or internal growth was not nearly as robust as defendants would lead investors to expect.

54. Ebix was required by the SEC but failed to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with generally accepted accounting principles

("GAAP").[8]   Section 13(b) 2 of the Exchange Act entitled *Periodical and Other Reports* states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A.      make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B.      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that--
>
> i.      transactions are executed in accordance with management's general or specific authorization;
>
> ii.      transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
>
> iii.      access to assets is permitted only in accordance with management's general or specific authorization; and

---

[8] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

          iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

55.    As the shifting from auditor to auditor shows, during the Class Period, defendants knew or recklessly disregarded that the Company's internal controls could not keep pace with its aggressive growth-by-acquisition business plan. There were numerous internal control issues in connection with its acquisitions throughout the Class Period.  A good system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations.

56.    It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records.  This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").[9]

---

[9] Generally accepted auditing standards codified in AU §319, *Consideration of Internal Control in a Financial Statement Audit*, is based on the internal control framework described in the COSO Report.  The COSO report was issued in September 1992 as a four-volume set.  An A*ddendum to Reporting to External Parties* was issued in May 1994.

57.   The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations.[10] More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

58.   The COSO Report requires that financial statements prepared for external purposes are fairly presented in conformity with GAAP and regulatory requirements.  Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following:

- the accounting principles selected and applied have general acceptance;

- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

- the financial statements reflect the underlying transactions and events in a manner that presents the

---

[10] *See* COSO Report, Executive Summary.

financial position, results of operations and cash flows
stated within a range of acceptable limits, that is, limits
that are reasonable and practical to attain in financial
statements.[11]

59.     The COSO Report describes internal control within a certain

framework that consists of five separate components that are discussed herein.  It

requires that financial statements prepared for external use are fairly presented in

conformity with generally accepted accounting principles and regulatory

requirements.  The COSO Report defines five components of an internal control

framework that are needed to enable a business to achieve its objectives: (1) the

control environment, (2) risk assessment, (3) control activities, (4) information and

communications and (5) monitoring.

60.     Everyone in an organization has responsibility for internal control.

The CEO, however, sets the "tone at the top" that affects integrity, ethics, and

other factors of a positive control environment.  "In any organization, 'the buck

stops' with the chief executive.  He or she has ultimate ownership responsibility

for the internal control system.  The influence of the CEO on an entire organization

cannot be overstated."[12]  The chief executive fulfills this duty by providing

---

[11] *See* COSO Report, Chapter 3; *see also* Statement on Auditing Standards No. 69, *The Meaning of*
*"Present Fairly in Conformity With Generally Accepted Accounting Principles" in the*
*Independent Auditor's Report* (New York: AICPA, 1992).
[12] COSO Report, Chapter 8, p. 84.

leadership and direction to senior managers and reviewing the way they are

controlling the business.  The Addendum to the COSO Report makes it clear the

role Chief Accounting Officer, who, in the case of Ebix was defendant Kerris,

plays with respect to the internal control system.

61.     Specifically, the CEO, defendant Raina and the CFO, defendant

Kerris failed to comply with SEC regulations and the requirements of COSO.  As

described herein there were internal control deficiencies with respect to revenues

and related accounts receivables in connection with certain acquisitions.  Ebix's

internal control system failed to live up to the standards as set forth in the five

elements of an internal control framework described above.  Defendants Raina and

Kerris failed to maintain a proper tone and control awareness that focused on

achieving consistent application of accounting policies and procedures and strict

adherence to GAAP.  They failed to ensure that reconciliations, verifications and

monitoring activities were properly carried out.  As a result, they failed to discover

in a timely manner or recklessly disregarded deficiencies in Ebix's internal control.

62.     Among Ebix's internal control issues related to its inability to

maintain adequate internal controls in connection with the companies that it had

acquired both during and before the Class Period.  For example, a former senior

billing analyst at Ebix during the relevant period who reported directly to Ebix

corporate controller Sean Donaghy, was responsible for billing clients and posting cash to specific accounts.[13]  As an initial matter, the senior billing analyst related that Ebix only staffed two billing analysts in the United States, the same number that a much smaller Peak employed prior to the acquisition.  The senior billing analyst described that there was no mandate at Ebix as to how quickly she was required to post cash to specific customer accounts.  Instead, she posted cash received whenever she had the time, often in between her billing duties.  The senior billing analyst often fell well behind on her cash posting responsibilities.

63.    The senior billing analyst relates that defendant Raina was well aware of the problem with posting cash to customer accounts, but neither he, nor her direct report, Mr. Donaghy, attempted to rectify the cash posting problem.  Rather, they set the priority at Ebix of billing customers at the expense of timely and accurate cash posting.  The senior billing analyst confirmed that the delay in posting cash was always a problem during her tenure at Ebix, especially related to businesses Ebix acquired.

64.    A June 21, 2010 email from Anita Anjoubault transmitted to, among others, defendant Kerris, controller Donaghy, Darren Joseph and Elizabeth Toure confirmed the ongoing trouble Ebix had posting cash:

---

[13] The senior billing analyst left her employment in the summer of 2010.

We are now facing another quarter end, another audit, another public financial reporting. ***As of last quarter, our accounts receivable area became a major concern to senior management and to our stockholders***. In order to get the client accounts current and out of the severely past due status, senior management has conducted a companywide collection blitz, bringing in assistance from all divisions to help up out. To continue to work effectively and efficiently with collection, it is so very important for me and for senior management to know where we stand, as soon as possible. This helps us to be able to concentrate on the accounts that have not been paid. This push is also helping you to get ready for the next billing wave and to send out client statements in a timely manner.

*****

***Attached is a payments report showing that $488K of payments have been entered in PS [People Soft] but only approx. $147K has been posted to the GL. I trust the checks entered are ones that have to be researched. I know this is a big part of the delay in posting cash, so I need to work out a process in streamlining the researching time***. (Emphasis added).

65. GAAP requires losses from uncollectible receivables to be accrued by a charge to income when such losses are probable and reasonably estimable.[14] In its Form 10-Q for the first quarter 2009 filed with the SEC on May 8, 2009, Ebix disclosed that its "[a]ccounts receivable [were] stated at invoice billed amounts net of the estimated allowance for doubtful accounts receivable." Ebix also disclosed

---

[14] *See* FASB ASC 310-10-35-8 – 9.

its policy for determining the allowance for doubtful accounts receivable which states that "management specifically analyzes accounts receivable and historical bad debts, write-offs, customer concentrations, customer creditworthiness, current economic trends and changes in [its] customer payment terms when evaluating the adequacy of the allowance for doubtful accounts."[15]

66.    Ebix's ability to generate an accurate detail of accounts receivable showing its unpaid invoices and the amount of time those invoices have been outstanding – or a detailed aging of accounts receivable – is an essential element to carrying out its analysis of the allowance for doubtful accounts receivable.  Ebix, however, was unable to maintain an accurate detail of its receivables because of its inability to generate accurate invoices, accurately and promptly apply cash collected to specific invoices, and integrate accounts receivable systems of acquired companies.

67.    For example, on March 23, 2010, the senior billing analyst created an excel spread sheet titled "Collection Research All cust" that she transmitted to Ebix controller Sean Donaghy ("Donaghy") by email dated March 24, 2010.  The spread sheet detailed collection issues with at least 26 customers.  For example, for

---

[15] As stated in its periodic reports under "Summary of Significant Accounting Policies," the Company's policy for determining the allowance for doubtful accounts receivable remained substantially unchanged during 2009, 2010 and the first six months of 2011.

customer identification number FLEM100, the spreadsheet indicates that that nine

invoices had been emailed to the customer that went unpaid (invoice numbers

3507, 3571, 4105, 4418, 4663, 5163, 5194, 5526 and 5989).  The spread sheet

indicates "per Sean do not send customer anymore invoices.  Sean to review report

customer will fax him."  Another customer, identification number THIE, received

emailed invoices 5195, 5218, 5237, 5261, 5284, 5306, 5328, 5351, 5369, 5402,

5430.  Ebix continued attempting to collect on these invoices in mid-2010 even

though, the spread sheet indicates, "customer response – "contract cancelled

1/1/09."  Thus, Ebix was billing and recording amounts as receivable when the

customer had terminated the relationship.

68.    The senior billing analyst remembers another specific account listed

on the spread sheet with identification number WESTV01.  This customer, the

state of West Virginia, had outstanding invoices 5158 and 5424 and a notation that

"[a]ll open invoices w[ere] sent via email to Vickie who forward[ed] them to

James Harvey.  I'm waiting on a call back from James."  In investigating these

invoices, the senior billing analyst discovered that West Virginia had already paid

all invoices.  Notwithstanding that, Ebix continued to pursue payment until West

Virginia sent copies of cancelled checks written to Ebix.  Ultimately, West

Virginia opened for bidding the contract it had with Ebix.

69.     Ebix's inability to maintain an accurate detail of its receivables precluded it from conforming to its own policy and accurately determining the allowance for doubtful accounts receivable.  This limitation had the effect of misstating the balance of its trade accounts receivable and its bad debt expense.

70.     Thus, during the Class Period, Ebix was unable accurately to report its accounts receivable at their net realizable value as required by GAAP,[16] or to accrue for losses from uncollectible receivables.[17]

71.     The inability of defendants to report accurately accounts receivable or to accrue for losses therefrom is critical to Ebix's results.  Gross accounts receivable have grown from $16.371 million at March 31, 2009 to $36.256 million at March 31, 2011, an increase of 121%.  During that same time frame, revenue grew from $20.668 million, as of March 31, 2009 to $40.050 million as of March 31, 2011, and increase of 94%.  During the Class Period's span, growth in accounts receivable, therefore, has outpaced growth in revenue by 27%.  Comparing the third quarter of 2010 to the second quarter of 2010, highlights this point.  Revenue grew during that period from $32.207 million to $33.281 million, an increase of $1.074 million or 3.3%.  Gross accounts receivable grew from $25.048 million to

---

[16] *See*, FAS CON 5: Recognition and Measurement in Financial Statements of Business Enterprises, Par 67.d. *Net realizable (settlement) value*.
[17] *See*, FASB ASC 310-10-35-7-11.

$29.137 million, an increase of $4.089 million or 16.3%.  The failure of Ebix to accrue accurately for doubtful accounts receivable, therefore, was critical to the financial condition it touted.  Because Ebix could not accurately assess its allowance for doubtful accounts during the Class Period, it overstated its net income and diluted EPS during the Class Period.

72.     Confirming the control problems at Ebix as related by the senior billing analyst, on May 24, 2011, three former shareholders of Peak Performance Solutions, Inc. ("Peak") filed a lawsuit against Ebix, alleging breach of contract and fraudulent misrepresentation.  The allegations of the Peak shareholders' complaint substantiate the problems highlighted by the senior billing analyst and show them to be far more wide-spread.  According to the complaint ("Peak Complaint"), in purchasing Peak, Ebix agreed to an "Earn Out" based on Peak's 2010 revenue and the value of Peak's accounts receivable as of September 30, 2009.  In the Peak Complaint, the former shareholders alleged that Ebix violated the purchase agreement by failing to provide certified financial statements for Peak.

73.     In October, 2009, the former shareholders of Peak sold their company to Ebix for $8 million, in cash, plus an Earn Out of up to $1.5 million based on Peak's 2010 revenues.  The purchase agreement required Ebix to pay the earn out

within 5 days of the completion of Peak's audited 2010 financial statements but no later than 90 days after the end of 2010.  The purchase agreement also required Ebix to provide the shareholders Peak's audited financial statements for 2010.  Not only did Ebix fail to provide Peak's audited financial statements, but it failed to pay the Earn Out.

74.     Despite numerous contacts seeking audited financial statements, as of mid-May, 2011, Ebix admitted that it had not had Peak's financials independently audited and that it would take weeks to perform such an audit.  According to the shareholders, however, it was not Peak's accounting systems that prevented the production of audited financials, but that of Ebix.

75.     According to the Peak Complaint – confirming the statements of the senior billing analyst – Ebix "was consistently unable to properly bill customers, tie customer payments to invoices issued by Ebix on Peak's behalf, provide basic financial data or calculate Peak's revenue during the Earn Out Period."

76.     For example, immediately after acquiring Peak, Ebix transferred its billing function to Ebix's employees who were unable to understand or properly account for Peak's operations.  Ebix immediately fired five Peak employees, including the only one responsible for customer billing.  Ebix could not timely and properly invoice customers.  This caused Peak's business to suffer, as customers

left or reduced their business with Peak over the billing errors.  One such customer

was Sentry Insurance Company which was to retain Peak to provide services at

$7,500 per month during 2010.  Because of the invoice errors, Sentry did not retain

Ebix.  Notwithstanding that Peak's shareholders informed Ebix of these issues in

November 2009, Ebix did nothing.

77.     More, as a direct result of Ebix billing problems, it failed to allocate

Peak sales to the appropriate accounting period, likely overstating Peak's accounts

receivable and revenue for the fourth quarter of 2009.  In addition, with knowledge

of an overstatement of Peak's revenue during the fourth quarter of 2009, Ebix

simply reduced its 2010 revenue to correct for its mistakes in late 2009.

78.     Still further, having fired Peak's accounting personnel, Ebix was

immediately responsible for tracking customer payments.  Unable to tie payments

to invoices, Ebix was "unable to determine which customers had made payment for

which projects."  Once again, having fired Peak's accounting personnel

immediately, this was an Ebix-specific problem and not a legacy problem of

Peak's former management.  As a result, confirming the problems related by the

senior billing analyst with the accounts of the rest of the Company, Ebix was

unable to manage accounts receivable or to create and maintain accurate books and

records with respect to Peak.

79.     After purchasing Peak, Ebix retained as a senior vice president former
Peak shareholder Steven R. Isaac ("Isaac").  After assuming control of Peak, the
Peak Complaint relays, Ebix was consistently unable to provide Isaac basic
accounting information in response to his repeated requests.  When Ebix did
provide this information, it was riddled with errors.

80.     In response to the Peak shareholders' inquiries, Ebix could not and
cannot provide accurate numbers.[18]  For example, in April, 2011, defendant Kerris
provided an unsupported spread sheet purporting to reflect Peak's revenues during
2010.  The spreadsheet failed to reflect accurately the amounts Ebix actually
received from customers, indicating that some customers provided "negative
revenues" during 2010.  The spread-sheet Kerris provided showed $5.875 million
in 2010 revenue.  In December 2010, however, Ebix controller Donaghy provided
a calculation of Peak's revenues during 2010, something he updated in April 2011.
According to Donaghy, Peak billed $6.5 million during 2010.  Ebix is unable to
account for this discrepancy.  According to Ebix's own billing records, however,
Peak billed its customers $6.656 million in 2010.  Ebix is unable to resolve the

---

[18] On July 26, 2011, Ebix finally provide Peak financial statements, purportedly audited by CBH.  These numbers
were different still than those the Peak shareholders had received from each of Ebix controller Donaghy and
defendant Kerris.  In addition, the Peak shareholders allege in their Amended Complaint, "the financial statements
provided to Plaintiffs did not accurately account for Peak's revenue during the Earn Out Period, due to improper
adjustments offsets and changes in historical reporting practices, among other things."

material discrepancy between defendant Kerris, controller Donaghy and its own billing records.

81.     According to the Peak shareholders, the failure of Ebix's controls seeped into its cash flow management and revenue and expense tracking.  This directly affected its ability to attract new customers.  For example, to do business in West Virginia, Ebix was required to pay unemployment compensation premiums.  Ebix failed to pay that premium, disabling it from doing business in West Virginia.  As a result, Ebix lost a long-term Peak customer that contributed $65,000 in revenue annually.  In addition, Ebix had issues with its bank accounts as in March, 2010, it bounced several checks including a check to one of the former Peak shareholders.

82.     Defendants knew or were reckless in not knowing, too, that Ebix's accounts receivable collection mechanism was deeply flawed and yielded inaccurate information that it included in its financial statements.  For example, Ebix was required to pay the former Peak shareholders all pre-closing accounts receivable through September 30, 2009.  Ebix's inability to collect receivables relating to Peak's pre-closing accounts lead to approximately $250,000 in write-offs.  Ebix was unable either to track which customers had paid pre-closing receivables or to explain why invoices were still outstanding in 2011.

83.     The issues surrounding Peak were particularly important.  According

to the Company's Annual Report on Form 10-K for the year ended December 31,

2010 ("2010 10-K"), during 2010, Ebix "reversed the previously recorded $1.5

million contingent liability earn out obligation because during the subsequent 2010

earn out period the defined revenue targets were not achieved by the Peak

operations."  This enabled Ebix improperly to reduce its 2010 general and

administrative expenses by $1.5 million or 5.9% and increasing its income before

income taxes by 2.6%.

84.     As a result of the internal control weaknesses described above, Ebix

failed to comply with the requirements of COSO.  Ebix had a poor tone at the top

that emphasized the maximization of billings to customers over the requirement to

keep accurate records; Ebix was unable to perform basic verifications and

reconciliations, and defendants Robin Raina and Robert Kerris failed to adequately

monitor the activities within the receivables function at Ebix.  This was all the

more important given that Ebix's accounting staff was inadequate to perform these

necessary functions.

85.     Some of the same internal control issues that plagued Ebix during the

Class Period were very similar to the aforementioned internal control issues

identified by KPMG and  BDO Seidman, LLP ("BDO") during their respective

2003 and 2004 year-end audits of which defendants were aware or which they recklessly disregarded.

86. These very problems continued to plague Ebix during the Class Period as it grew exponentially by acquisition.

### Defendants Improperly Inflated Net Income and Diluted EPS by Means of an Improper Tax Strategy

87. Defendants materially overstated net income and diluted earnings per share ("EPS") for each reporting period during the Class Period by engaging in an improper and potentially illegal tax avoidance scheme. Defendants improperly claimed that Ebix had effective tax rates of 1.1% and 2.5% in 2010 and 2009 respectively. In support of this very low tax rate, defendants claimed that Ebix's India and Singapore subsidiaries enjoyed the benefit of a tax holiday. About this, the Company's Annual Report on Form 10-K for the year ended December 31, 2009 ("2009 10-K"), states:

> The Company's consolidated effective tax rate is reduced because of the blend of reduced tax rates in foreign jurisdictions where a significant portion of our income resides. Furthermore, the Company's world-wide product development operations and intellectual property ownership has been centralized into our Singapore and India subsidiaries. Our operations in India benefit from a tax holiday which will continue thru 2015; as such local India taxable income, other than passive interest and rental income, is not taxed. After the tax holiday expires taxable income generated by our India operations will be

taxed at 50% of the normal 33.99% corporate tax rate for a period of five years. This tax holiday had the effect of reducing tax expense by $5.5 million.

88.     The Company issued a substantially similar disclosure in its Annual Report on Form 10-K for the year ended December 31, 2010 ("2010 10-K"), quantifying the effect of the tax holiday on its tax expense at $11.5 million. Defendants did not quantify the effects of the tax holiday on Ebix's quarterly tax expense in its 10-Q filings.

89.     In pursuing this tax scheme, Ebix, in essence, transferred its income to its Indian and Singapore subsidiaries even as it earned over 70% of its revenues in the United States.  The following chart, derived from Ebix's Annual Report on Form 10-K for the year ended December 31, 2010 ("2010 10-K") indicates the steady decline in U.S. pre-tax income and increase in foreign income over the past four years.

|  | Year Ended December 31, 2006 | Year Ended December 31, 2007 | Year Ended December 31, 2008 | Year Ended December 31, 2009 | Year Ended December 31, 2010 |
|---|---|---|---|---|---|
| Domestic Income | 5.162 million (77.7%) | $12.823 million (97%) | $7.921 million (27.6%) | $14.501 million (36.4%) | $13.694 million (23%) |
| Foreign Income | 1.483 million | $376,000 | $20.778 million | $25.331 million | $45.960 million |

90.     This "tax holiday" has created a fantastic jolt to Ebix's net income and earnings per share.  For example, in 2008, the Company's reduced its United States statutory tax rate from 34% to 4.8%.  The tax impact of foreign subsidiaries accounted for approximately 70% of this reduction.  Employing the foreign tax strategy in 2008, Ebix was able to reduce its U.S. tax obligation by 20.3%.  Similarly, in 2009 and 2010 respectively, Ebix was able to reduce its U.S. tax obligations by 19.5% and 25.6% related solely to the tax holidays it enjoyed in India and reduced tax rates in Singapore.  By contrast, the tax impact of foreign subsidiaries on Ebix's 2007 effective tax rate was only 1%.

91.     Quantifying the impact of its foreign tax strategy for 2010, Ebix stated in the 2010 10-K, "[t]his tax holiday had the effect of reducing tax expense by $11.5 million" which had the effect of improving its diluted EPS by $0.29.  For 2009, the impact of the tax holiday was $5.5 million which improved diluted EPS by $0.14.

92.     Properly stated, therefore, Ebix should have recorded a tax expense of $12.135 million in 2010 and $6.51 million in 2009.  In 2010, Ebix reported net income of $59.019 million, up from $38.822 million in 2009.  Thus, by its own admission, had Ebix been unable to benefit from its foreign tax gambit in 2010, it would have reported net income of $47.519 million and diluted EPS of $1.22

instead of $1.51.  Similarly, in 2009, unable to employ its tax scheme, Ebix would

have reported net income of $33.322 million instead of the $38.822 it reported and

diluted EPS of $0.89 instead of $1.03 reported.  Thus, as a result of its tax scheme,

Ebix overstated its net income and diluted EPS by 24.2% in 2010.  Similarly, in

2009, Ebix overstated its net income and diluted EPS by 16.5% and 16.3%

respectively.

93.     Ebix's foreign tax strategy was, however, a sham.  First, it is critical

to note that according to the 2010 10-K, Ebix's Indian subsidiaries – Ebix Software

India Private Ltd and Ebix Software Asia SEZ Private Ltd – earned $0.00 revenue

from external customers in 2008, 2009, and 2010 while operations in Singapore

earned 2.6%, 1.9% and 3.1% of Ebix's total revenues respectively for those years.

That is so, according to the July 16, 2011 *Barrons* article, *Prolonging a Foreign

Tax Holiday*, because all income earned by the Indian subsidiaries results from

intercompany transactions with Ebix's other operations.[19]   Barrons noted that

"[t]he tax savings from Ebix's intercompany transactions with its subsidiaries in

Singapore and India have been crucial to the cash flow and profit that Raina's

produced at the U.S. parent."  Simply put, Ebix's other operating units are buying

---

[19] Ebix's own public filings confirm that the Indian subsidiaries' receivables were exclusively intercompany.  This is
so because generally accepted accounting principles ("GAAP") require that Ebix only report revenue for geographic
areas such as its Indian subsidiaries from external sources, excluding intercompany revenues.  *See* Financial
Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 280-10-50-4.1.

services and software from its India and Singapore subsidiaries, thus shifting

Ebix's earnings into those countries where they are taxed at much lower rates.

94.     GAAP presumes that "all undistributed earnings of a subsidiary will

be transferred to the parent entity"[20] and requires that a deferred tax liability be

recognized for this eventual transfer[21] unless "sufficient evidence shows that the

subsidiary has invested or will invest the undistributed earnings indefinitely."[22]

For those unrecognized tax liabilities that relate to undistributed earnings of a

foreign subsidiary which are permanently invested, GAAP requires a Company to

disclose the description and cumulative amount of those unremitted earnings and

the amount of the unrecognized deferred tax liability relating thereto or state

affirmatively that determination of such liability is not practicable.[23]

95.     GAAP also required the Company to record a deferred tax liability by

increasing its tax expense relating to such intercompany transactions if it did not

consider the resulting foreign earnings to be permanently re-invested in India.[24]

Defendants knew or should have known of this strict requirement and disclosed in

the 2010 10-K that "[t]he Company has not provided deferred U.S. taxes on its

unremitted foreign earnings because it considers them to be permanently re-

---

[20] *See* FASB ASC 740-30-50-25-3.
[21] *See* FASB ASC 740-30-50-25-5.
[22] *See* FASB ASC 740-30-50-25-17-18.
[23] *See* FASB ASC 740-30-50-2.
[24] *See* FASB ASC 740-30-50-25-3.

invested." The entirety of Ebix's foreign tax gambit, therefore, hinges upon whether it permanently re-invested the earnings of its Indian subsidiaries in India.

96.     According to Ebix's own public filings, however, it did not permanently re-invest its profits in India. According to *Barrons*' evaluation of Ebix's 2010 public filings in India, Ebix's subsidiaries reported revenue of $38 million from Ebix's other operating units. Those same public filings make it clear, according to *Barrons*, that the Indian subsidiaries' outstanding receivables were equal to a year's sales or approximately $38 million. *Barrons* stated, "at one point in 2010, in fact, receivables due from the U.S. parent ballooned to almost three years' worth of one Indian subsidiary's sales."

97.     These receivable balances indicate that Ebix's other operating units were not paying their bills to the Indian subsidiaries. Because cash being transferred to the Indian subsidiaries was significantly below the amount owed, the income that the Indian subsidiaries booked consisted almost entirely of paper gains that could not possibly have been permanently reinvested there.

98.     Confirming the sham nature of Ebix's transactions with its Indian subsidiaries, *Barrons* caught defendant Raina misrepresenting the flow of cash to Ebix's Indian subsidiaries. *Barron*s detailed that Indian regulatory filings "show several years in which receivables from Ebix U.S. swelled beyond a year's sales."

Disputing that fact, Raina stated in an email to *Barrons*, "[w]e were following a policy of clearing all intercompany [accounts receivable] with India within 365 days, which is within guidelines laid out by Reserve Bank of India." *Barrons* attributes to defendant Raina that "receivables in India are now down to $2 million or less than 100 days of sales, and, going forward, Ebix intends to clear all receivables with India within 120 days." Defendant Raina's statement about the receivables indicates that he understands the concerns *Barrons* raised after the Class Period's end and sought publically to alleviate any such concerns.

99.    Yet Ebix's own periodic reports to the SEC and investors belie Raina's contention about shrinking receivables, establishing that defendants knew or recklessly disregarded that Ebix reinvested little if any cash in its Indian subsidiaries. Indeed, throughout the Class Period, defendants disclosed in periodic reports to the SEC that Ebix purchased and continues to purchase certain derivative instruments "to hedge the intercompany receivables originated by our Indian subsidiary that are denominated in United States dollars." Defendants continued that the "U.S. dollar/Indian rupee hedges are intended to partially offset the impact of movement in exchange rates on future operating costs, and to reduce the risk that our earnings and cash flows will be adversely affected by changes in foreign currency exchange rates." In essence, by purchasing these hedge contracts,

defendants caused Ebix to insure that at least a portion of the intercompany receivables Ebix purportedly owed to its Indian subsidiaries would avoid the adverse effect of currency fluctuations.  For purposes of Ebix's tax gambit, however, this series of disclosures establishes a continuing and ever increasing minimum amount of receivables owed to Ebix's Indian subsidiaries.

100.   In its Current Report on Form 10-Q for the quarter ended June 30, 2011 and filed with the SEC on August 16, 2011, for example, defendants stated that "the notional value of these contracts. . . is $23.7 million."  That is, as of the date Raina wrote his email to *Barrons*, defendants knew or recklessly disregarded that the Indian subsidiaries' receivables were at least 10 times the amount Raina claimed to *Barrons*.[25]

101.   Throughout the Class Period and beyond, therefore, Ebix was failing to pay balances due from Ebix's other operating units to its Indian subsidiaries, in turn  failing to transmit the cash that it was required to relinquish and permanently reinvest in India to benefit from its tax holiday.  These intercompany receivables grew as the Class Period progressed.  While defendants knew of or recklessly disregarded these large intercompany receivable balances, investors and other users of Ebix's financial statements were unaware of this fact because Ebix

---

[25] Nor did that minimum receivables amount abate during the third quarter of 2011.  In Ebix's Quarterly Report on Form 10-Q for the quarter ended September 30, 2011, the Company reported notional value of its derivative instruments of $22 million.

eliminated such receivables in the consolidation of its financial results without providing other disclosures likely required by GAAP.

102.   Because Ebix was failing to transfer cash to its Indian subsidiaries, it was not – as it claimed – permanently re-investing that income abroad.  Defendants knew or recklessly disregarded that critical fact.  The failure permanently to re-invest that income precluded Ebix from excluding from its income taxable in the United States the earnings of its Indian subsidiaries.  By virtue of this tax strategy manipulation, defendants violated GAAP by failing to record an adequate tax expense and to reserve for such a liability.  As a result of its tax gambit, Ebix overstated its 2010 net income by 24.2% and its 2009 net income by 16.2%.

### By Artificially Inflating its Net Income and EPS Defendants Violated GAAP

103.   Due to the foregoing accounting improprieties, the Company represented its financial results and statements in a manner which materially violated GAAP, including the following fundamental accounting principles:

(a)   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

(b)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶ 40);

(c)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibility for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

(d)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on

evaluations of past enterprise performance (FASB Statement of Concepts

No. 1, ¶ 42);

(e)     The principle that financial reporting should be reliable in that it

represents what it purports to represent was violated.  That information

should be reliable as well as relevant is a notion that is central to accounting

(FASB Statement of Concepts No. 2, ¶¶ 58-59);

(f)     The principle of completeness, which means that nothing is left

out of the information that may be necessary to ensure that it validly

represents underlying events and conditions, was violated (FASB Statement

of Concepts No. 2, ¶ 79); and

(g)     The principle that conservatism be used as a prudent reaction to

uncertainty to try to ensure that uncertainties and risks inherent in business

situations are adequately considered was violated.  The best way to avoid

injury to investors is to try to ensure that what is reported represents what it

purports to represent (FASB Statement of Concepts No. 2 ¶¶ 95, 97).

104.   The undisclosed adverse information concealed by defendants during

the Class Period is the type of information which, because of SEC regulations,

regulations of the national stock exchanges and customary business practices, is

expected by investors and securities analysts to be disclosed and is known by

corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

105.   In addition, defendants were responsible for accurate financial reporting under the Sarbanes Oxley Act of 2002 ("SOX").  Congress enacted SOX "to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, and for other purposes."  To ensure the accountability of management in achieving these goals, SOX requires the principal executive officer or officers and the principal financial officer or officers of a company to certify their specific responsibilities over financial reporting, disclosures, and internal controls over financial reporting.  The principal officers, namely the CEO and CFO, are responsible for the company's publicly filed information, so that end users who rely on such information for decision making purposes can have a higher level of comfort based on the fact that the principal officers of the company were taking "ownership" of the financial information.  As stated above, defendants Raina and Kerris certified all of Ebix's financial statements during the Class Period, pursuant to SOX Section 302, 906, and 404.

**Defendants Misrepresented Critical Organic Growth Rates**

106.    About defendant Raina's claim of 11% organic growth in 2010,
*Barrons* noted, "[i]n the blur of 18 acquisitions, it's been hard to distinguish
acquired growth from organic growth."  In a roll-up like Ebix, however, organic
growth information is critical to investors who must determine whether increases
in revenue and income are acquired or are organic and sustainable.  In its March
24, 2011 analysis, Copperfield was far more scathing.  It stated that "Investors
have a distorted view of the company's organic growth profile (historically roll-ups
trade at low earnings multiples)."  Copperfield concluded that "the REAL organic
growth over the past two years appears to be relatively minimal."  Cautioning that
its analysis is an estimate, Copperfield stated, "estimating the contributions of
acquired businesses leads to the conclusion that Ebix has no growth," and that any
growth it shows relates to the impact of foreign exchange rates on revenue.

107.    Through the end of 2008, Ebix provided information that enabled
investors to create a crude analysis of organic growth.  For example, in its Annual
Report on Form 10-K for the year ended December 31, 2008 ("2008 10-K"), Ebix
gave investors a glimpse of growth rates by disclosing divisional breakdowns of its
revenue, noting how much each acquisition contributed.  Of its increase in 2008
revenues, Ebix stated:

> The increase in operating revenue is a result of both
> organic and acquisitive growth with the effect of recently

completed business combinations having greater impact.
We have consistently demonstrated the ability to quickly
integrate business acquisition into existing operations and
thereby rapidly leverage product cross-selling
opportunities. The specific components of our revenue
and the changes experienced during the past year are
discussed further below.

108.   In discussing revenue components in the 2008 10-K, Ebix broke down

the increase in 2008 revenue by legacy and acquired businesses.  For example,

with respect to its business process outsourcing ("BPO") unit, Ebix stated:

BPO division revenues increased $7.1 million which
includes revenue increases of approximately $5.5 million
from EbixBPO's-Hemet, CA operations (formerly IDS;
acquired in November 2007), $596 thousand from the
EbixBPO's-Portland, MI operations (formerly Periculum;
acquired in April 2008), and $1.1 million from
EbixBPO's-San Diego, CA operations (formerly
ConfirmNet; acquired in November 2008). EbixBPO's-
Hemet, CA operation represents the headquarters of the
newly formed EbixBPO division.

109.   Investors were able to glean from this information the amount of

revenues purchased versus the amount attributable to Ebix's legacy operations.  In

the case of Ebix's BPO division, the entirety of its revenue growth in 2008 was

attributable to acquisitions.

110.   In reporting the first quarter of 2009, however, defendants replaced

the clarity of that disclosure with unit revenue figures that failed to distinguish

between revenue achieved through legacy operations and revenue achieved

through acquisition.  In its Quarterly Report on Form 10-Q for the quarter ended

March 31, 2009, for example, Ebix excised the information distinguishing among

legacy versus acquired revenue sources, stating:

> During the three months ended March 31, 2009 our
> operating revenue increased $4.0 million or 24%, to
> $20.7 million in the first quarter of 2009 compared to
> $16.6 million during the first quarter of 2008. The
> increase in our first quarter 2009 revenue as compared to
> the first quarter of 2008 is a the result of a $2.6 million
> increase in our health insurance exchange division
> revenues, a $1.5 million increase in our annuity and life
> insurance exchange division revenues , and a $1.7
> million increase in BPO division revenues, partially
> offset by a $1.5 million decrease in our property and
> casualty insurance exchange revenues primarily due to
> the effect of fluctuation in foreign currency exchange
> rates effecting reported results.

111.   By early 2009, the start of the Class Period, therefore, the Company's

disclosures were completely opaque, disabling investors from analyzing and

determining organic growth.  Gone from defendants' disclosures on revenue

growth was any breakdown of the contribution of acquisitions to revenue and the

growth of legacy operations.

112.   Defendants excised this information from Ebix's public filings

because they knew or recklessly disregarded that Ebix's organic growth rates were

actually declining, meaning that the only way it could continue to grow revenue

was by acquisition.  Several former employees of acquired companies whom Ebix

either employed post-acquisition or with whom it had continuing dealings confirmed this stalled growth.

113.   For example, a former Ebix account manager, who had worked for E-Z Data prior to the acquisition and continued to work for Ebix until early 2011, confirmed declining growth.  The account manager recounted that after acquiring E-Z Data, Ebix laid-off a number of E-Z Data personnel, claiming to trim the fat. In addition, Ebix cut remaining employees' salaries by 10%, explaining that without the cuts it would have to terminate more employees.  In particular, the account manager related, to centralize administrative functions, Ebix terminated all but one of E-Z Data's administrative staff including the sales operations function. As a result of that centralization, the E-Z Data sales force became less effective as they assumed sales operations work in addition to their normal functions. Ultimately, according to the account manager, Ebix was forced to add sales staff. The account manager departed from Ebix because he saw no growth opportunities for himself or the company.  Having been with the company for three years, he saw little noticeable organic growth.

114.   A senior application developer with Infinity Systems who worked at Ebix through mid-2011 and reported to John Schmitt, VP of development, confirms that like E-Z Data, Infinity Systems, too, was experiencing no organic

growth.  Indeed, the senior application developer was terminated in May, 2011 because there were not enough sales to justify keeping staff.  According to the senior application developer, the former Infinity Systems group was not getting new clients because Ebix's sales force was not selling the products his group was developing.  When Ebix purchased Infinity Systems, the senior application developer related, it was simply buying companies like they were on EBay.  At the time, Ebix told Infinity Systems personnel that they would receive support from Ebix, such as network support.  Ebix, however, never satisfied those promises as promised infrastructure help failed to materialize.

115.   In addition, the senior application developer related his experience dealing with Ebix's software developers in India.  He stated that Infinity Systems required good software engineers whom, he believed, Ebix could have hired in Virginia.  Instead, the group was told to include Ebix software engineers from India.  While he praised some of Ebix's Indian software development staff, he stated that no good results came from his sending work to India for completion.

116.   As the Copperfield research note demonstrated, therefore, Ebix was not growing organically as defendants claimed throughout the Class Period. Rather, according to its public filings, Ebix spent only $6.4 million on sales and marketing in 2010 or less than 5% of revenue.  "[T]his absolute spend," according

to public filings of Ebix and ADAM – a public company that Ebix acquired during the first quarter of 2011 – "was less than Adam's stand-alone sales and marketing expense. ADAM was 1/20th the size of Ebix." Copperfield continued that in 2010, Ebix spent only $13.6 million on product development or 10% of its sales, consistent with mature industrial companies and not growing technology companies.

117. Supporting the conclusions of Copperfield, a former senior executive of Connective Technologies, Inc., confirmed not only the experience of Peak with respect to Ebix's inability to provide accurate financials on which to base his earn out, but the lack of a plan to grow Connective or, indeed, Ebix as a whole. According to this senior executive, he asked Raina directly how Ebix would grow Connective's business. Raina had no plan, instead promising either to hire more personnel or to outsource the function of marketing the product. According to this former senior executive, Ebix had dramatically understaffed its marketing department. He related that a company of Ebix's size should have ten to fifteen marketing personnel while Ebix only staffed two. While Raina promised the senior executive that he would hire additional marketing staff, Ebix did not meet that promise. The senior executive said that while Ebix had accumulated some

marketable products, Raina purposefully avoided adding staff to promote those product additions adequately.

118.   The lack of adequate sales and marketing staff, commitment to products and customers of acquired units, or adequate research and development spending, organic growth is implausible – all facts of which defendants were aware or that the recklessly disregarded – belie claims of double digit organic growth.

119.   By failing to disclose either accurate organic growth rates or information that would enable investors to reach their own conclusions, Defendants violated SEC regulations regarding financial and non-financial reporting.  Public companies are required by the SEC to adhere to, among other things, rules and regulations regarding financial and non-financial reporting and disclosures.  These rules are set forth in the Securities Act of 1933 and the Securities Exchange Act of 1934 and regulations promulgated thereunder.

120.   For example, Regulation S-X sets forth the form and content requirements for financial statement to be filed with the SEC.  As a public company bound by this regulation, Ebix was required to file an annual report with the SEC on Form 10-K, which includes financial statements prepared in conformity with GAAP. The SEC requires that certain disclosures supplement a

company's quarterly and annual financial statements to help investors better understand a company's financial condition.

121.   Specifically, SEC Regulation S-K, Item 303, requires that each quarterly Form 10-Q and annual Form 10-K include a narrative explaining the financial statements and the changes in financial condition of the company "through the eyes of management."  Interpretative guidance prepared by the SEC – Financial Reporting Release No. 36 ("FRR 36"), *Management's Discussion and Analysis of Financial Condition and Results of Operations* – further discusses the disclosure requirements of Regulation S-K, Item 303.  SEC Staff Accounting Bulletin ("SAB") Topic 13B requires disclosure of a policy for each material type of transaction.  This SAB (SAB 101) requires the following disclosures with respect to revenue recognition in the Management's Discussion and Analysis ("MD&A") section of the Form 10-K:

> MD&A requires a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.[26] This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue…The Commission stated in FRR

---

[26] *See* Regulation S-K, Article 303 and FRR 36.

36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."[27]

122.   Specifically, Regulation S-K, Item 303 (a) (3) (ii) requires that issuers "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. . . ."

123.   Ebix failed to disclose the aforementioned required information in its Forms 10-K during the class period.  Further, Ebix omitted certain information that, under all of the circumstances, was likely required, concerning its acquisitions during the class period.  SEC Rule 3-05(b)(2)(i) of Regulation S-X requires that companies look at its acquisitions in combination and they therefore cannot pass off their acquisitions as individually insignificant.  Had Ebix furnished separate financial statements of the individual acquirees, investors would have been in a position to calculate the acquired growth of Ebix as compared to its true organic growth.

124.   As a result, defendants knew or recklessly disregarded that the organic growth rates they touted to investors were materially inflated, that Ebix was

---

[27] FRR 36, also in the matter of Matter Caterpillar Inc., AAER 363 (March 31, 1992).

suffering from anemic or negative organic growth, and that the Company was growing only through acquisition.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

### *Ebix Discloses Its Financial Results for the First Quarter of 2009*

125.   On May 6, 2009, the first day of the Class Period, Ebix issued a press release, disclosing it financial results for the first quarter of 2009, ended March 31, 2009.  Ebix recorded first quarter 2009 revenue of $20.67 million up from $16.64 million for the same quarter in 2008, a 24% increase.  According to defendants, "[n]et income after taxes for the quarter rose 47 percent to $8.34 million, or $0.69 per diluted share, up from $5.67 million, or $0.47 per diluted share, in the first quarter of 2008 - earnings per share growth of 47 percent."  The Company recorded an income tax provision of $196,000 in the first quarter of 2008.  The Company also booked accounts receivable for the quarter of $15.918 million, net an allowance of $453,000, an increase from $13.562 million net of an allowance of $453,000 as of December 31, 2008.  Defendants reiterated these results both in its Quarterly Report on Form 10-Q for the quarter ended March 31, 2009, filed with the SEC on May 8, 2009 and signed by defendants Raina and Kerris, and in a presentation on an earnings conference call on May 6, 2009.

126.   Of these results, in the May 6, 2009 press release, defendant Raina touted the Company's improving net margins in the context of the then current difficult economic environment and adverse effects relating to foreign exchange issues.  "Considering all that," defendant Raina stated, "this has been a satisfying quarter to the extent that it helps underline the fundamental strength of the company today. Our repetitive revenue streams and infrastructure based transaction services, helped ensure that Ebix continues to grow its revenues, net income and net margins steadily."

127.   Concluding his remarks on the quarter in the press release with remarks he would restate in the earning conference call, Raina stated:

> In January 2009, we had announced that Ebix has received a 100% tax-free status till 2014, for its new development operations in India under the Software Export Zone (SEZ) act of the Govt. of India.  This new building - our third in India will be fully functional in a few days from now, resulting in giving Ebix a continued tax break along with another world class facility to support our continued growth.

128.   On May 6, 2009, defendants convened and conducted an earnings conference call.  During his presentation, defendant Raina reiterated the financial results Ebix had announced in its press release.  With respect to Ebix's controls, Raina stated:

Now, all this when you do stuff like that, and put controls
in place, you can't compromise nimbleness. So, what we
have done is we have created systems across the world so
that while the controls are in place we're not losing in
terms of our efficiency. Having said that, you see
expense control is the journey. When you can't -- you can
never be sure that you have everything under control.
You have to be absolutely on the watch, each and every
day virtually, to make sure you are doing it right.

129.    During the question an answer portion of the May 6, 2009 earnings

conference call, investors questioned defendants Raina and Kerris about Ebix's tax

rates.  For example, one investor asked about Ebix's very low tax rates as a result

of tax holidays its Indian and Singapore subsidiaries enjoyed, an investor asked,

whether the tax holiday for the Company's existing India subsidiary expired in

2010.  In response, Raina stated:

Well, the other tax holiday is basically a -- it's starting in
the March of 2010. However, it is -- at the present
moment, the Government of India has made some
announcement, they're in an election period right now in
India. But before they went into elections, they basically
made some announcement that we're extending it for
another two years. It's not yet a bill, but most likely to
happen, the extension of two years. In any case, we have
almost insulated ourselves, whether they extend it or they
don't extend it. (inaudible) the new facility that we have
in place.

130.    Another investor questioned defendants Raina and Kerris about the

Company's "organic growth potential" in the context of its revenue opportunities

over the next 3-5 years.  In response to this question, defendant Raina answered, in

relevant part:

> Well I think, first of all, is the revenue opportunity.  If
> we're discussing opportunity, I mean, we -- the market
> size is almost $59 billion meaning in terms of just the
> amount that you are spending on paper-based processes
> of insurance alone.  So, clearly to me that is opportunity.
> Now, what can Ebix do in that?  And I don't -- I hate to
> answer that because I don't want to be issuing any
> guidance on revenues.
>
> Having said that, I think we have consistently grown our
> revenue. Meaning, if you go to our website you'll see a
> particular presentation there, which walks you through
> some of the organic growth rate last year.  And once you
> take out all that commission, you'll see it's a 22, 23, I
> think it's 27% actually.  The organic growth rate.  So, it's
> -- we have done decently well with cross-selling.  In a
> time like this when new capital decisions are harder to
> come by, we have continued cross selling and using --
> launching new products and opening up new areas, and
> so on, and so that has kept our revenue growing.
>
> And clearly, we will make a few acquisitions, and
> coming back to the second question on acquisitions, we
> clearly will make a few acquisitions.  You could see us
> make possibly, you will -- you could see us go after two
> kinds of companies.  One are relatively smaller
> acquisitions, a kind of acquisition we have made in the
> past, which tend to be, have to - have always been
> accretive.  We have never made an acquisition that was
> not accretive on day one.  And then there is, there are
> larger opportunities.  You could possibly see us going
> after some larger acquisitions, but the only case in which
> we'll go after a larger acquisition is only if we see a slam-
> dunk situation.

> If we see our -- this has the next big life changing step for
> us, then only we'll go after that.  And clearly, even when
> we do that, we are very simplistic in that approach.  We
> expect accretiveness on day one, rather than as a long
> term objective.  So, our staff always become harder when
> we are looking at acquisitions, because we're almost
> trying to make an acquisition with accretiveness in the
> first quarter.  And that's been our history, and we feel
> that's the benchmark we're getting evaluated by, and we
> want to stick to that.

131.   On May 8, 2009, the Company filed its Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 signed by defendants Raina and Kerris.  In addition, as stated above, both Raina and Kerris certified the Company's financial results for the first quarter of 2009, ended March 31, 2009.

132.   The May 8 10-Q also discusses Ebix's accounting for income taxes. Note 4 to the financial statements boasts and effective income tax rate of 4.7% for the quarter, down .522% from the same period in 2008.  According to the Company, it bases its interim period tax provision on its "current estimate of the effective income tax rates applicable to the related annual twelve month period, after considering discrete items unique to the respective interim reporting period." The Company further boasted that its tax rate decline in 2009 was related "to the change in the mix of taxable income amongst the various domestic and foreign

countries, including certain low tax rate foreign jurisdictions, in which the

Company conducts operations."

133. About the taxes on its Indian operations, the 10-Q stated:

> Currently, in India the Company's local taxable income, other than passive interest and rental income, is subject to a tax holiday. The tax holiday is scheduled to expire in 2010. The Company's operations in India are also subject to the 11.33% Minimum Alternative Tax ("MAT"). For the three month period ended March 31, 2009 the Company's MAT liability was $396 thousand. The tax paid under the MAT provisions is carried forward for a period of seven years and set off against future tax liabilities computed under the regular corporate income tax provisions, for which the current income tax rate is 33.99%. Accordingly, the Company's consolidated balance sheet at March 31, 2009 includes a long-term deferred tax asset in the amount of $1.6 million.

134. About the Company's accounts receivable, the 10-Q related that

"Management specifically analyzes accounts receivable and historical bad debts,

write-offs, customer concentrations, customer credit-worthiness, current economic

trends and changes in our customer payment terms when evaluating the adequacy

of the allowance for doubtful accounts." Defendants further related that Ebix

writes-off accounts receivable "to the allowance account when the Company has

exhausted all reasonable collection efforts. During the three months ending March

31, 2009 and 2008 there were no accounts receivable written off."

135.    Also in that Form 10-Q, defendants discussed their evaluation of

internal control over financial reporting and their evaluation of disclosure controls

and procedures, stating:

> *Evaluation of Disclosure Controls and Procedures*. As
> required by Rule 13a-15(e) and 15d-15(e) under the
> Securities Exchange Act of 1934, an evaluation was
> carried out under the supervision and with the
> participation of our management, including the Chief
> Executive Officer and Chief Financial Officer, of the
> effectiveness of the design and operation of our
> disclosure controls and procedures as of March 31, 2009.
> Based upon this evaluation, our Chief Executive Officer
> and Chief Financial Officer have concluded that, as of
> March 31, 2009, our disclosure controls and procedures
> were effective to provide reasonable assurance that
> information required to be disclosed in the reports that
> we file or submit under the Securities Exchange Act of
> 1934 is accurately and properly recorded, processed,
> summarized and reported within the time periods
> specified in the applicable rules and forms and that it is
> accumulated and communicated to our management,
> including our Chief Executive Officer and Chief
> Financial Officer, as appropriate, to allow timely
> decisions regarding required disclosure.
>
> *Internal Control over Financial Reporting*. There were
> no changes in our internal control over financial
> reporting during the fiscal quarter ended March 31, 2009,
> that have materially affected, or are reasonably likely to
> materially affect, our internal control over financial
> reporting.

136.    The foregoing statements about the first quarter of 2009 were false or

misleading.  As stated above in paragraphs 33-86 and 103-105, defendants knew or

recklessly disregarded that serious internal control problems plagued Ebix since 2003.  These internal control problems did not improve throughout the Class Period.  As a result, defendants knew or recklessly disregarded that Ebix was unable to account for its accounts receivable accurately or to post cash timely and accurately.  Defendants, therefore, were unable to assess accurately Ebix's need to reserve for bad debts in the face of its mounting accounts receivable.  Accordingly, throughout the Class Period, in violation of GAAP, defendants knew or recklessly disregarded Ebix understated its allowance for doubtful accounts, enabling it to overstate its net income and diluted earnings per share.

137.   In addition, as stated above in paragraphs 87-105, throughout the Class Period, defendants knew or were reckless in not knowing that Ebix was overstating net income and diluted EPS by means of a sham tax strategy that shifted profits overseas, profits, defendants knew or recklessly disregarded, that Ebix was not permanently reinvesting in the foreign jurisdictions.  By means of this sham tax strategy, in violation of GAAP, defendants knew or recklessly disregarded that Ebix overstated net income in 2009 by 16.5% and 2009 diluted EPS by 16.3%.

138.   Last, as stated above in paragraphs 106-124, defendants knew or recklessly disregarded that throughout the Class Period, they disclosed materially

inaccurate organic growth rates, a critical metric for investors in the case of a roll-up such as Ebix.  In fact, as defendants knew or recklessly disregarded, Ebix's legacy operations were not growing organically.  Rather the Company was growing only through acquisition.

### Ebix Discloses Its Financial Results for the Second Quarter of 2009

139.   On August 5, 2009, the Company issued a press release, detailing its financial and operating condition for the second quarter of 2009, ended June 30, 2009.  Ebix recorded second quarter 2009 revenue of $22.42 million up 26% from $17.80 million for the same quarter in 2008.  Defendants boasted that "[n]et income after taxes for the quarter rose 41 percent to $8.96 million, or $0.73 per diluted share, up from $6.34 million, or $0.54 per diluted share, in the second quarter of 2008 - an earnings per share growth of 35 percent."  For the quarter, the Company recorded an income tax provision of $416,000.  The Company also booked accounts receivable for the quarter of $16.394 million, net an allowance of $548,000, an increase from $13.562 million net of an allowance of $453,000 as of December 31, 2008.  Defendants reiterated these results both in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2009, filed with the SEC on August 7, 2009 and signed by defendants Raina and Kerris, and in a presentation on an earnings conference call on August 5, 2009.

140.   About these results, defendant Raina stated in the August 5 press release:

> We are pleased that the second quarter results are in line with our expectations.  The insurance industry continues to pass through a difficult phase with capital decisions related to deployment of backend systems being postponed or just being put into cold storage for want of budget or focus.  Considering that inertia, and the adverse impact of the significant strengthening of the US dollar on our financial results in the second quarter of 2009 as compared to the second quarter of 2008 (as much as 15% with respect to Indian Rupee, 20% with respect to Australian dollar, 22% with respect to New Zealand dollar, and 7% with respect to Singapore dollar); we are pleased that our revenues and net income both have still continued to grow.  The current times have been a good test of our infrastructure-based On-Demand software exchanges, our recurring revenue model, and the expanse of our customer base.
>
> We are especially pleased that net margins after taxes in the second quarter grew to 40% from 36% in the same quarter last year.  The exchange and BPO channels continued to grow in a healthy manner and more than made up for the slight decrease in revenues associated with postponed implementations and delayed decision making relating to back-end systems that took place in the broker and carrier channels.  The second quarter saw the exchange channel become 59% of our total revenues while the BPO channel accounted for 16% of our revenues.  Broker systems business accounted for 13% and the carrier channel accounted for 12% of our worldwide revenues.

141.   Also in the August 5, 2009 press release, defendant Kerris stated:

> The Company continues to produce substantial cash from its operating activities generating $15.54 million during the six months ending June 30, 2009 representing a 46% improvement over the same period in 2008, while at the same time sustaining attractive operating margins of 41% for both the second quarter and six-month periods of 2009, both improvements in our performance since 2008.

142.   Also on August 5, 2009, defendants convened and conducted an earnings conference call.  During his presentation, defendant Raina reiterated the financial results Ebix had announced in its press release.  He also touted the effectiveness of Ebix's systems and operations, stating:

> we decided to invest in creating effective systems and effective operations. We decided to aggressively consolidate, streamline, standardize and centralize our back office activities. We believe then efficient business with controls will help us have a better handle on our own destiny, rather than deal with surprises towards the end of each quarter. With 20-plus offices across the globe, it was important for us to establish controls that had a check and balance mechanism built into them, while not compromising on nimbleness.

143.   During the question and answer session with analysts, Raina discussed the Company's tax rates with analyst Eileen Segall as follows:

> EILEEN SEGALL: Right now your earnings are benefiting from an extremely low tax rate, which seems to be temporary. Once you work through the NOLs and the tax holiday, maybe out in 2011, what should I think of as a tax rate?

ROBIN RAINA: Well, first of all, our tax holiday is until 2014. And then after 2014 we have a 50% tax holiday until 2019 and basically referring to India. Now, when you look at our overall tax rate, I could not hazard and give you a number, because it's too early for me to give you a number and tell you this is where we think we are headed. But like I said, we are in the midst of a tax [review]. We do not think that there is going to be dramatic changes on our tax rate. I think you will see a gradual change and that gradual change will happen over a period of time. You're not going to see some dramatic changes there. And part of it is because we are widely spread out and we have tax advantages of being in different places around the world.

EILEEN SEGALL: What portion of your earnings are subject to the tax holiday?

ROBIN RAINA: The tax holiday is only in India. In the US we have NOLs that are only usable in the US. But then as I said, we have a tax structure worldwide that takes advantage of India, where India gets paid on (inaudible) basis based on (inaudible) rules and that allows India to -- since India is tax free, that's quite advantageous to us.

EILEEN SEGALL: So looking out after you've used all your NOLs, we're not looking at a typical 30 to 40% tax rate kind of long term?

ROBIN RAINA: No, you're not looking at that rate and like I said, it's very difficult for me to give you a particular number right now, but purely because in the mix of the strategy but what you're going to see is a gradual upswing. You could possibly see over a period of time these rates going up to possibly 10 then 11 and so on. You're not going to suddenly see the rate jump up to 30 or 29 or 25.

144.   On August 7, 2009, the Company filed a Quarterly Report on Form

10-Q for the quarter ended June 30, 2009 signed by defendants Raina and Kerris.

In that Form 10-Q, defendants reiterated the Company's results from the August 5,

2009 press release.  In addition, as stated above, both Raina and Kerris certified the

Company's financial results for the second quarter of 2009, ended June 30, 2009.

145.   In that Form 10-Q, the Company boasted of its continued expansion,

"both organically and through a series of acquisitions. . . ."  Indeed, during the

second quarter of 2009, the Company acquired Facts Services, Inc. for $6.5 million

in cash, combining it with its EbixHealth division.  The reported results from the

second quarter of 2009 included those of Facts Services, Inc.

146.   The May 8 10-Q also discusses Ebix's accounting for income taxes.

Note 10 to the financial statements boasts and effective income tax rate of 4.81%

for the six months ended June 30, 2009, down .89% from the same period in 2008.

According to the Company, it bases its interim period tax provision on its "current

estimate of the effective income tax rates applicable to the related annual twelve

month period, after considering discrete items unique to the respective interim

reporting period."  The Company further boasted that its tax rate decline in 2009

was related "to the change in the mix of taxable income amongst the various

domestic and foreign countries, including certain low tax rate foreign jurisdictions,

in which the Company conducts operations."

147.   About the taxes on its Indian operations, the 10-Q stated:

> Currently, the Company's local taxable income in India, other than passive interest and rental income, is subject to a tax holiday. The tax holiday is scheduled to expire in 2011. The Company's operations in India are also subject to the 11.33% Minimum Alternative Tax ("MAT"). For the three month and six periods ended June 30, 2009 the Company's MAT liability was $343 thousand and $739 thousand respectively. The tax paid under the MAT provisions is carried forward for a period of seven years to be used as an offset against future tax liabilities computed under the regular corporate income tax provisions, for which the current income tax rate is 33.99%. Accordingly, the Company's consolidated balance sheet at June 30, 2009 includes a long-term deferred tax asset in the amount of $2.1 million.

148.   About the Company's accounts receivable, the 10-Q again stated that

"Management specifically analyzes accounts receivable and historical bad debts,

write-offs, customer concentrations, customer credit-worthiness, current economic

trends and changes in our customer payment terms when evaluating the adequacy

of the allowance for doubtful accounts."  Defendants further related that Ebix

writes-off accounts receivable "against the allowance account when the Company

has exhausted all reasonable collection efforts. No accounts were written off as

uncollectible during the six months ending June 30, 2009 and 2008 respectively."

149.   Also in that Form 10-Q, defendants discussed their evaluation of

internal control over financial reporting and their evaluation of disclosure controls

and procedures, stating:

> *Evaluation of Disclosure Controls and Procedures*—As
> required by Rule 13a-15(e) and 15d-15(e) under the
> Securities Exchange Act of 1934, an evaluation was
> carried out under the supervision and with the
> participation of our management, including the Chief
> Executive Officer and Chief Financial Officer, of the
> effectiveness of the design and operation of our
> disclosure controls and procedures as of June 30, 2009.
> Based upon this evaluation, our Chief Executive Officer
> and Chief Financial Officer have concluded that, as of
> June 30, 2009, our disclosure controls and procedures
> were effective to provide reasonable assurance that
> information required to be disclosed in the reports that
> we file or submit under the Securities Exchange Act of
> 1934 is accurately and properly recorded, processed,
> summarized and reported within the time periods
> specified in the applicable rules and forms and that it is
> accumulated and communicated to our management,
> including our Chief Executive Officer and Chief
> Financial Officer, as appropriate, to allow timely
> decisions regarding required disclosure.
>
> *Internal Control over Financial Reporting*—There were
> no changes in our internal control over financial
> reporting during the six months ended June 30, 2009, that
> have materially affected, or are reasonably likely to
> materially affect, our internal control over financial
> reporting.

150.   The foregoing statements about the second quarter of 2009 were false

or misleading.  As stated above in paragraphs 33-86 and 103-105, defendants knew

or recklessly disregarded that serious internal control problems plagued Ebix since 2003.  These internal control problems did not improve throughout the Class Period.  As a result, defendants knew or recklessly disregarded that Ebix was unable to account for its accounts receivable accurately or to post cash timely and accurately.  Defendants, therefore, were unable to assess accurately Ebix's need to reserve for bad debts in the face of its mounting accounts receivable.  Accordingly, throughout the Class Period, in violation of GAAP, defendants knew or recklessly disregarded Ebix understated its allowance for doubtful accounts, enabling it to overstate its net income and diluted earnings per share.

151.   In addition, as stated above in paragraphs 87-105, throughout the Class Period, defendants knew or were reckless in not knowing that Ebix was overstating net income and diluted EPS by means of a sham tax strategy that shifted profits overseas, profits, defendants knew or recklessly disregarded, that Ebix was not permanently reinvesting in the foreign jurisdictions.  By means of this sham tax strategy, in violation of GAAP, defendants knew or recklessly disregarded that Ebix overstated net income in 2009 by 16.5% and 2009 diluted EPS by 16.3%.

152.   Last, as stated above in paragraphs 106-124, defendants knew or recklessly disregarded that throughout the Class Period, they disclosed materially

inaccurate organic growth rates, a critical metric for investors in the case of a roll-up such as Ebix.  In fact, as defendants knew or recklessly disregarded, Ebix's legacy operations were not growing organically.  Rather the Company was growing only through acquisition.

### Ebix Discloses Its Financial Results for the Third Quarter of 2009

153.   On November 4, 2009, Ebix issued a press release, disclosing it financial results for the third quarter of 2009, ended September 30, 2009.  Ebix recorded third quarter 2009 revenue of $23.29 million up 16% from $20.17 million for the same quarter in 2008.  Defendants again boasted of a substantial earnings increase, stating, "[n]et income after taxes for the quarter rose 28 percent to $9.43 million, or $0.76 per diluted share, up from $7.40 million, or $0.62 per diluted share, in the third quarter of 2008- earnings per share growth of 22 percent."  The Company reported an income tax provision of $313,000.  The Company also booked accounts receivable for the quarter of $18.660 million, net an allowance of $548,000, an increase from $13.562 million net of an allowance of $453,000 as of December 31, 2008.  Defendants reiterated these results both in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2009, filed with the SEC on November 11, 2009 and signed by defendants Raina and Kerris, and in a presentation on an earnings conference call on November 4, 2009.

154.   Of these results, defendant Raina stated in the November 4 press

release:

We are pleased that the third quarter results are in line
with our expectations.  We are especially pleased that net
margins after taxes in the third quarter grew to 41% from
37% in the same quarter last year.  We feel good about
our consistent revenue streams and believe that the
company has the ability to continue our growth both
organically and through strategic acquisitions.

These are both very strategic acquisitions that allow us
cross selling opportunities, as also help us take a giant
leap forward in terms of making the dream of end-to-end
computing possible.  We intend integrating them within
Ebix on a war footing and in the most sensible fashion
with the aim of leading the industry, accompanied by
short term and long term accretiveness for our
shareholders.

In recent times, we have been repeatedly asked by
investors, for some guidance on the impact of EZDATA
and Peak on our financial results.  Clearly we remain
focused on getting the same level of net margins from
these two deals, as we are used to today.  While we are
not yet fully prepared to discuss the complete positive
impact of the EZ Data and Peak acquisitions on our
results, yet we feel comfortable enough to define some
floor metrics in terms of revenues and net income from
these acquisitions.  We expect the two deals to contribute
a combined minimum of $26 million in revenues and
$7.5 million in net income, over the next 12 months.

155.   Also in the November 4 press release, defendant Kerris added:

During nine months ending September 30, 2009 the
Company generated $22.1 million from our operating

> activities which represents a 14% improvement over the
> same period a year earlier.  Net income for the third
> quarter of $9.43 million is up $483 thousand or 5% from
> the second quarter, representing the thirteenth
> consecutive quarter of sequential quarter over quarter net
> income growth.  Our operating margins remain strong at
> 42% for the quarter and 41% the nine-month period
> ending September 30, 2009, respectively.  We are also
> pleased by the fact that to date $26.6 million of the
> original $35.0 million of convertible debt issued during
> 2007 and 2008 has been paid or converted into Ebix
> common stock, leaving a remaining balance due on those
> obligations of $8.4 million.

156.   Also on November 4, 2009, defendants convened and conducted an

earnings conference call.  During his presentation, defendant Raina reiterated the

financial results Ebix had announced in its press release.  He also touted the

Company's shift in operations to India, including its "increased [] infrastructure for

R&D. . . ."  Raina described that Ebix had purchased another building in a tax free

zone in India.  Focusing on the tax-free nature of Ebix's India operations,

defendant Raina stated "The SEZ, the Software Export Zone Act of the

government of India, is meant to offer tax-free status for five years and 50% tax-

free status for five years after that, with a view to encourage software exports."

Defendant Raina continued:

> Ebix decided not to wait until 2011 and, instead, took --
> sought government approval to get into the bonded
> export area, called the Software Export Zone, SEZ. We
> received all the government permissions and are today

fully functional in the tax-free SEZ area, and that will[does] have a tax-free status until 2014 and 50% tax-free status after that. That's a rather important development for Ebix, as it allows us the benefit of having hundreds of people operating out of (inaudible) and allows us a low tax jurisdiction in addition to access to duty-free imports for hardware and infrastructure in that area.

157. During the question and answer session, one analyst noted the increase in accounts receivable, questioning whether the increase related to "acquisitions or just the normal billing cycle?" Defendant Raina replied, "Yes, it is, and I'll let Bob explain that further, but it is. It's purely a timing issue. Clearly, when you make these acquisitions, I mean, you'll have some tiny timing differences that will happen, and that's all you're seeing." Defendant Kerris added, "Yes. Our DSO at the end of the quarter stood at 63 days, but since the end of the quarter, we've collected sufficient sums of funds from our foreign customers and our DSO has come down. We look at this as strictly a timing issue and are not concerned about any ongoing issues there." Defendant Raina concluded, "We have no real A/R issues, so I think it's purely a timing issue."

158. On November 9, 2009, the Company filed a Quarterly Report on Form 10-Q for the quarter ended September 30, 2009 signed by defendants Raina and Kerris. In that Form 10-Q, defendants reiterated the Company's results from the November 4, 2009 press release. In addition, as stated above, both Raina and

Kerris certified the Company's financial results for the third quarter of 2009, ended September 30, 2009.

159.   In that Form 10-Q, the company boasted of increased revenues, stating, "During the nine months ended September 30, 2009 our operating revenue increased $11.8 million or 21.6%, to $66.4 million in 2009 compared to $54.6 million during the same period in 2008. This revenue increase is a result of both the impact of strategic business acquisitions made in 2008 in our health insurance exchange and BPO channels, as well organic growth realized in our annuity and life insurance exchange channels."

160.   The May 8 10-Q also discusses Ebix's accounting for income taxes. Note 9 to the financial statements boasts and effective income tax rate of 5.45% for the nine months ended September 30, 2009, down .31% from the same period in 2008.  According to the Company, it bases its interim period tax provision on its "estimate of the effective income tax rates applicable to the related annual twelve month period, after considering discrete items unique to the respective interim reporting period."  The Company continued that "[r]eported income tax expense for the three and nine months ended September 30, 2009 are also lower due to reductions in the provision for unrecognized tax benefits, which is detailed below."  The Company further boasted that its tax rate decline in 2009 was related "to the

change in the mix of taxable income amongst the various domestic and foreign

countries, including certain low tax rate foreign jurisdictions, in which the

Company conducts operations."

161.   About the taxes on its Indian operations, the 10-Q stated:

> Currently, the Company's taxable income in India, other
> than passive interest and rental income, is subject to a tax
> holiday. The tax holiday is scheduled to expire in 2011.
> The Company's operations in India are also subject to the
> Minimum Alternative Tax ("MAT") which rate is
> 16.33% effective March 2009 and had been 11.33%
> previously. The MAT liability accrued for the three and
> nine month period ending September 30, 2009 was $505
> thousand and $1.2 million respectively. The MAT
> liability accrued for the corresponding three and nine
> month period ending September 30, 2008 was $326
> thousand and $978 thousand respectively. The tax paid
> under the MAT provisions is carried forward for a period
> of seven years to be used as an offset against future tax
> liabilities computed under the regular corporate income
> tax provisions, for which the current income tax rate is
> 33.99%. Accordingly, the Company's consolidated
> balance sheet at September 30, 2009 includes a long-term
> deferred tax asset in the amount of $2.6 million.

162.   With respect to Company's accounts receivable, conspicuously, the

10-Q excised from Note 1 relating to Ebix's *Summary of Significant Accounting*

*Policies* that "Management specifically analyzes accounts receivable and historical

bad debts, write-offs, customer concentrations, customer credit-worthiness, current

economic trends and changes in our customer payment terms when evaluating the

adequacy of the allowance for doubtful accounts." Defendants did, however, relate that Ebix writes-off accounts receivable "against the allowance account when the Company has exhausted all reasonable collection efforts. No accounts were written off as uncollectible during the nine months ending September 30, 2009 and 2008, respectively."

163. Also in that Form 10-Q, defendants discussed their evaluation of internal control over financial reporting and their evaluation of disclosure controls and procedures, stating:

> *Evaluation of Disclosure Controls and Procedures*— As required by Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, an evaluation was carried out under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of September 30, 2009. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of September 30, 2009, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports that we file or submit under the Securities Exchange Act of 1934 is accurately and properly recorded, processed, summarized and reported within the time periods specified in the applicable rules and forms and that it is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

> *Internal Control over Financial Reporting*— There were no changes in our internal control over financial reporting during the nine months ended September 30, 2009, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

164. The foregoing statements about the third quarter of 2009 were false or misleading. As stated above in paragraphs 33-86 and 103-105, defendants knew or recklessly disregarded that serious internal control problems plagued Ebix since 2003. These internal control problems did not improve throughout the Class Period. As a result, defendants knew or recklessly disregarded that Ebix was unable to account for its accounts receivable accurately or to post cash timely and accurately. Defendants, therefore, were unable to assess accurately Ebix's need to reserve for bad debts in the face of its mounting accounts receivable. Accordingly, throughout the Class Period, in violation of GAAP, defendants knew or recklessly disregarded Ebix understated its allowance for doubtful accounts, enabling it to overstate its net income and diluted earnings per share.

165. In addition, as stated above in paragraphs 87-105, throughout the Class Period, defendants knew or were reckless in not knowing that Ebix was overstating net income and diluted EPS by means of a sham tax strategy that shifted profits overseas, profits, defendants knew or recklessly disregarded, that Ebix was not permanently reinvesting in the foreign jurisdictions. By means of

this sham tax strategy, in violation of GAAP, defendants knew or recklessly disregarded that Ebix overstated net income in 2009 by 16.5% and 2009 diluted EPS by 16.3%.

166.   Last, as stated above in paragraphs 106-124, defendants knew or recklessly disregarded that throughout the Class Period, they disclosed materially inaccurate organic growth rates, a critical metric for investors in the case of a roll-up such as Ebix.  In fact, as defendants knew or recklessly disregarded, Ebix's legacy operations were not growing organically.  Rather the Company was growing only through acquisition.

### Ebix Discloses Its Financial Results for the Fourth Quarter and Year-end 2009

167.   On March 8, 2010, Ebix issued a press release, disclosing it financial results for the fourth quarter and full year 2009, ended December 31, 2009.  Ebix recorded fourth quarter 2009 revenue of $31.3 million, up 55% from $20.1 million in the fourth quarter of 2008.  Annual 2009 revenue increase to $97.7 million up 31% from $74.8 million in 2008.  Defendants touted yet another earnings increase, stating that fourth quarter 2009 net income increased 53% to $12.1 from $7.9 million in the same period of 2008 and reported diluted EPS growth to $0.92, up from $0.66, a 39.4% increase.  Annual earnings were similarly healthy as defendants "reported net income of $38.8 million, an increase of 42% from the

prior year net income of $27.3 million" and diluted EPS of $3.10, up 36% from $2.28 in 2008.   The Company recorded income tax expenses of $85,000 and $1.010 million for the fourth quarter and year ended December 31, 2009.   With respect to its taxes, the Company stated that it "expects its blended worldwide income tax rate to be in the range of 6-8% for the fiscal year 2010; and a gradual increase to a blended worldwide tax rate of 8-12% over the following few years." Ebix reported accounts receivable for the year-end of $22.861 million, net an allowance of $565,000, an increase from $13.562 million net of an allowance of $453,000 as of December 31, 2008.

168.   Defendants reiterated these results both in the 2009 10-K, filed with the SEC on March 16, 2010 and signed by defendants Raina and Kerris, and in a presentation on an earnings conference call on March 8, 2010.

169.   Of those results, defendant Raina stated in the March 8, 2010 press release:

> These results mark 10 years of continued sequential growth for Ebix in the areas of revenue, net income and diluted EPS.  Our Q4 and full year results both are record results for the Company.  These results demonstrate our ability to withstand difficult times in the industry and the economy.  To come up with our best ever results in a year, which was easily considered the worst year in a decade for the insurance industry, makes this year's performance even more special for us. We believe that the story can get even better from here.

> Looking at the future, we see the BRIC countries (Brazil, Russia, China and India) emerging as the key hubs driving economic growth in the insurance industry over the next decade or so.  We intend to set up strong local bases in each of these countries, to be able to benefit from the early mover advantage, while we attempt to deploy exchanges in these countries.  Our recent efforts to create strong bases in Brazil, India, Singapore, and China are a step in that direction.

170.   In addition, in the March 8, 2010 press release, defendant Kerris stated:

> We are pleased with our results especially since they include non-recurring expenses associated with the acquisitions of EZ Data and Peak.  With $19.2 million of cash as of 31st December 2009, $22 million of additional borrowing capacity, and the continued growth in operating cash flows, we believe that we are well positioned to use this cash towards making strategic accretive acquisitions in the Exchange arena.

171.   Also on March 8, 2010, the Company convened an "Earnings Conference Call," that defendants Raina and Kerris conducted.  During his remarks, defendant Raina touted the centralization of the Company's intellectual property and development operations in Singapore and India where the Company enjoyed "subsidized tax rates" of 10% and 0% respectively.  During 2010, defendants Raina stated, the Company expected a "blended worldwide income tax

rate" of 6%-8% with "a gradual increase to a blended worldwide tax rate of 8% to 12% over the following years."

172.   Defendant Raina also discussed accounts receivable, touting an "almost perfect customer retention rate." Raina attributed the Company's customer retention rate to "excellent" customer relations and no "material collection issues over the last decade." Defendant Raina continued that in the context of Ebix's rapid growth it had "continued to evolve and strengthen its internal controls through the use of quality partners, vendors, tax advisors, and arms-length statutory auditors." In response to a question about Ebix's changes of auditors, defendant Raina attempted to deflect that concern, stating:

> I think, first of all, our audit firms haven't really changed.
> Our past audit firm was acquired by another firm and the
> partners remain the same. It was simply the name change
> middle of the quarter to HAW Having said that, I think
> we continue like any other firm, we are very sensitive to
> cost, quality of audits and so on. I think we are one of the
> few firms who continues to use all the past firms we have
> used across -- forget three years -- across the last seven
> years, I would say. As I said in my talk, for example,
> meaning let's step back and look at 2003. We were using
> (inaudible) and (inaudible) today still is our auditor and
> in multiple countries as I said earlier, across the world.
> HAW in the year 2009 itself we hired them back for
> some tax related work. And of course with CBX we
> continue to maintain excellent arms length relationship.
> So I think it's like any other firm and the fact that all our
> past firms work for us today in one capacity or another, it
> speaks for itself about the nature of our relationship with

them or the nature of the relationship we always had with
them. Thank you.

173.    Another analyst questioned the 30% difference in growth in revenues

of 55% and growth in accounts receivable less deferred revenues of 85% from the

fourth quarter of 2009 over the fourth quarter of 2008.  In response, defendant

Kerris related that days sales outstanding ("DSO") was 67 days as of December 31,

2009, up 5 days from December 31, 2008.  Kerris concluded that "we look at this

increase as being a temporary matter as we continue to integrate our acquired

customer bases into the Company and into our processes.

174.    Following on defendant Kerris's comments about the rate of increase

in Ebix's accounts receivable, defendant Raina stated:

> part of it is that when you make these acquisitions and
> you have to remember that as your revenue you're
> suddenly having increases in revenue and there will be a
> cycle that it will take to set it up. It's like anything else.
> That's why you see a bit of a Q coming up but I think we
> have fantastic, if you look at our history and you forget
> one or two years, to look at a decade and look at our
> collection record, we've never had any material issue on
> anything virtually so we're pretty pleased with that and
> we believe we'll continue moving. I think our
> relationship, we're so well entrenched in that space that
> really, believe me, we do not spend any time internally
> worrying about collection issues in this Company.

175.   In response to an analyst's question about the Company's organic growth and the contribution of acquisitions to the fourth quarter of 2009, Raina expressed discomfort, failing to answer the question, but stating.  In failing to answer the question, defendant Raina stated that:

> Marti, this is one question, I hate to say it, but I will answer this, and the reason I hate to say this is because sometimes when companies talk about organic growth rate, people want to anyway do their own analysis.  So my suggestion always to them is there are lots of analysts out there and you can also (inaudible) so people can do their own analysis.  Our analysis, actually, incidentally tells us that the organic growth rate was somewhere beyond 14% but I think I'll let the analysts worry about this.  We'll continue working on our fundamentals and keep doing, keep growing the business.

176.   On March 16, 2010, the Company filed with the SEC its Annual Report on Form 10-K for the year December 31, 2009 signed by, among others, Raina and Kerris.  In that Form 10-K, defendants reiterated the Company's results from the March 8, 2010 press release.  In addition, both Raina and Kerris certified the Company's financial results for the fourth quarter and full year 2009, ended December 31, 2009.

177.   In the 2009 10-K, defendants included information about the acquisitions of Peak Performance Solutions, Inc. and E-Z Data, Inc., both during the fourth quarter of 2009.  The Company paid $8 million in cash for Peak and

$50.53 million for E-Z Data, consisting of $25.53 in cash and $25 million in Ebix

common stock.  In that context, defendants also commented on the Company's

revenues with respect to internal growth, stating:

> During the twelve months ended December 31, 2009 our
> total revenue increased $22.9 million or 30.7%, to
> $97.7 million in 2009 compared to $74.8 million in 2008.
> The increase in revenues is a result of both the impact of
> strategic business acquisitions made during 2009 and
> 2008 particularly in the area of exchanges, and in our
> BPO channel, as well as organic growth realized in our
> BPO and Exchange channels.  We are able to quickly
> integrate business acquisitions into our existing
> operations and thereby rapidly leverage product cross-
> selling opportunities.  The specific components of our
> revenue and the changes experienced during the past year
> are discussed further below.

*****

> **Total revenue –** The Company's revenues are derived
> primarily from the services sector with a smaller portion
> coming from the software licensing business.  Service
> sector revenue includes transaction fees, hosting fees,
> implementation, software development and
> customization, maintenance, consulting, training and
> project management services provided to the Company's
> customers using our data exchanges, ASP platforms, and
> other services.  Software licensing revenue includes
> revenue derived from the licensing of our proprietary
> platforms and the licensing of third party software
> applications.  During the twelve months ended December
> 31, 2008 our total revenue increased $31.9 million or
> 74%, to $74.8 million in 2008 compared to $42.8 million
> in 2007.  The increase in operating revenue is a result of
> both organic and acquisitive growth with the effect of

recently completed business combinations having greater impact. We have consistently demonstrated the ability to quickly integrate business acquisition into existing operations and thereby rapidly leverage product cross-selling opportunities. The specific components of our revenue and the changes experienced during the past year are discussed further below.

178. The 2009 10-K also discusses Ebix's accounting for income taxes. Note 9 to the financial statements boasts and effective income tax rate of 2.5% for the year ended December 31, 2009, down 4.8% for the same period in 2008. The company continued that:

> The Company's consolidated effective tax rate is reduced because of the blend of reduced tax rates in foreign jurisdictions where a significant portion of our income resides. Furthermore, the Company's world-wide product development operations and intellectual property ownership has been centralized into our Singapore and India subsidiaries. Our operations in India benefit from a tax holiday which will continue thru 2015; as such local India taxable income, other than passive interest and rental income, is not taxed. After the tax holiday expires taxable income generated by our India operations will be taxed at 50% of the normal 33.99% corporate tax rate for a period of five years. This tax holiday had the effect of reducing tax expense by $5.5 million.

179. With respect to Company's accounts receivable, defendants stated in the 2009 10-K that "Management specifically analyzes accounts receivable and historical bad debts, write-offs, customer concentrations, customer credit-worthiness, current economic trends and changes in our customer payment terms

when evaluating the adequacy of the allowance for doubtful accounts."

Defendants also related that Ebix "currently has $393 thousand of accounts

receivable that has been outstanding for more than a year over, all which is fully

covered by the allowance for doubtful accounts."

180. Also in that Annual Report, defendants included a section on

"Management's Report on Internal Control over Financial Reporting." The

assessment of its internal controls did not include recently acquired Facts Services,

Inc., E-Z Data, Inc. or Peak Performance Solutions, Inc. According to defendants:

> Based upon this evaluation and assessment, our Chief
> Executive Officer and Chief Financial Officer concluded
> that as of December 31, 2009 our disclosure controls and
> procedures and our internal control over financial
> reporting are effective to ensure, among other things, that
> the information required to be disclosed by us in the
> reports that we file or submit under the Securities and
> Exchange Act of 1934 is recorded, processed,
> summarized, and reported accurately.
>
> Cherry, Bekaert & Holland, L.L.P., the independent
> registered public accounting firm that audited our
> Consolidated Financial Statements included in this
> Annual Report on Form 10-K, audited the effectiveness
> of our internal control over financial reporting as of
> December 31, 2009. Cherry, Bekaert &Holland, L.L.P
> has issued their report which is included in this Annual
> Report on Form 10-K.

181. The foregoing statements about the fourth quarter and year-end 2009

were false or misleading. As stated above in paragraphs 33-86 and 103-105,

defendants knew or recklessly disregarded that serious internal control problems plagued Ebix since 2003. These internal control problems did not improve throughout the Class Period. As a result, defendants knew or recklessly disregarded that Ebix was unable to account for its accounts receivable accurately or to post cash timely and accurately. Defendants, therefore, were unable to assess accurately Ebix's need to reserve for bad debts in the face of its mounting accounts receivable. Accordingly, throughout the Class Period, in violation of GAAP, defendants knew or recklessly disregarded Ebix understated its allowance for doubtful accounts, enabling it to overstate its net income and diluted earnings per share.

182.   In addition, as stated above in paragraphs 87-105, throughout the Class Period, defendants knew or were reckless in not knowing that Ebix was overstating net income and diluted EPS by means of a sham tax strategy that shifted profits overseas, profits, defendants knew or recklessly disregarded, that Ebix was not permanently reinvesting in the foreign jurisdictions. By means of this sham tax strategy, in violation of GAAP, defendants knew or recklessly disregarded that Ebix overstated net income in 2009 by 16.5% and 2009 diluted EPS by 16.3%.

183.   Last, as stated above in paragraphs 106-124, defendants knew or recklessly disregarded that throughout the Class Period, they disclosed materially inaccurate organic growth rates, a critical metric for investors in the case of a roll-up such as Ebix.  In fact, as defendants knew or recklessly disregarded, Ebix's legacy operations were not growing organically.  Rather the Company was growing only through acquisition.

### *Ebix Discloses Its Financial Results for the First Quarter of 2010*

184.   On May 7, 2010, Ebix issued a press release, disclosing it financial results for the first quarter of 2010, ended March 31, 2010.  Ebix recorded first quarter 2010 revenue of $31.6 million up 53% from $20.7 million for the same quarter in 2009.  Net income for the quarter, defendants touted was up 49% from $8.3 million in 2009 to $12.759 million in 2010.  Diluted EPS grew at a similarly healthy 39% pace to $0.32, up from $0.23 in 2009.  The Company reported an income tax provision of $615,000 and accounts receivable for the quarter of $26.025 million, net an allowance of $508,000, an increase from $22.861 million net of an allowance of $565,000 as of December 31, 2009.  Defendants reiterated these results both in its Quarterly Report on Form 10-Q for the quarter ended March 31, 2010, filed with the SEC on May 10, 2010 and signed by defendants

Raina and Kerris, and in a presentation on an earnings conference call on May 7, 2010.

185.    Of those results, defendant Raina stated in the May 7 press release:

> We are pleased to report record revenues, income and EPS in Q1 of 2010.  This was a good quarter for us in terms of winning certain key accounts named above.  We believe that we are uniquely positioned today as an end-to-end enterprise services player for the insurance industry.  That end-to-end strategy has not been emulated by any Company in the insurances software services industry worldwide providing us a lead of at least a few years to gain the early mover advantage worldwide."

> We have a choice of growing Ebix aggressively or growing Ebix aggressively but sensibly.  Ebix can either choose the path of high growth with low 10-15% operating margins or the path of sensible growth with 40% or more of operating margins.  We prefer to do the latter and thus remain focused on working towards our goal of Annualized Revenue run rate of $200 Million by Q4 of 2011, with 40% or more in operating margins.  Doing that, while ensuring Ebix's 70% plus recurring revenue streams and minimal customer attrition rates is not likely to be easy.  We believe that if we are able to achieve or beat all these goals by Q4 of 2011, we would have created a new benchmark in terms of operating cash flows, for the On-Demand sector in the United States.

186.    On May 7, 2010, defendants convened an earnings conference call.  In his prefatory remarks, defendant Raina touted Ebix's continued focus on organic growth, boasting signed accounts with important firms in the insurance industry and financial services industry.

187.    One analyst questioned what accounted for the rise in accounts receivable.  In response, defendant Kerris stated, "This is just due to the increase in receivables from recent acquisitions that we've made, strictly a timing issue.  And we look to see quite a bit of collections and reduction of AR during the coming quarter."  In response to a question comparing margin levels at Saleforce.com to those of Ebix, Raina, too, referred to accounts receivable, comparing Ebix's DSO favorably to those of Salsforce.com.  In fact, according to Raina, Ebix's DSO were, on average, 20% better than the DSO of Salseforce.com.  Raina concluded, "And I think the reason we have better DSOs is simply because our attrition rate -- ratio is minimal in terms of customers. Also, we are so highly entrenched in insurance companies and brokers and so on, that we are able to -- that our customers are dependent on us as an infrastructure service, not just any other service."

188.    On May 10, 2010, the Company filed a Quarterly Report on Form 10-Q for the quarter ended March 31, 2010 signed by defendants Raina and Kerris.  In that Form 10-Q, defendants reiterated the Company's results from the May 7, 2010 press release.  In addition, as stated above, both Raina and Kerris certified the Company's financial results for the first quarter of 2010, ended March 31, 2010.

189.    The May 10 10-Q also discusses Ebix's accounting for income taxes.
Note 7 to the financial statements boasts and effective income tax rate of 4.73% for
the three months ended March 31, 2010, up slightly by .03% from the same period
in 2009.  According to the Company, it bases its interim period tax provision on its
"estimate of the effective income tax rate expected to be applicable to the related
annual period, after separately considering any discrete items unique to the
respective interim period being reported."  Defendants further stated that the
Company's "effective tax rate reflects the tax benefits from having significant
component of our operations outside the United States in foreign jurisdictions that
have tax rates lower than the U.S. statutory rate of 35%."

190.    With respect to Company's accounts receivable, the 10-Q states in
Note 1 relating to Ebix's *Summary of Significant Accounting Policies* that
"Management specifically analyzes accounts receivable and historical bad debts,
write-offs, customer concentrations, customer credit-worthiness, current economic
trends and changes in our customer payment terms when evaluating the adequacy
of the allowance for doubtful accounts."  Defendants further conveyed that "There
was no bad debt expense incurred during either the three ended March 31, 2010 or
2009. Accounts receivable are written off against the allowance account when the
Company has exhausted all reasonable collection efforts. $57 thousand and $0 of

accounts receivable were written off as uncollectible during the three months

ending March 31, 2010 and 2009, respectively."

191. Also in that Form 10-Q, defendants discussed their evaluation of

internal control over financial reporting and their evaluation of disclosure controls

and procedures, stating:

> *Evaluation of Disclosure Controls and Procedures:* The
> Company maintains controls and procedures designed to
> ensure that it is able to collect the information we are
> required to disclose in the reports we file with the SEC,
> and to process, summarize and disclose this information
> within the time periods specified in the rules of the SEC.
> As of the end of the period covered by this report and
> pursuant to Rule 13a-15 of the Securities Exchange Act
> of 1934, the Company's management, including the
> Chief Executive Officer and Chief Financial Officer,
> conducted an evaluation of the effectiveness and design
> of our disclosure controls and procedures to ensure that
> information required to be disclosed by the Company in
> the reports that files under the Securities Exchange Act of
> 1934 is recorded, processed, summarized and reported
> within the time periods specified by the SEC's rules and
> forms. Based upon that evaluation, the Company's Chief
> Executive Officer and Chief Financial Officer concluded
> as of March 31, 2010 that the Company's disclosure
> controls and procedures were effective in recording,
> processing, summarizing and reporting information
> required to be disclosed, within the time periods specified
> in the SEC's rules and forms.

> *Internal Control over Financial Reporting:* There were
> no changes in our internal control over financial
> reporting during the fiscal quarter ended March 31, 2010,
> that have materially affected, or are reasonably likely to

materially affect, our internal control over financial
reporting.

192.   Defendants stated nothing further about the Company's internal
controls.  In particular it did not discuss the internal controls as they related to the
recent acquisitions of E-Z Data and Peak.

193.   The foregoing statements about the first quarter of 2010 were false or
misleading. As stated above in paragraphs 33-86 and 103-105, defendants knew or
recklessly disregarded that serious internal control problems plagued Ebix since
2003.  These internal control problems did not improve throughout the Class
Period.  As a result, defendants knew or recklessly disregarded that Ebix was
unable to account for its accounts receivable accurately or to post cash timely and
accurately.  Defendants, therefore, were unable to assess accurately Ebix's need to
reserve for bad debts in the face of its mounting accounts receivable.  Accordingly,
throughout the Class Period, in violation of GAAP, defendants knew or recklessly
disregarded Ebix understated its allowance for doubtful accounts, enabling it to
overstate its net income and diluted earnings per share.

194.   In addition, as stated above in paragraphs 87-105, throughout the
Class Period, defendants knew or were reckless in not knowing that Ebix was
overstating net income and diluted EPS by means of a sham tax strategy that
shifted profits overseas, profits, defendants knew or recklessly disregarded, that

Ebix was not permanently reinvesting in the foreign jurisdictions.  By means of this sham tax strategy, in violation of GAAP, defendants knew or recklessly disregarded that Ebix overstated net income in 2009 by 16.5% and 2009 diluted EPS by 16.3%.

195.   Last, as stated above in paragraphs 106-124, defendants knew or recklessly disregarded that throughout the Class Period, they disclosed materially inaccurate organic growth rates, a critical metric for investors in the case of a roll-up such as Ebix.  In fact, as defendants knew or recklessly disregarded, Ebix's legacy operations were not growing organically.  Rather the Company was growing only through acquisition.

### Ebix Discloses Its Financial Results for the Second Quarter of 2010

196.   On August 9, 2010, Ebix issued a press release, disclosing it financial results for the second quarter of 2010, ended June 30, 2010.  Ebix recorded second quarter 2010 revenue of $32.2 million up 44% from $22.4 million for the same quarter in 2009.  Once again, defendants reported extraordinary increases in net income and diluted EPS.  Net income rose 56% to $14.0 million, up from $9.0 million in the second quarter of 2009.  Diluted EPS rose 50% to $0.36, up from $0.24 in 2009.  These results included non-operating income of $1.4 million, relating to the E-Z Data acquisition and the gain on an option granted thereon.  The

Company reported an income tax provision of $556,000 and accounts receivable for the quarter of $24.402 million, net an allowance of $646,000, an increase from $22.861 million net of an allowance of $565,000 as of December 31, 2009.

Defendants reiterated these results both in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2010, filed with the SEC on August 9, 2010 and signed by defendants Raina and Kerris, and in a presentation on an earnings conference call on August 9, 2010.

197.   Of those results, defendant Raina stated in the August 9 press release:

> The insurance industry is still reeling from the after effects of the economic crisis in the United States.  With consumer confidence being rather low, Annuity production industry wide is down 20% year over year.  The property and casualty sector has had one of the worst years in a decade.  The health insurance industry is still dealing with the uncertainties created by the Health reform bill passage.  In spite of all of that, Ebix has continued to move forward with record revenues, earnings, cash flows and net income.  We have continued to substitute production drops in the industry through organic growth means by bringing new clients to our Exchanges.  We have always believed that a company's true strength is tested when times are bad for the industry.  A company that can produce record results in an economy like this has a much better chance of producing spectacular results as times become better for the industry as a whole.
>
> We believe that our end-to-end Exchange solutions provide us a strategic business and technology advantage over our competition.  We are presently in the process of

hiring fifteen new sales people for our Exchange and
CRM initiatives.  These additional resources should
enable us to organically grow our revenues more
dramatically over the coming months and years.

In recent times, I have often been asked about the
possibility of a dividend being issued by the Company.
Clearly, our intent is to try and secure the best possible
returns from the use of our operating cash flows.  We
believe that our cash can generate much higher returns
for our shareholders, by investing in both new accretive
acquisitions and organic growth initiatives than through
issuing dividends to our shareholders.  While the
Company does not completely rule out the possibility of
issuing dividends in the future, at present we are more
inclined to use our cash to generate further improvement
in future earnings.

198.    In addition, in the March 8, 2010 press release, defendant Kerris

stated:

We are pleased to report $16 million of operating cash
flows in the second quarter of 2010 and sustained 40%
operating margins.  Our current ratio improved to 1.13 at
June 30, 2010 as compared to 0.62 at December 31, 2009
and our working capital position improved to $6.1
million from a deficit of $28.6 million that existed at the
end of the 2009.  The improvement in our short-term
liquidity position is the result of stronger operating cash
flows, the refinancing of our revolving credit facility that
is now set to mature in February 2012, and better
collections on outstanding trade accounts receivable.

199.    On August 9, 2010, defendants convened and earnings conference

call.  Of note, Defendant Raina continued to tout the Company's ability to grow

organically stating, ". . . in spite of the head wind, Ebix has continued to grow revenues.  It's because of our ability to organically keep adding new clients continuously and retaining our existing clients."

200.   On August 9, 2010, the Company filed a Quarterly Report on Form 10-Q for the period ended June 30, 2010, signed by defendants Raina and Kerris. In that Form 10-Q, defendants reiterated the Company's results from the August 9, 2010 press release.  In addition, as stated above, both Raina and Kerris certified the Company's financial results for the second quarter of 2010, ended June 30, 2010.

201.   In that Form 10-Q, the company boasted of its continued expansion, "both organically and through a series of acquisitions."  Indeed, defendants stated:

> During the three months ended June 30, 2010 our total operating revenues increased $9.8 million or 44%, to $32.2 million as compared to $22.4 million during the second quarter of 2009.  This increase in revenues is a result of healthy organic growth realized in our Exchange, BPO and Broker channels, and also the due to certain strategic business acquisitions made during 2009 particularly in our Exchange channel.  The Company continues to consistently and efficiently integrate its business acquisitions into existing operations, thereby rapidly leveraging product cross-selling opportunities.

202.   The August 9 10-Q also discusses Ebix's accounting for income taxes. Note 7 to the financial statements boasts and effective income tax rate of 4.24% for the six months ended June 30, 2010, down by .22% from the same period in 2009.

According to the Company, it bases its interim period tax provision on its "estimate of the effective income tax rate expected to be applicable to the related annual period, after separately considering any discrete items unique to the respective interim period being reported." Defendants further stated that "[t]he Company's effective tax rate for 2010 reflects the tax benefits from having a higher mix of significant components of our operations outside the United States in foreign jurisdictions where earnings are taxed at rates lower than U.S. statutory rates."

203.   With respect to Company's accounts receivable, the 10-Q once again states in Note 1 relating to Ebix's *Summary of Significant Accounting Policies* that "Management specifically analyzes accounts receivable and historical bad debts, write-offs, customer concentrations, customer credit-worthiness, current economic trends and changes in our customer payment terms when evaluating the adequacy of the allowance for doubtful accounts." Defendants further conveyed that:

> Bad debt expense incurred during three and six month period ended June 30, 2010 or 2009 was $202 thousand and $90 thousand respectively. Accounts receivable are written off against the allowance account when the Company has exhausted all reasonable collection efforts. $120 thousand and $0 of accounts receivable were written off as uncollectible during the six months ending June 30, 2010 and 2009, respectively.

204.   Also in the August 9 Form 10-Q, defendants discussed their evaluation of internal control over financial reporting and their evaluation of disclosure controls and procedures, stating:

> *Evaluation of Disclosure Controls and Procedures:* The Company maintains controls and procedures designed to ensure that it is able to collect the information we are required to disclose in the reports we file with the SEC, and to process, summarize and disclose this information within the time periods specified in the rules of the SEC. As of the end of the period covered by this report and pursuant to Rule 13a-15 of the Securities Exchange Act of 1934, the Company's management, including the Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness and design of our disclosure controls and procedures to ensure that information required to be disclosed by the Company in the reports that files under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms. Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded as of June 30, 2010 that the Company's disclosure controls and procedures were effective in recording, processing, summarizing and reporting information required to be disclosed, within the time periods specified in the SEC's rules and forms.
>
> *Internal Control over Financial Reporting:* There were no changes in our internal control over financial reporting during the quarter ended June 30, 2010, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

205.   Defendants stated nothing further about the Company's internal controls.  In particular it did not discuss the internal controls as they related to the recent acquisitions of E-Z Data and Peak.

206.   The foregoing statements about the second quarter of 2010 were false or misleading.  As stated above in paragraphs 33-86 and 103-105, defendants knew or recklessly disregarded that serious internal control problems plagued Ebix since 2003.  These internal control problems did not improve throughout the Class Period.  As a result, defendants knew or recklessly disregarded that Ebix was unable to account for its accounts receivable accurately or to post cash timely and accurately.  Defendants, therefore, were unable to assess accurately Ebix's need to reserve for bad debts in the face of its mounting accounts receivable.  Accordingly, throughout the Class Period, in violation of GAAP, defendants knew or recklessly disregarded Ebix understated its allowance for doubtful accounts, enabling it to overstate its net income and diluted earnings per share.

207.   In addition, as stated above in paragraphs 87-105, throughout the Class Period, defendants knew or were reckless in not knowing that Ebix was overstating net income and diluted EPS by means of a sham tax strategy that shifted profits overseas, profits, defendants knew or recklessly disregarded, that Ebix was not permanently reinvesting in the foreign jurisdictions.  By means of

this sham tax strategy, in violation of GAAP, defendants knew or recklessly disregarded that Ebix overstated net income in 2009 by 16.5% and 2009 diluted EPS by 16.3%.

208.   Last, as stated above in paragraphs 106-124, defendants knew or recklessly disregarded that throughout the Class Period, they disclosed materially inaccurate organic growth rates, a critical metric for investors in the case of a roll-up such as Ebix.  In fact, as defendants knew or recklessly disregarded, Ebix's legacy operations were not growing organically.  Rather the Company was growing only through acquisition.

### Ebix Discloses Its Financial Results for the Third Quarter of 2010

209.   On November 9, 2010, Ebix issued a press release, disclosing it financial results for the third quarter of 2010, ended September 30, 2010.  Ebix recorded third quarter 2010 revenue of $33.3 million up 43% from $23.3 million for the same quarter in 2009.  Defendants reported stunning earnings gains for that quarter.  Net income rose 77% to $16.7 million up from $9.4 million in 2009.  Similarly, diluted EPS rose 72% to $0.43, up from $0.25 in 2009.  These results included non-operating income of $3.9 million, relating to the E-Z Data acquisition and the gain on an option granted thereon.  The Company recorded an income tax provision of $768,000, and accounts receivable for the quarter of $28.816 million,

net an allowance of $321,000, an increase from $22.861 million net of an allowance of $565,000 as of December 31, 2009.  Defendants reiterated these results both in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2010, filed with the SEC on November 9, 2010 and signed by defendants Raina and Kerris, and in a presentation on an earnings conference call on November 9, 2010.

210.   Of those results, defendant Raina stated in the November 9, 2010 press release:

> We are pleased with these results as we are able to deliver these results despite the present economic crisis in the insurance industry, along with our continued investment in future Exchange and On-Demand Based products and services for the insurance and financial services industries.  We are presently in the process of building many new products designed to expand the portfolio, and geographical reach of many of our services such as life, health and annuity exchanges along with cloud computing based carrier back end systems.  We expect to launch some of these services in the first half of 2011.
>
> We remain focused on creating a fundamentally strong Company with recurring revenue streams, 40% operating margins, minimal customer attrition and healthy operating cash flows.  We have always believed that a Company with all these attributes has the potential of becoming the largest Insurance software services player worldwide.  Accordingly, the Company has not tried to grow its top line aggressively at the cost of its bottom-

line.  We intend to make efforts to grow both
proportionately.

We feel good about our future prospects both in the
United States and abroad especially in the area of
Exchanges.  Accordingly, we are presently in the process
of doubling our sales resources across the Company
especially in the Exchange arena.

211.   In addition, in the November 9, 2010 press release, defendant Kerris

stated:

We are pleased with the Company's consistent ability to
generate strong operating cash flows, and in particular
the fact that the $33.8 million of cash flow from our
operating activities for the nine months ending
September 30, 2010 represents a 93% realization of
adjusted net income (defined as net income less net non-
cash gains from derivative instruments and unrealized
foreign exchange gains, or $43.1 million less $5.4 million
and $1.3 million, respectively) for the same period.
Despite our rapid growth, only 1.4% of our receivables
have been outstanding for more than a year, implying
that virtually all of our operating revenues are realized in
the form of cash inflows within our annual reporting
cycle.  As to the health of our balance sheet, we are
pleased with the fact that our current ratio has improved
to 1.09 at September 30, 2010 as compared to 0.62 at
December 31, 2009 due to stronger operating cash flows,
retirement of convertible debt obligations, and the
refinancing of our revolving credit facility.

212.   On November 9, 2010, defendants conducted and earnings conference

call.  In explaining the Company's "exemplary" record on accounts receivable,

defendant Raina stated "We prefer to deploy our services in a manner where clients

pay as they use our system while the ownership of the IP stays at Ebix. This has

been key to our ability to have an exemplary record [] on receivable[s]. For

example, we had only $408,000 in receivable pending for more than a year as of

September 30, 2010."

213.   With respect to the Company's tax rate, on analyst noted the low tax

rate Ebix paid on its earnings and asked when the tax rate might normalize.  In the

colloquy that followed, defendant Raina defended the Company's guidance on a

10% tax rate, stating:

> ROBIN RAINA: Well, I think we have already issued
> guidance on taxes in the past, and we have basically said
> over the next two years, we expect our tax rate to grow
> somewhere close to a 10% number. Part of it is that our
> tax rates are low because most of our IT is based abroad.
> We also get worldwide lower tax rate on account of
> having a lower tax rate than some of the other foreign
> jurisdiction, and most of our income lies there.
>
> WALTER RAMSEY: Okay. So the ongoing rates, I
> mean, there's no carry-forwards that are currently
> reducing it?
>
> ROBIN RAINA: Pardon, I didn't hear you.
>
> WALTER RAMSEY: The 10% doesn't include any tax
> carry forwards? I mean this is the actual ongoing normal
> business tax rate, 10%?
>
> ROBIN RAINA: Well, I think at this point, we'd like to
> give you a general guidance with respect to the 10% rate.
> Having said that, I'm not sure I really understand your

> question. But this is the overall number, a worldwide
> effective number that we have referenced in the past.

214.   On November 9, 2010, the Company filed a Quarterly Report on

Form 10-Q for the quarter ended September 30, 2010 signed by defendants Raina

and Kerris.  In that Form 10-Q, defendants reiterated the Company's results from

the November 9, 2010 press release.  In addition, as stated above, both Raina and

Kerris certified the Company's financial results for the third quarter of 2010, ended

September 30, 2010.

215.   In that Form 10-Q, the Company boasted of its continued expansion,

"both organically and through a series of acquisitions."  Indeed, defendants stated:

> During the three months ended September 30, 2010 our
> total operating revenues increased $10.0 million or 43%,
> to $33.3 million as compared to $23.3 million during the
> third quarter of 2009. This revenue increase is a result of
> organic growth achieved in our Exchange, BPO and
> Broker Systems channels, and also because of certain
> strategic business acquisitions made during the fourth
> quarter of 2009 particularly in our Exchange channel.
> The Company continues to efficiently integrate its
> business acquisitions across all existing operations,
> thereby rapidly leveraging product cross-selling
> opportunities.

216.   The November 9, 2010 10-Q also discusses Ebix's accounting for

income taxes.  Note 7 to the financial statements boasts and effective income tax

rate of 4.25% for the nine months ended September 30, 2010, down by 1.20% from

the same period in 2009.  According to the Company, it bases its interim period tax provision on its "estimate of the effective income tax rates applicable to related annual twelve month period, after considering any discrete items uniquely related to the respective interim reporting period."  Defendants further stated that "[t]he Company's lower effective tax rate for 2010 reflects the tax benefits from having a higher mix of significant components of our operations outside the United States in foreign jurisdictions where earnings are taxed at rates lower than U.S. statutory rates."

217.   With respect to Company's accounts receivable, the 10-Q once again states in Note 1 relating to Ebix's *Summary of Significant Accounting Policies* that "[m]anagement specifically analyzes accounts receivable and historical bad debts, write-offs, customer concentrations, customer credit-worthiness, current economic trends and changes in our customer payment terms when evaluating the adequacy of the allowance for doubtful accounts."  Defendants further conveyed that:

> Bad debt expense incurred during three and nine month periods ended September 30, 2010 was $140 thousand and $342 thousand respectively and nil and $90 thousand, respectively, for the three and nine month periods ended September 30, 2009. Accounts receivable are written off against the allowance account when the Company has exhausted all reasonable collection efforts.

218.   Also in that Form 10-Q, defendants discussed their evaluation of

internal control over financial reporting and their evaluation of disclosure controls

and procedures, stating:

>*Evaluation of Disclosure Controls and Procedures:* The
>Company maintains controls and procedures designed to
>ensure that it is able to collect the information we are
>required to disclose in the reports we file with the SEC,
>and to process, summarize and disclose this information
>within the time periods specified in the rules of the SEC.
>As of the end of the period covered by this report and
>pursuant to Rule 13a-15 of the Securities Exchange Act
>of 1934, the Company's management, including the
>Chief Executive Officer and Chief Financial Officer,
>conducted an evaluation of the effectiveness and design
>of our disclosure controls and procedures to ensure that
>information required to be disclosed by the Company in
>the reports that files under the Securities Exchange Act of
>1934 is recorded, processed, summarized and reported
>within the time periods specified by the SEC's rules and
>forms. Based upon that evaluation, the Company's Chief
>Executive Officer and Chief Financial Officer concluded
>as of September 30, 2010 that the Company's disclosure
>controls and procedures were effective in recording,
>processing, summarizing and reporting information
>required to be disclosed, within the time periods specified
>in the SEC's rules and forms.
>
>*Internal Control over Financial Reporting:* There were
>no changes in our internal control over financial
>reporting during the quarter ended September 30, 2010,
>that have materially affected, or are reasonably likely to
>materially affect, our internal control over financial
>reporting.

219. Defendants stated nothing further about the Company's internal controls. In particular it did not discuss the internal controls as they related to the recent acquisitions of E-Z Data and Peak.

220. The foregoing statements about the third quarter of 2010 were false or misleading.

### *Ebix Discloses Its Financial Results for the Fourth Quarter and Year-end 2010*

221. On March 14, 2011, Ebix issued a press release, disclosing it financial results for the fourth quarter and full year 2010, ended December 31, 2010. Ebix recorded fourth quarter 2010 revenues of $35.1 million, up 12% from $31.3 million in the fourth quarter of 2009. Annual 2010 revenue increase to $132.2 million up 35% from $97.7 million in 2009. According to defendants, net income rose in the fourth quarter by 32% to $15.9 million, up from $12.1 million in 2009. Diluted EPS rose for the fourth quarter rose 35.5% to $0.42, up from $0.31 in 2009. For the full fiscal year, 2010, defendants boasted a 52% increase in net income to $59.0 million up from $38.8 million in 2009. Diluted EPS for the year rose 46.6% to $1.51, up from $1.03 in 2009. The Company recorded an income tax expense of $635,000 for the fourth quarter of 2010 and an income tax benefit of $1.304 for the year ended December 31, 2010. Ebix reported accounts receivable as of December 31, 2010 of $26.028 million, net an allowance of

$1.126, an increase from $22.861 million net of an allowance of $565,000 as of

December 31, 2009.  Defendants reiterated these results both in its 2010 10-K,

filed with the SEC on March 16, 2011 and signed by defendants Raina and Kerris,

and in a presentation on an earnings conference call on March 14, 2011.

222.   Of those results, defendant Raina stated in the March 14, 2011press

release:

> In the year 2010, Ebix emerged as the largest insurance
> exchange player worldwide. We intend to launch many
> new exchange related services in 2011 and beyond. Our
> ability to deliver end-to-end exchange services while
> providing enterprise backend solutions in an on-demand
> manner continues to differentiate us from all our
> competitors worldwide. In addition, our focus on
> delivering solutions across the globe with the same code
> base, while deploying these solutions in multiple
> languages and currencies continues to hold immense
> value for our multinational insurance clients.
>
> In the year 2011, our vision is to focus on three key areas
> - one, the launch of new exchanges and on-demand
> backend platforms in various geographies across the
> world; two, the launch of a mobile utility initiative with
> applications in diverse insurance areas being deployed on
> a utilities basis; three, the continued focus on services
> like Ebix Enterprise targeted at providing a single on-
> demand platform to a wide variety of insurance entities
> across all insurance product lines.

223.   In addition, in the March 14, 2011 press release, defendant Kerris

stated:

> We are very pleased with the improvements realized
> during 2010 particularly regarding our operating cash
> flows and the overall health of our balance sheet. Our
> recurring operating activities during 2010 produced $19.0
> million of additional cash flows above the levels realized
> in 2009. We closed the year with $23.4 million of cash
> on hand, an increase of $4.2 million or 22% from a year
> earlier, in spite of investing $15.2 million for business
> acquisitions, remitting $22.5 million to settle outstanding
> convertible debt, and paying $10.5 million to repurchase
> shares of our common stock. During 2010 our current
> ratio significantly improved and was 1.56 at December
> 31st as compared to 0.62 a year earlier, and we
> eliminated all but $5.0 million of the previous $29.4
> million of convertible debt.

224.   On March 14, 2011, defendants convened and earnings conference call.  In his prefatory remarks, defendant Raina, once again, touted the Company's evolving and strengthening internal controls "through the use of quality partners, vendors, tax advisers, and statut[ory] auditors."  In addition, Raina reiterated the subsidized tax rates to which Ebix was entitled of 10% in Singapore and 0% in India.  In the question and answer segment of the conference call, defendant Kerris continued to guide analysts to a 10-12% tax rate for 2011.

225.   In response to an analyst's question with respect to organic growth trends in the context of purportedly successful acquisitions, the following colloquy between and analyst and defendant Raina ensued:

> MARK GIOVANNIELLO, ANALYST, COPELAND
> CAPTIAL MANAGEMENT: Thanks. Just a question

about the organic growth trends, particularly in the
Exchange business. I know you've had some successful
acquisitions over the -- certainly this year and last year.
Could you speak to the trend, what you might have done
in Q4 in 2010 and what you might expect going forward?
Thanks.

ROBIN RAINA: I normally -- this is a question I
normally refer to our analysts.  Simply because we hate
to talk about organic growth in terms of specific
numbers. Having said that, I'll try to address that.  We
know that an overall numbers -- when we publish our K,
when the K comes out in a few days, the 10-K, you're
going to see a pretty good chop in here which basically
clearly spells it out in terms of what that organic growth
is, because it will tell you what our revenue with all these
acquisitions would have been in 2009, and what it would
have been in 2011 with our current growth rate, so it
basically comes out to 11% that we have.

Now, this 11%, however, it doesn't really give you the
true story of the growth in exchanges because exchange
growth has been a lot higher. The number goes down a
bit purely because we had drops in the revenues in the
Carrier segment, and the Carrier segment,-- benefit
Carrier segment that's the PNC back-end Carrier
segment. That's clearly taken a bit of a hit in the last few
years, especially in the year 2010. PNC industry has been
in the doldrums in the year 2010 and that has also
[a]ffected us.

Also what has [a]ffected us is earlier and earlier days we
were very -- we used to go out and sign all these large
License-based deals. We decided that the -- when you
look at our recurring versus non-recurring business, the
main non-recurring part of our business was the Carrier
Back-end system business. Everything else had become
more or less recurring, baring professional services

required to customize the system, which is incidentally a small portion of our business. So when we looked at the Carrier business we said we have to change our revenue model. And, in 2010, we made an honest effort to change our revenue model.

Today, Ebix does not send out a proposal on the Carrier Back-end business with the license-based revenue model. We sell everything on a recurring business, but when you do business on a recurring basis, you're not going to get those multi-million deals. What I mean by that if you were signing earlier a Carrier with $5 million initial license revenues or today, we are rather happier to sign a Carrier who gives us $1 million a year or a couple $1.5 million a year, but continuously keeps doing that through the life cycle of the Carrier. Because in the earlier model you have a lot of revenue earlier, but in subsequent years you were dependent on only the support revenue, and we felt that's the model where we have to dig a well every year and get the water out. And so we wanted to convert it into a recurring business, but then you cannot try to convert it into a recurring business, you have to make initial sacrifices and that's what we did in the last quarter, in the last year, but overall the number that you will see in the K also is around 11% for the year.

MARK GIOVANNIELLO: Thank you. And going forward do you think that's a reasonable expectation or is something more normal in the single digits, typically, for this business?

ROBIN RAINA: Let me put it that way, that we would be disappointed if it was in single digits. We don't have a tendency of issuing guidance and so I'm not going to tell you what we will do or not do, but at the same time if you're asking us if would we be happy with that? No, absolutely not. We would be disappointed if our organic growth today was in single digits.

226.   On March 16, 2011, the Company filed with the SEC its 2010 10-K signed by, among others, Raina and Kerris.  In that Form 10-K, defendants reiterated the Company's results from the March 14, 2011 press release.  In addition, both Raina and Kerris certified the Company's financial results for the fourth quarter and full year 2010, ended December 31, 2010.

227.   In the 2010 10-K, stated that Ebix's effective tax rate for 2010 was 1.1% down from 2.5% in 2009.  The Company's income tax expense decreased $375,000 from $1.0 million in 2009 to $635,000 in 2010.  Explaining, in part, the Company's low tax rates, Note 9 to the financial statements boasts:

> The Company's consolidated effective tax rate is reduced because of the blend of reduced tax rates in foreign jurisdictions where a significant portion of our income resides. Furthermore, the Company's world-wide product development operations and intellectual property ownership has been centralized into our India and Singapore subsidiaries, respectively. Our operations in India benefit from a tax holiday which will continue thru 2015; as such local India taxable income, other than passive interest and rental income, is not taxed. After the tax holiday expires taxable income generated by our India operations will be taxed at 50% of the normal 33.99% corporate tax rate for a period of five years. This tax holiday had the effect of reducing tax expense by $11.5 million.

228.   With respect to Company's accounts receivable, defendants stated in the 2019 10-K that:

> Management specifically analyzes accounts receivable and historical bad debts, write-offs, customer concentrations, customer credit-worthiness, current economic trends and changes in our customer payment terms when evaluating the adequacy of the allowance for doubtful accounts. Bad debt expense was $1.2 million and $321 thousand during the twelve months ended December 31, 2010 and 2009, respectively.

229.   In addition, the 2010 10-K disclosed that the Company was able partially to offset an increase in general and administrative expenses, resulting from "a $1.5 million benefit associated with the reversal of a previously recorded contingent liability earn out obligation associated with our October 2009 acquisition of Peak, because during the subsequent 2010 earn out period the defined revenue targets was not achieved by the Peak operations."

230.   Also in the 2010 10-K, defendants included a section on "Management's Report on Internal Control over Financial Reporting."  They purportedly assessed and tested the Company's internal controls, finding them to be effective.  The Company stated:

> Based upon this evaluation and assessment, our Chief Executive Officer and Chief Financial Officer concluded that as of December 31, 2010 our disclosure controls and procedures and our internal control over financial reporting are effective to ensure, among other things, that the information required to be disclosed by us in the reports that we file or submit under the Securities and Exchange Act of 1934 is recorded, processed, summarized, and reported accurately.

231.   Cherry, Bekaert & Holland, L.L.P., the independent registered public

accounting firm that audited the Company's Consolidated Financial Statements

opined on the quality of the Company's internal controls, stating:

> We also have audited, in accordance with the standards
> of the Public Company Accounting Oversight Board
> (United States), the Company's internal control over
> financial reporting as of December 31, 2010, based on
> criteria established in Internal Control-Integrated
> Framework issued by the Committee of Sponsoring
> Organizations of the Treadway Commission (COSO),
> and our report dated March 16, 2011 expressed an
> unqualified opinion thereon.

232.   The foregoing statements about the fourth quarter and year-end 2010

were false or misleading.  As stated above in paragraphs 33-86 and 103-105,

defendants knew or recklessly disregarded that serious internal control problems

plagued Ebix since 2003.  These internal control problems did not improve

throughout the Class Period.  As a result, defendants knew or recklessly

disregarded that Ebix was unable to account for its accounts receivable accurately

or to post cash timely and accurately.  Defendants, therefore, were unable to assess

accurately Ebix's need to reserve for bad debts in the face of its mounting accounts

receivable.  Accordingly, throughout the Class Period, in violation of GAAP,

defendants knew or recklessly disregarded Ebix understated its allowance for

doubtful accounts, enabling it to overstate its net income and diluted earnings per share.

233.   In addition, as stated above in paragraphs 87-105, throughout the Class Period, defendants knew or were reckless in not knowing that Ebix was overstating net income and diluted EPS by means of a sham tax strategy that shifted profits overseas, profits, defendants knew or recklessly disregarded, that Ebix was not permanently reinvesting in the foreign jurisdictions.  By means of this sham tax strategy, in violation of GAAP, defendants knew or recklessly disregarded that Ebix overstated net income in 2009 by 16.5% and 2009 diluted EPS by 16.3%.

234.   Last, as stated above in paragraphs 106-124, defendants knew or recklessly disregarded that throughout the Class Period, they disclosed materially inaccurate organic growth rates, a critical metric for investors in the case of a roll-up such as Ebix.  In fact, as defendants knew or recklessly disregarded, Ebix's legacy operations were not growing organically.  Rather the Company was growing only through acquisition.

### *Ebix Discloses Its Financial Results for the First Quarter of 2011*

235.   On May 10, 2011, the Company disseminated a press release, detailing its first quarter 2011 financial and operating results.  Ebix recorded first

quarter 2011 revenue of $40.1 million up 27% from $31.6 million for the same

quarter in 2010.  According to defendants, net income for the quarter rose 22% to

$15.2 million up from $12.4 million in 2010, including non-operating of $354,000

related to the E-Z data option.  Diluted EPS for the quarter were $0.37, up 15.6%

from $0.32 for the same period in 2010.  The Company recorded an income tax

provision of $1.569 million and accounts receivable of $35.173 million net an

allowance for doubtful accounts of 1.083 million, up from a net balance of $26.028

as of December 31, 2010.

> 236.  Of these results, in the May 10, 2011 press release, Raina stated:

> Ebix turned in a strong Q1 2011 performance.  Operating
> margins and cash flow from operations remained strong
> despite the impact of one-time acquisition, integration
> and other A.D.A.M. - related costs.  The highlight of the
> Q1 2011 results for us is the fact our operating margins
> would have been 43% when excluding the non-recurring
> expenses directly associated with the ADAM acquisition
> (specifically $1.39 million investment banking fee and
> $0.4 million of employee severance costs).

> We are very pleased with the progress of the A.D.A.M.
> integration so far. We anticipate positive revenue and
> profit contributions from A.D.A.M. in future periods as
> we work to leverage their customer reach, health
> information, and e-Learning expertise to create
> pioneering health content and e-commerce exchanges in
> the United States and abroad. The integration has proven
> to be particularly streamlined given A.D.A.M. was also
> based in Atlanta.

237.   In addition, Kerris stated:

Ebix continued to produce sustainable and attractive cash flow from our ongoing operations during Q1 2011.  With $39.3 million of bank deposits ($35.6 million of cash and $3.7 million of fixed deposits for 90 days or more) as of March 31, 2011, $26.3 million of additional borrowing capacity as of April 19, 2011, and the continued growth in operating cash flows, Ebix is well positioned to use this cash towards supporting continued organic growth, develop cutting edge products and services, and making strategic accretive acquisitions in the Exchange arena.

As of March 31, 2011, the Company had remaining available domestic NOL carry-forwards of $68.5 million which are available to negate cash outflows that will otherwise have been expected in connection with future federal and certain tax payments associated with future taxable income.  Our Q1 results reflect a worldwide effective tax rate of 9.4% versus 4.7% in Q1 of 2010 reflecting a relatively greater mix of income in higher tax rate jurisdictions in Q1 of 2011, as compared to the same quarter in 2010.

238.   Also on May 10, 2011, defendants convened and conducted an earnings conference call.  A colloquy with an analyst over the Company's organic growth rate proceeded as follows:

WALTER RAMSLEY: All right. Great. And organic growth, did you make that calculation for the quarter?
ROBIN RAINA: We have -- meaning did we -- this is a question that I would rather have you ask the analysts. We have four analysts on our staff. Some of them -- one on the call, and I'm sure you can address it, because we feel these answers should come from a very unbiased manner from outside parties, because in the past we have

130

given answers and people have started to do organic calculations.

WALTER RAMSLEY: Yeah.

ROBIN RAINA: It depends on how you do your -- analysts do it in their own way, and we're very comfortable with that. All of the numbers are reported, as you know of all acquisitions, especially since 2010, they are all -- we have made filings with the past numbers, A.D.A.M. was a public company, everybody knows their numbers. We have filed a -- we have made a specific filing with their audited numbers for 2010. Any acquisitions we made in 2010, those numbers are there.

So we feel people should do their analysis independently on their own, or they should get analysts to do it, because in the past, like I said, we have done different ways and then some people say well, we would like to do organic growth, while if you make an acquisition for 12 months, don't even count their revenue, even after you have acquired them, and we find that a bit weird because if we made an acquisition in a country, ABC, and then in country ABC, if we made an acquisition, and the revenue was let's say $1.7 million a year, and now we grew that $1.7 million to $4 million. Clearly we are going to count $4 million, minus $1.7 million , $2.3 million as organic growth.

However, there are people who have told us that is wrong. They are saying you should not count the $2.3 million as organic growth for one year you should ignore that, so I'm going to respect their opinion. I'm not going to disagree with them. It's just another opinion -- it's another way of doing organic growth, so we really feel this answer should be best addressed by you yourself looking, doing your own math, or by asking the analysts,

>because each analyst could do it slightly differently, and
>I'm nobody to comment on it. So -- thank you.

239.    On May 10, 2011, the Company filed with the SEC a Quarterly

Report on Form 10-Q for the quarter ended March 31, 2010 signed by defendants

Raina and Kerris.  In that Form 10-Q, defendants reiterated the Company's results

from the May 10, 2011 press release.  In addition, as stated above, both Raina and

Kerris certified the Company's financial results for the first quarter of 2011, ended

March 31, 2011.

240.    In that Form 10-Q, the Company boasted of its continued expansion,

"both organically and through a series of acquisitions."  Indeed, defendants stated:

>During the three months ended March 31, 2011 our total
>operating revenues increased $8.4 million or 27%, to
>$40.1 million as compared to $31.6 million during the
>first quarter of 2010. This revenue increase is primarily
>the result of the growth achieved across our Exchange
>channel and the revenue from the acquisition of ADAM
>since February 7, 2011. The Company continues to
>efficiently integrate its business acquisitions across all
>existing operations leveraging product cross-selling
>opportunities.

241.    The May 10 10-Q also discusses Ebix's accounting for income taxes.

Note 7 to the financial statements boasts and effective income tax rate of 9.38% for

the three months ended March 31, 2011, and increase of 4.65% from the same

period in 2010.  According to the Company, it bases its interim period tax

provision on its "estimate of the effective income tax rates applicable to related annual twelve month period, after considering any discrete items uniquely related to the respective interim reporting period."  Defendants further stated that "[t]he Company's effective tax rate for 2011 reflects the significant tax benefits from having a higher mix of a portion of our operations in foreign jurisdictions where earnings are taxed at rates lower than U.S. statutory rates and where certain components of the Company's income are exempt from taxation."

242.   With respect to Company's accounts receivable, the 10-Q once again states in Note 1 relating to Ebix's *Summary of Significant Accounting Policies* that "[m]anagement specifically analyzes accounts receivable and historical bad debts, write-offs, customer concentrations, customer credit-worthiness, current economic trends and changes in our customer payment terms when evaluating the adequacy of the allowance for doubtful accounts."  Defendants further conveyed that:

> Bad debt expense incurred during the three month periods ended March 31, 2011 and 2010 was approximately $11 and $0 thousand, respectively. Accounts receivable are written off against the allowance account when the Company has exhausted all reasonable collection efforts.

243.   Also in that Form 10-Q, defendants discussed their evaluation of internal control over financial reporting and their evaluation of disclosure controls and procedures, stating:

*Evaluation of Disclosure Controls and Procedures:* The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the company's disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.

*Internal Control over Financial Reporting:* There were no changes in our internal control over financial reporting during the quarter ended March 31, 2011, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

244.    The foregoing statements about the first quarter of 2011 were false or misleading.   As stated above in paragraphs 33-86 and 103-105, defendants knew or recklessly disregarded that serious internal control problems plagued Ebix since 2003.  These internal control problems did not improve throughout the Class Period.  As a result, defendants knew or recklessly disregarded that Ebix was unable to account for its accounts receivable accurately or to post cash timely and accurately.  Defendants, therefore, were unable to assess accurately Ebix's need to reserve for bad debts in the face of its mounting accounts receivable.  Accordingly, throughout the Class Period, in violation of GAAP, defendants knew or recklessly

disregarded Ebix understated its allowance for doubtful accounts, enabling it to overstate its net income and diluted earnings per share.

245.   In addition, as stated above in paragraphs 87-105, throughout the Class Period, defendants knew or were reckless in not knowing that Ebix was overstating net income and diluted EPS by means of a sham tax strategy that shifted profits overseas, profits, defendants knew or recklessly disregarded, that Ebix was not permanently reinvesting in the foreign jurisdictions.  By means of this sham tax strategy, in violation of GAAP, defendants knew or recklessly disregarded that Ebix overstated net income in 2009 by 16.5% and 2009 diluted EPS by 16.3%.

246.   Last, as stated above in paragraphs 106-124, defendants knew or recklessly disregarded that throughout the Class Period, they disclosed materially inaccurate organic growth rates, a critical metric for investors in the case of a roll-up such as Ebix.  In fact, as defendants knew or recklessly disregarded, Ebix's legacy operations were not growing organically.  Rather the Company was growing only through acquisition.

## THE TRUTH BEGINS TO EMERGE

247.   On March 24, 2011, *Seeking Alpha* published a report by Copperfield,

carried by Bloomberg, titled *Ebix: Not a Chinese Fraud, but a House of Cards*

*Nonetheless*.

248.   About Ebix's growth, Copperfield stated:

> Winston Churchill's famous quote, "a riddle wrapped in a
> mystery inside an enigma," might as well have been
> targeting Ebix Inc. (EBIX).  EBIX has been an
> aggressive acquirer of a variety of companies over the
> years, many of which focus on the insurance industry.
> The company's offering mix is a confusing amalgamation
> of niche products that all have a "roll-up" stench. Robin
> Raina, EBIX's CEO, has liberally described his business
> with the buzz words du jour, such as "exchanges,"
> "CRM," "The Cloud," and "SaaS."
>
> The stock has performed well, fueled by retail investor
> interest, momentum publications like Investors' Business
> Daily and minimal scrutiny from analysts. We believe
> that EBIX is nothing more than a roll-up that has
> materially misrepresented its business (relative to the
> CEO's buzz words) as well as its organic growth. Its
> business model is predicated on two principals: tax
> arbitrage and dramatic cost cuts (headcount reductions
> and offshoring), neither of which is sustainable.  Further,
> the company's tax arbitrage may be more than "just"
> unsustainable, it may actually be illegal.
> EBIX's problems run deeper than unusual accounting.
> The EBIX story also comes with multiple auditor
> resignations, governance abuses, misrepresented organic
> growth, questionable cash flow and a contentious CEO.
> Below we address these concerns in great detail. Given
> the gravity of these issues, we have notified the IRS and

the SEC of the material abuses at EBIX.  We hope the
warranted scrutiny saves investors from significant losses
as the true EBIX story gets told.

EBIX shares are worth no more than $9.00, a level that
would represent a 65% decline from current prices.  We
arrive at our target by adjusting current consensus
estimates for a 35% tax rate (where it will likely go), and
applying a generous market multiple of 12x normalized
earnings (consensus estimates include assumptions that
are unattainable and adjust for oddities such as
amortization, while failing to contemplate massive
underinvestment in sales and R&D).  We estimate that
the company has less than $0.75 of de novo earnings
power.

249.   In a sweeping indictment of Ebix, defendant Raina and the

Company's auditor, DBH, among the issues Copperfield highlighted were Ebix's

history of auditor turnover and abnormally low audit fees for firms its size and

accounting red flags.  Copperfield further noted Ebix's "manipulative metrics" for

organic growth, which it calculated were far less than the 10% numbers

management had touted, including Ebix's very low sales and research and

development expenses that foretold large margin erosion when the Company began

developing new and enhanced products to damn the floodwaters of deteriorating

organic growth.  Copperfield also heavily criticized Ebix's foreign tax gambit,

terming its superficial transaction with its Indian subsidiaries unsustainable.

Absent the tax strategy, Copperfield concluded, "dramatically change[s] the

economics of Ebix's business, significantly impair[s] its earnings expectations, and could subject the company to significant fines, penalties and back taxes." Last, Copperfield questions the quality of Ebix's earnings, noting, in particular, its manipulation of its accounts receivable and its allowance for doubtful accounts.

250.   On this news, shares of Ebix declined $7.20 per share, or over 23%, closing on March 24, 2011 at $22.52 per share on relatively enormous trading volume of nearly 15 million shares traded.

251.   In an attempt to further defendants' fraud, Ebix responded to Copperfield's analysis in a March 25, 2011 press release, defending itself and its management.  It stated:

> The Company also refuted the random implications in a recent blog posted on Seeking Alpha about the Company. The Company normally does not comment on blog posts, but believes it is the author's intention to advance his interests, and the interests of other investors that have taken a position adverse to the long-term growth prospects of the company.  It is management's opinion that this post misrepresents and distorts facts not relevant to the Company's current financial position, long-term growth prospects and management policies.  To that end, the Company reiterates its long term growth initiatives and expansion opportunities, both domestically and internationally with an expanding distribution channel and broadening a product offering.
>
> The Company holds its directors, officers and employees to the highest ethical standards in both its business

operations, and in its efforts to achieve long-term value for its shareholders.  The Seeking Alpha post appears to have been issued specifically to cause a decline in the Company's stock price to support the increase in the short interest in the Company stock, and purchases of stock options related to these short positions.  The company is considering filing a formal complaint with the Securities and Exchange Commission's Division of Trading and Markets and Division of Enforcement, to report this anonymous blog targeted at causing a decline in shareholder value.  The Company will take other appropriate action if needed to protect its business operations and the reputation of its management team, board of directors, employees and partners.

252.   On June 3, 2011, in response to a sharp dip in the price of its stock, defendants confirmed the Company's financial health, including strong cash flow growth for 2011, strong sales, and healthy and improving operating margins.  The Company then reiterated that it was buying back up to $45 million in Ebix shares.

253.   On June 30, 2011, however, *Bloomberg* wrote a story on the Peak shareholders' lawsuit, discussed in detail above, which essentially confirmed some of the problems discussed in the March 24, 2011 Copperfield research report.  In that story, *Bloomberg* noted that a similar suit was filed in San Diego, California in April, 2010, alleging that Ebix had lost control of its accounts receivable accounting.  As a result of the June 30, 2011 disclosure of these allegations, the price of Ebix fell by $1.30 per share to close at $19.05 per share, down 6% from its previous close on unusually heavy trading volume of over 5 million shares traded.

254.   As a result of defendants' false statements and omissions, Ebix common stock traded at artificially inflated prices during the Class Period.

## ADDITIONAL SCIENTER ALLEGATIONS

255.   As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Ebix, their control over, and/or receipt and/or modification of Ebix allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Ebix, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

256.   During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Ebix common stock and operated as a fraud or deceit on Class Period

purchasers of Ebix common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market through partial disclosures, the price of Ebix common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Ebix common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about Ebix was revealed through a series of partial disclosures that removed the artificial inflation from the price of Ebix common stock.

257.   By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of Ebix's business and prospects. Defendants' false and misleading statements had the intended effect and caused Ebix common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $30.35 per share on March 24, 2011.

258.   As a direct result of the disclosures on March 24, 2011 and June 30, 2011, Ebix common stock fell precipitously.  These drops removed a good deal of the artificial inflation from the price of Ebix common stock, causing real economic loss to investors who had purchased Ebix common stock at artificially inflated prices during the Class Period.

259.   The declines were a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price declines in Ebix common stock negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Ebix common stock and the subsequent significant declines in the value of Ebix common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

260.   At all relevant times, the market for Ebix common stock was an efficient market for the following reasons, among others:

(a)   Ebix common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Ebix filed periodic public reports with the SEC and the NASDAQ;

142

(c)     Ebix regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Ebix was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

261.   As a result of the foregoing, the market for Ebix common stock promptly digested current information regarding Ebix from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Ebix common stock during the Class Period suffered similar injury through their purchase of Ebix common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

262.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were

not identified as "forward-looking statements" when made.  To the extent there

were any forward-looking statements, there were no meaningful cautionary

statements identifying important factors that could cause actual results to differ

materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any

forward-looking statements pleaded herein, defendants are liable for those false

forward-looking statements because at the time each of those forward-looking

statements were made, the particular speaker knew that the particular forward-

looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Ebix who knew that those statements

were false when made.

## COUNT I

### FOR VIOLATION OF §10(b) OF THE EXCHANGE
### ACT AND RULE 10b-5 AGAINST ALL DEFENDANTS

263.   Plaintiffs reiterate and incorporate herein by reference the foregoing

paragraphs as if fully stated herein.

264.   During the Class Period, defendants participated in the preparation of

and/or caused to be disseminated the material false or misleading statements

specified above, which they knew or deliberately disregarded were misleading in

that they contained misrepresentations and failed to disclose material facts

necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

265.   Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Ebix common stock during the Class Period.

266.   Defendants, individually or in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and financial performance of Ebix, as related above.

267.   Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein, by, among other things,

participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about Ebix and its operating and financial performance and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly above, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Ebix common stock during the Class Period.

268.   Defendants possessed actual knowledge or recklessly disregarded that their statements during the Class Period were false and misleading or omitted material facts they had a duty to disclose.  Defendants' engaged in violations of Section 10(b) and Rule 10b-5, knowingly or recklessly disregarding the truth for the purpose and effect of concealing Ebix's true financial and operating condition from the investing public and supporting the artificially inflated price of its publicly traded common stock.

269.   As a result of defendants' disseminating false and misleading statements about Ebix, as set forth above, the market price of Ebix's publicly traded securities was artificially inflated during the Class Period.  In ignorance of that artificial inflate in the price of Ebix securities and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which

the securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements during the Class Period, Plaintiffs and members of the Class paid artificially high prices for Ebix securities and were damaged thereby as demonstrated, in part, by the declines in the price of the Company's stock following the March 24, 2011 and June 30, 2011 disclosures.

270.   At the time of defendants' misrepresentations and omissions, Plaintiffs and the members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs, members of the Class, and the market known the truth regarding defendants' false and misleading statements, Plaintiffs and the members of the Class would not have purchased or otherwise acquired Ebix securities, or, if they had, would not have done so at the artificially inflated prices which they paid.

271.   As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their respective purchases and sales of Ebix stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Ebix common stock and experienced loses when the artificial inflation was released from Ebix stock as a result of the partial revelations and stock price decline detailed herein.

Plaintiffs and the Class would not have purchased Ebix common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

272.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### FOR VIOLATION OF §20(a) OF THE EXCHANGE ACT AGAINST DEFENDANTS RAINA AND KERRIS

273.    Plaintiffs reiterate and incorporate herein by reference the foregoing paragraphs as if fully stated herein.

274.    Defendants Raina and Kerris acted as controlling persons of Ebix within the meaning of §20(a) of the Exchange Act, as alleged herein.  By reason of their high-level, controlling positions with the Company and their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Ebix provide Raina and Kerris with unlimited access to copies of the Company's reports, press

releases, public filings, and other statements, that Plaintiffs allege to be misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause Ebix to correct the statements in question.

275.   In particular, Raina and Kerris had direct and supervisory involvement in the day-to-day finance and accounting operations of the Company.  They are presumed, therefore, to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

276.   As set forth above, each of these defendants violated and others whom they control violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

277.   By reason of their own conduct and the conduct of those over whom they exercised control, defendants Raina and Kerris are liable pursuant to §20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.   Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiffs and the members of the Class damages, including

interest;

C.     Awarding Plaintiffs reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may

deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  November 28, 2011

**HOLZER HOLZER & FISTEL, LLC**

/s/ Marshall P. Dees
Corey D. Holzer
Georgia Bar Number: 364698
Michael I. Fistel, Jr.
Georgia Bar Number: 262062
Marshall P. Dees
Georgia Bar Number: 105776
William W. Stone
Georgia Bar Number: 273907
200 Ashford Center North
Suite 300
Atlanta, Georgia  30338
Telephone: 770-392-0090
Facsimile: 770-392-0029

**FARUQI & FARUQI, LLP**
Antonio Vozzolo
Richard Gonnello
369 Lexington Avenue, 10th Floor
New York, New York 10017
Tel: 212-983-9330

Fax: 212-983-9331
avozzolo@faruqilaw.com

and

Jacob A. Goldberg
Sandra G. Smith
101 Greenwood Avenue, Suite 600
Jenkintown, PA  19046
Tel: 215-277-5770
Fax: 215-277-5771
jgoldberg@faruqilaw.com
ssmith@faruqilaw.com

**Attorneys for Plaintiffs**

## <u>CERTIFICATE OF SERVICE AND TYPE</u>

Pursuant to Local Rule 7.1(D), the undersigned counsel for Plaintiffs Anghel and Fenske hereby certifies that the foregoing Consolidated Amended Complaint for Violations of the Federal Securities Laws has been prepared with a font size and point selection (Times New Roman, 14 pt.) which was approved by the Court, and that on this 28th day of November, 2011, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record who have appeared in this matter.

/s/ Marshall P. Dees
Marshall P. Dees
Georgia Bar No. 105776