**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|                                      |     |                           |
| ------------------------------------ | --- | ------------------------- |
|                                      | :   |                           |
|                                      | :   |                           |
|                                      | :   |                           |
|                                      | :   |                           |
| IN RE: EBIX, INC. SECURITIES         | :   | CIVIL ACTION NO.          |
| LITIGATION                           | :   | 1:11-CV-02400-RWS         |
|                                      | :   |                           |
|                                      | :   |                           |
|                                      | :   |                           |
|                                      | :   |                           |

**ORDER**

This case comes before the Court on Defendants' Motion to Dismiss

Consolidated Amended Complaint [28-1].  After reviewing the record, the

Court enters the following Order.

**Background**

This is a consolidated securities class action.  Plaintiffs bring claims

under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (hereinafter

"Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange

Commission (hereinafter "SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5,

promulgated thereunder.  Plaintiffs represent all persons who purchased or

otherwise acquired Ebix, Inc. common stock between May 6, 2009 and June 30,

2011 (the "Class Period").  Defendants are Ebix, Inc., Robin Raina (Chief

Executive Officer of Ebix during the Class Period), and Robert Kerris (Chief

Financial Officer of Ebix during the Class Period).

## I.     Summary of Factual Allegations

Plaintiffs, in their Consolidated Amended Complaint (hereinafter

"CAC") [22], allege Ebix, Inc. and Defendants Raina and Kerris (hereinafter

"Individual Defendants") made a series of statements that misled investors and

artificially increased the value of Ebix securities in violation of §§ 10(b) and

20(a) of the Exchange Act and SEC Rule 10b-5.  The facts discussed below

come entirely from Plaintiffs' CAC and are taken as true.

Ebix supplies software and e-commerce solutions to the insurance and

financial industries.  Plaintiffs allege that Defendants made materially

misleading statements regarding Ebix's foreign tax strategy, internal controls,

and organic growth rate in violation of federal securities laws.  Defendants'

misrepresentations in these areas resulted in overstatement of Ebix's net income

and dilution of earnings per share.  According to Plaintiffs, the truth about these

aspects of Ebix's business was revealed to the market on March 24, 2011 in a

research report published by *Seeking Alpha* (a blog covering stock market news

and financial analysis) and carried by *Bloomberg*.  That day, Ebix share prices

fell 25.8% (to $22.52, down from an intraday, class period high of $30.35).  On June 30, 2011, *Bloomberg* disclosed that former shareholders of a company acquired by Ebix had sued Ebix.  That article reiterated much of the information published by the *Seeking Alpha* blog three months earlier.  On that date, stock prices fell further – to $19.05, down 6% from an intraday high of $ 20.93.

A.    *Ebix's Internal Control Problems*

Plaintiffs allege that Defendants knowingly failed for several years to rectify significant internal control problems at Ebix and misrepresented the strength of Ebix's internal controls in several public statements and SEC filings during the Class Period.  In 2003, KPMG, Ebix's independent auditing firm, informed Defendants that it had identified "reportable conditions" with respect to Ebix's internal controls. [22] at 19.  Ebix's 2004 Annual Report on SEC Form 10-K described the reportable conditions identified by KPMG during its 2003 audit: (1) delegation of authority and inadequate reviews by persons other than the preparer of accounting information; (2) lack of a formalized contract review process to ensure proper revenue recognition; (3) lack of a complete understanding of Ebix's income tax positions and related accounts; (4) inadequate documentation for certain unusual transactions, including the basis

3

for Ebix's accounting conclusions; and (5) internal control matters under the Sarbanes-Oxley Act. [22] at 20.

The same 2004 Form 10-K noted that BDO Seidman LLP, Ebix's auditor after KPMG, also "identified certain significant deficiencies relating to [Ebix's] internal control over financial reporting." [22] at 21-22.  The "significant deficiencies" identified by BDO related to: "the lack of knowledge and leadership at foreign locations, inadequate documentation for certain accounting transactions, insufficient analysis and review of domestic account reconciliations, lack of documentation of development costs and related agreements, and the lack of documentation to support the Company's income tax provisions and related accounts." [22] at 22.  Defendants claimed to have taken specific action to address each of the issues identified by KPMG, but with regard to deficiencies uncovered by BDO, the company said only that it would "evaluate what steps it needs to take to address these significant deficiencies." [22] at 20-22.

In 2005 and 2006, Ebix did not engage BDO to perform an audit of the company's internal controls over financial reporting.  In Ebix's 2005 Annual Report on Form 10-K, Defendants stated, "the Company's internal control over financial reporting is effective." [22] at 24.  In April 2007, Ebix disclosed that it

4

had dismissed BDO as its independent auditor and hired Miller Ray Houser & Stewart, a smaller accounting firm.  Miller Ray then merged with Habif, Arogeti & Wynne, LLP (hereinafter "Habif").  Habif did not perform an audit of Ebix's internal controls in 2007.  Again, in Ebix's 2007 Annual Report on Form 10-K, Defendants reported that the controls were "effective" and that "the information required to be disclosed by us in the reports that we file or submit under the Securities and Exchange Act of 1934 is accumulated, recorded, processed, and communicated accurately." [22] at 25.

In 2008, Ebix hired a new auditor, Cherry, Bekaert & Holland, LLP (hereinafter "CBH").  CBH is a relatively small southeast-based firm.  Between 2004 and 2010, Ebix's revenue grew from $14.4 million to $132.2 million.  However, Ebix's audit fees increased by only about $50,000 (from approximately $290,000 for the KPMG 2003 audit to $339,600 for CBH's 2010 audit). [22] at 26.  Ebix management cited reductions in audit costs and continuity as reasons for going with a small firm instead of a "Big Three" firm. [22] at 26.  In 2008, 2009 and 2010, CBH audited Ebix's internal controls.  CBH concluded each year that Ebix, "maintained, in all material respects, effective internal control over financial reporting . . . ." [22] at 27.  However, Plaintiffs allege that CBH had its own problems regarding its audit practices.

5

On two separate occasions, in 2007 and 2010, the Public Company Accounting

Oversight Board (hereinafter "PCAOB") found deficiencies in audits performed

by CBH.  Specifically, the PCAOB reports cited CBH's failure to obtain

sufficient competent evidential matter to support its opinions and procedures.

[22] at 27-28.

Plaintiffs maintain that Ebix's internal controls could not keep pace with

its growth.  As a result, Ebix was unable to disclose accurate financial

statements to investors.  The CAC alleges that Individual Defendants failed to

comply with SEC regulations and the requirements of the Internal Control -

Integrated Framework prepared by the Committee of Sponsoring Organizations

of the Treadway Commission (hereinafter "COSO Report").[1]  Specifically,

Individual Defendants "failed to discover in a timely manner or recklessly

disregarded deficiencies in Ebix's internal control" regarding revenues and

related accounts receivable in connection with certain acquisitions, and they

"failed to maintain a proper tone and control awareness that focused on

achieving consistent application of accounting policies and procedures and

strict adherence to GAAP." [22] at 33.

---

[1] The COSO Report was issued in September 1992.  According to the CAC, Generally Accepted Auditing Standards ("GAAS") are based on the internal control framework set out in the COSO Report. [22] at 30 n. 9.

6

The CAC discusses various internal control problems, including issues regarding accounting and billing, related to the companies Ebix acquired before and during the Class Period.  One such problem was posting cash received to specific accounts in a timely and accurate manner.  According to an anonymous senior billing analyst who was employed by Ebix during the first half of the Class Period, Ebix did not mandate how quickly she was to post cash received.  She posted cash received when she had time, generally between billing clients.  In fact, Defendant Raina prioritized customer billing over cash posting. [22] at 34.  The senior billing analyst "confirmed that the delay in posting cash was always a problem during her tenure at Ebix, especially related to businesses Ebix acquired." [22] at 34.

Problems with accounts receivable also plagued Ebix.  An email (the title and position of the sender are not specified in the CAC) sent to Defendant Kerris and other personnel on June 21, 2010 said, "As of last quarter, our accounts receivable area became a major concern to senior management and to our stockholders." [22] at 35.  Plaintiffs allege that Defendants were unable to accurately identify doubtful accounts receivable.  Under GAAP principles, doubtful accounts receivable – where losses due to uncollectible receivables are probable and reasonably estimable – are to be charged to income.  Here,

AO 72A
(Rev.8/82)

because Ebix could not "generate accurate invoices, accurately and promptly apply cash collected to specific invoices, and integrate accounts receivable systems of acquired companies," the company was unable to comply with these GAAP requirements.

The CAC discusses a spreadsheet created by the anonymous senior billing analyst that was sent to Ebix's controller in March 2010. The spreadsheet included detailed collection problems with at least 26 customers. One customer had been invoiced nine times and the bill remained unpaid. Another customer on the spreadsheet canceled its contract with Ebix on January 1, 2009 but the company was still attempting to collect on invoices in mid-2010. Finally, the state of West Virginia, an Ebix customer, had paid all invoices but Ebix was still pursuing payment.

On May 24, 2011, three former shareholders of Peak Performance Solutions, Inc. (hereinafter "Peak"), a company acquired by Ebix, filed a lawsuit against Ebix for breach of contract and fraudulent misrepresentation. The complaint in that case describes Ebix's problems with Peak's billing operations, alleging that Ebix fired Peak's accounting personnel immediately and was then "unable to manage accounts receivable or to create and maintain accurate books and records with respect to Peak." [22] at 41. The CAC also

details discrepancies in 2010 Peak revenue figures from different sources within Ebix, including information provided by Defendant Kerris, Ebix's controller, and Ebix's own billing records. [22] at 41-42.  Ebix's difficulties with Peak's billing led to Ebix's inability to manage cash flow and track revenue and expenses.  As a result, Ebix bounced several checks in March 2010 and lost at least one long-term customer for failure to pay mandatory unemployment compensation premiums in West Virginia. [22] at 43.

B..     *Ebix's Sham Foreign Tax Strategy*

Plaintiffs allege that Defendants engaged in an improper and potentially illegal tax avoidance scheme, which led to overstatements of Ebix's net income and diluted earnings per share.  According to the CAC, Defendants "improperly claimed that Ebix had effective tax rates of 1.1% and 2.5% in 2010 and 2009, respectively," and at all relevant times attributed the extremely low rates to Ebix's business operations abroad in low-tax and tax-free jurisdictions [22] at 45.

Ebix claimed on its 2009 and 2010 Forms 10-K that its India and Singapore subsidiaries enjoyed a tax holiday through 2015, from which the entire company benefitted.  Plaintiffs claim that Ebix's operating units were buying services and software from Ebix's India and Singapore subsidiaries,

9

shifting Ebix earnings into countries with low tax rates. [22] at 48-49.  GAAP

required Ebix to record a deferred tax liability and increase its tax expenses

relating to intercompany transactions if it did not permanently re-invest the

resulting foreign earnings in India and Singapore.  Plaintiffs allege that Ebix

could not possibly have been permanently reinvesting in India because the

money due from Ebix's other operating units was not ever transferred there.

A *Barron's* article entitled "Prolonging a Foreign Tax Holiday"

published on July 16, 2011 discussing Ebix's 2010 public filings in India stated,

"at one point in 2010 . . . receivables due from the U.S. parent ballooned to

almost three years' worth of one Indian subsidiary's sales." [22] at 50.  Further,

the Indian regulatory filings "show several years in which receivables from

Ebix U.S. swelled beyond a year's sales" for the Indian subsidiaries.[22] at 50.

Meanwhile, Ebix's reports to the SEC revealed that the company was hedging

intercompany receivables in India through purchases of derivative instruments.

In the second quarter of 2011, Ebix reported those derivatives to be worth $23.7

million. [22] at 51-52.  Based on these reports, Plaintiffs allege, "the income

that the Indian subsidiaries booked consisted almost entirely of paper gains,"

which could not have been invested in India and therefore, under GAAP, the

company was not allowed to report the low effective tax rates and income tax

AO 72A
(Rev.8/82)

provisions that it did throughout the class period. [22] at 50.  According to the

CAC, as a result of this tax scheme, Ebix overstated its 2009 income by 16.2%

and its 2010 income by 24.2% and failed to disclose adverse information that

investors and securities analysts expect to know. [22] at 53.

C.      *Ebix's Stagnant Organic Growth Rate*

Until 2009, Ebix provided financial information that allowed investors to

distinguish between revenue achieved through legacy operations and revenue

achieved through acquisition.  Beginning in the first quarter of 2009, however,

Ebix omitted information distinguishing between legacy and acquired revenue

sources.  Plaintiffs allege that Defendants excised this information because they

knew Ebix's organic growth rates were actually declining and because organic

growth numbers are particularly important to investors in "rollup" companies.[2]

[22] at 59.

One account manager from E-Z Data, a company acquired by Ebix, said

he saw little noticeable organic growth during his three years working for Ebix.

He reported that Ebix laid off a number of E-Z Data personnel, cut remaining

---

[2] "Rollup" companies are those that purchase many smaller, related companies
in order to create economies of scale and reduce costs.  Between 2008 and 2010,
according to the CAC, Ebix acquired eleven companies, several of which were based
abroad. [22] at 15-18.

employees' salaries, and terminated all but one of E-Z Data's administrative staff, including sales staff.  Similarly, a senior application developer with Infinity Systems, another Ebix acquisition, reported to Ebix's Vice-President of Development that Infinity Systems was experiencing no organic growth.  He said that the former Infinity Systems group was not getting new clients because the Ebix sales staff was not selling Infinity Systems products. [22] at 60-61.

The report published on *Seeking Alpha* in March 2011 stated: "Investors have a distorted view of [Ebix's] organic growth profile. . . . The REAL organic growth over the past two years appears to be relatively minimal." [22] at 57. The report continued: "estimating the contributions of acquired businesses leads to the conclusion that Ebix has no growth." [22] at 57.  The report noted that Ebix spent only $6.4 million on sales and marketing in 2010, less than 5% of the company's revenue.  And the company spent only $13.6 million on product development, which is consistent with a mature industrial company, not a growing technology company. [22] at 61-62.  A former senior executive of Connective Technologies, Inc., another company acquired by Ebix, said there was no plan to grow Connective or Ebix as a whole.  When the senior executive confronted Defendant Raina directly about the problem, Defendant Raina promised to hire additional marketing staff to help with growth.  But the hires

12

were never made.  The senior executive maintains that Defendant Raina

purposefully avoided adding staff to adequately promote marketable products

acquired by Ebix. [22] at 62-63.

According to the CAC, Defendants failed to satisfy their obligations

under federal securities laws' reporting requirements.  Specifically, SEC

Regulation S-K, Item 303, requires issuers to "describe any known trends or

uncertainties that have had or that the registrant reasonably expects will have a

material favorable or unfavorable impact on net sales or revenues or income

from continuing operations. . . ." [22] at 65.  The purpose of Regulation S-K is

to supplement 10-K and 10-Q financial filings by explaining changes in a

company's financial condition from the management's perspective.  Here, in

violation of Regulation 10-K, Defendants materially inflated organic growth

rates to investors and hid that the company was growing only through

acquisition.

D.    *Defendants' Material Misrepresentations and Omissions Regarding
      Internal Controls, Tax Strategy, and Organic Growth*

1.    First Quarter of 2009

In a press release, on an earnings conference call with Individual

Defendants, and on SEC Quarterly Report Form 10-Q certified by Individual

13

Defendants, Ebix reported revenue of $20.67 million and accounts receivable of $15.918 million, net an allowance of $453,000, for the first quarter of 2009. Individual Defendants signed the SEC filing certifying the company's financial results.  In the press release, Defendant Raina said, "this has been a satisfying quarter to the extent that it helps underline the fundamental strength of the company today.  Our repetitive revenue streams and infrastructure based transaction services, helped ensure that Ebix continues to grow its revenues, net income and net margins steadily." [22] at 67.  One investor questioned Individual Defendants about Ebix's organic growth potential over the next three to five years.  Defendant Raina directed the investor to Ebix's website and a presentation on the prior year's organic growth rate.  He added: "I think it's 27% actually.  The organic growth rate.  So, it's – we have done decently well with cross-selling." [22] at 69.

The Form 10-Q discussed Ebix's income tax rates.  Ebix disclosed an effective income tax rate for the quarter of 4.7%.  The company attributed the low rate to "the change in the mix of taxable income amongst the various domestic and foreign countries, including certain low tax rate foreign jurisdictions in which the Company conducts operations." [22] at 70-71.  The Form 10-Q stated: "Currently, in India the Company's local taxable income,

14

other than passive interest and rental income, is subject to a tax holiday.  The tax holiday is scheduled to expire in 2010." [22] at 71.

With regard to Ebix's accounts receivable, the Form 10-Q stated: "Management specifically analyzes accounts receivable and historical bad debts, write-offs, customer concentrations, customer credit-worthiness, current economic trends and changes in our customer payment terms when evaluating the adequacy of the allowance for doubtful accounts."[3] [22] at 71.  The Form also stated that Ebix writes off accounts receivable "to the allowance account when the Company has exhausted all reasonable collection efforts."  During the quarter ending March 31, 2009 there were no accounts receivable written off. [22] at 71.

The Form 10-Q also addressed Individual Defendants' evaluation of Ebix's internal controls and financial reporting procedures.  Individual Defendants reported: "[O]ur Chief Executive Officer and Chief Financial Officer have concluded that, as of March 31, 2009, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports that we file or submit under the

---

[3] This language regarding analyzing accounts receivable appears in every quarterly and annual report filed by Defendants during the Class Period except the third quarter report in 2009.

15

[Exchange Act] is accurately and properly recorded, processed, summarized and reported within the time periods specified in the applicable rules and forms and that it is accumulated and communicated to our management . . . ." [22] at 72. The form continues: "There were no changes in our internal control over financial reporting during the fiscal quarter ended March 31, 2009, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."[4] [22] at 72.

>    2.    Second Quarter of 2009

Defendants reported revenue for the second quarter 2009 of $22.42 million and net income after taxes of $8.96 million. Defendants also reported an income tax provision of $416,000 and accounts receivable of $16.394 million, net an allowance of $548,000. These figures were disclosed in a press release, during an earnings conference call with Individual Defendants, and in an SEC Quarterly Report on Form 10-Q certified by Individual Defendants. [22] at 74.

The quarter's Form 10-Q reported an effective income tax rate of 4.81%. One investor questioned Defendant Raina during the conference call about

---

[4] This language regarding evaluation of Ebix's internal controls is also included in successive filings during the Class Period.

16

Ebix's low tax rate.  The investor noted that the rate enjoyed by Ebix appeared to be temporary and asked whether investors could expect a typical tax rate of 30% to 40% in the long-term.  Defendant Raina responded that he would not hazard a guess regarding a specific tax rate after the expiration of the Indian tax holiday in 2014, but said, "You could possibly see over a period of time these rates going up to possibly 10 then 11 and so on.  You're not going to suddenly see the rate jump up to 30 or 29 or 25." [22] at 77.  Defendant Raina attributed Ebix's favorable tax rate to the tax holiday in India: "[W]e have a tax structure worldwide that takes advantage of India . . . [S]ince India is tax free, that's quite advantageous to us." [22] at 77.

     3.     Third Quarter of 2009

In the third quarter of 2009 Ebix reported revenue of $23.29 million and net income after taxes of $9.43 million.  Ebix reported an income tax provision of $313,000 and accounts receivable of $18.660 million for the quarter.  These results were reported in a press release, during an earnings conference call with Individual Defendants, and on Form 10-Q filed with the SEC and certified by Individual Defendants.

In the press release, Defendant Raina commented, "We feel good about our consistent revenue streams and believe that the company has the ability to

continue our growth both organically and through strategic acquisitions." [22] at 83.  When asked on the conference call whether the increase in accounts receivable was due to acquisitions or "the normal billing cycle," Defendant Raina responded: "Yes, it is, and I'll let Bob explain that further, it is.  It's purely a timing issue.  Clearly, when you make these acquisitions, I mean, you'll have some tiny timing differences that will happen, and that's all you're seeing." [22] at 85.  Defendant Kerris commented: "We look at this as strictly a timing issue and are not concerned about any ongoing issues there." [22] at 85.  The Form 10-Q said increased revenues were a result of "both the impact of strategic business acquisitions made in 2008 in [Ebix's] health insurance exchange and BPO channels, as well as organic growth realized in [Ebix's] annuity and life insurance exchange channels." [22] at 86.

The Form also reported an effective income tax rate of 5.45% for the nine months ending September 30, 2009.  Again, Defendants attributed the low tax rate to Ebix's operations in low-tax foreign jurisdictions.  Defendant Raina announced on the earnings conference call that Ebix had purchased another building in the tax-free zone in India that would enjoy tax-free status until 2014 and 50% tax-free status after 2014.  Defendant Raina commented, "That's a rather important development for Ebix, as it allows us . . a low tax jurisdiction

18

in addition to access to duty-free imports for hardware and infrastructure in that area." [22] at 85.

4.      Fourth Quarter and Year-End, 2009

At the end of 2009 Defendants reported another strong quarter.  In a press release, on an earnings conference call, and in filings with the SEC, Defendants reported fourth quarter revenue of $31.3 million and annual revenue of $97.7 million, up 31% from $74.8 million in 2008.  Defendants also reported annual earnings of $38.8 million, an increase of 42% from 2008, and diluted earnings per share of $3.10, up 36% from 2008. [22] at 90-91.  Defendants stated the company "expects its blended worldwide income tax rate to be in the range of 6-8% for the fiscal year 2010; and a gradual increase to a blended worldwide tax rate of 8-12% over the following few years." [22] at 91. The company reported 2009 year-end accounts receivable of $22.861 million, net an allowance of $565,000, an increase from $13.562 with an allowance of $453,000 at the end of 2008.

During the earnings call, Defendant Raina discussed Ebix's accounts receivable.  He mentioned an "almost perfect customer retention rate," "excellent" customer relations, and no "material collection issues over the last decade." [22] at 93.  He stated that Ebix "continued to evolve and strengthen its

19

internal controls through the use of quality partners, vendors, tax advisors, and arms-length statutory auditors." [22] at 93.  When questioned about Ebix's changes in independent auditors, Raina responded, ". . . our audit firms haven't really changed. . . . It was simply the name change . . . . I think we continue like any other firm, we are very sensitive to cost, quality of audits and so on.  I think we are one of the few firms who continues to use all the past firms we have used across – forget three years – across the last seven years, I would say." [22] at 93.

One analyst questioned Individual Defendants about the 55% growth in revenues and 85% growth in accounts receivable – a 30% difference – between the fourth quarter of 2008 and the fourth quarter of 2009.  Defendant Kerris said that day sales outstanding were 67 days as of December 31, 2009, up five days from December 31, 2008.  He said, "we look at this increase as being a temporary matter as we continue to integrate our acquired customer bases into the Company and into our processes." [22] at 94.  Defendant Raina added, "if you look at our history and you forget one or two years, to look at a decade and look at our collection record, we've never had any material issue on anything . . . . . [W]e do not spend any time internally worrying about collection issues in this Company." [22] at 94.

When questioned about the company's organic growth rate and the contribution of acquisitions in the fourth quarter of 2009, Defendant Raina answered: "Our analysis, actually, incidentally tells us that the organic growth rate was somewhere beyond 14% but I think I'll let the analysts worry about this." [22] at 95.  On Ebix's 2009 Annual Report on Form 10-Q, Defendants stated: "The increase in revenues is a result of both the impact of strategic business acquisitions made during 2009 and 2008 particularly in the area of exchanges, and in our BPO channel, as well as organic growth realized in our BPO and Exchange channels.  We are able to quickly integrate business acquisitions into our existing operations and thereby rapidly leverage product cross-selling opportunities." [22] at 96.

With regard to Ebix's income taxes, the Form 10-Q Annual Report boasted an effective income tax rate of 2.5% for 2009.  Defendants stated that Ebix's tax rate "is reduced because of the blend of reduced tax rates in foreign jurisdictions where a significant portion of our income resides.  Furthermore, the Company's world-wide product development operations and intellectual property ownership has been centralized into our Singapore and India subsidiaries." [22] at 97.

21

5.     2010 Quarterly and Year-End Reports

The CAC follows a similar pattern in detailing Ebix's 2010 financial

reports and Defendants' statements regarding internal controls, tax rates and

organic growth.  Ebix continued to record increases in revenue, net income and

diluted earnings per share each quarter, as well as a favorable effective income

tax rate due to its operations in low-tax or tax-free foreign jurisdictions.

Defendants continuously maintained in quarterly press releases, on conference

calls, and in SEC filings that Ebix's internal controls were sufficient and that

revenue increases were attributable to both organic growth (specifically, growth

achieved in the exchange and BPO channels) and acquisitions.  Defendants

repeatedly promoted Ebix's efficient integration of business acquisitions across

existing operations.

During an August 9, 2010 earnings conference call, Defendant Raina

praised Ebix's ability to grow organically.  He said, "in spite of the head wind,

Ebix has continued to grow revenues.  It's because of our ability to organically

keep adding new clients continuously and retaining our existing clients." [22]

108-109.  On a March 14, 2011 earnings conference call, when Defendant

Raina was asked about Ebix's organic growth trends in 2010 and beyond, he

responded that the organic growth rate "basically comes out to 11%."  He said

22

that growth in the exchange channels had been a lot higher.  When asked if he

expected organic growth rates in the single digits going forward, Defendant

Raina responded: "We would be disappointed if our organic growth today was

in single digits." [22] at 124.

      Regarding accounts receivable and internal controls, Ebix began writing

off some accounts as uncollectible beginning in the first quarter of 2010.

According to Ebix's Form 10-Q for the second quarter of 2010, "Accounts

receivable are written off against the allowance account when the Company has

exhausted all reasonable collection efforts." [22] at 110.  In the first quarter of

2010 Defendants wrote off $57,000 as uncollectible; in the second quarter they

wrote off $120,000; in the third, $140,000.  Despite the write-offs, Defendants

remained optimistic in public statements about the company's accounts

receivable.  In a November 9, 2010 press release Defendant Kerris stated, "only

1.4% of our receivables have been outstanding for more than a year, implying

that virtually all of our operating revenues are realized in the form of cash

inflows within our annual reporting period." [22] at 115.  Additionally,

Defendant Raina promoted Ebix's "exemplary" record on accounts receivable

during a November 9, 2010 earnings conference call. [22] at 115.  Defendants

included reports in their 2010 SEC forms that management had evaluated

AO 72A
(Rev.8/82)

internal controls and procedures and concluded that the company's controls were effective.  In its 2010 SEC filings, Ebix did not discuss internal controls as they related to specific acquisitions (e.g., E-Z Data and Peak).

Ebix also continued to report low effective income tax rates throughout 2010.  In November 2010, when Defendant Raina was asked by an analyst when the tax rate might normalize, Defendant Raina defended Ebix's guidance on a 10% tax rate, saying, "our tax rates are low because most of our IT is based abroad.  We also get worldwide lower tax rate on account of having a lower tax rate than some of the other foreign jurisdictions, and most of our income lies there." [22] at 116.  In March 2011, Defendant Kerris continued to guide analysts to a 10-12% tax rate for 2011. [22] at 122.

By the end of 2010, Defendants reported annual revenue of $132.2 million, up 35% from 2009, and a 52% increase in net income over 2009. Diluted earnings per share rose 46.6% to $1.51.  Ebix reported accounts receivable of $26.028 million, net an allowance of $1.126 million.  Ebix's 2010 Annual Report on Form 10-K recorded an effective tax rate of 1.1%, down from 2.5% in 2009, and the company's income tax expense declined from $1 million in 2009 to $635,000 in 2010.  Ebix reported annual bad debt expenses of $1.2 million and $321,000 in 2010 and 2009, respectively.

6.    First Quarter of 2011

Defendants reported revenue of $40.1 million in the first quarter of 2011, up 27% from the same quarter in 2010.  Net income rose 22% to $15.2 million and diluted earnings per share were up 15.6% to $0.37.  Ebix also recorded an income tax provision of $1.569 million and accounts receivable of $35.173 million, net an allowance for doubtful accounts of $1.083 million.  In a May 10, 2011 press release Defendant Kerris stated: "Our Q1 results reflect a worldwide effective tax rate of 9.4% versus 4.7% in Q1 of 2010 reflecting a relatively greater mix of income in higher tax rate jurisdictions in Q1 of 2011, as compared to the same quarter in 2010." [22] at 130.  On its quarterly Form 10-Q Ebix recorded bad debt expense of $11,000.  Management, including Individual Defendants, certified that they had evaluated Ebix's disclosure controls and procedures and concluded they "were effective as of the end of the period covered by this report." [22] at 134.  On a May 10, 2011 earnings conference call Defendant Raina was again questioned about Ebix's organic growth rate.  Defendant Raina responded that he would rather not provide an answer because "we feel these answers should come from a very unbiased manner from outside parties, because in the past we have given answers and people have started to do organic calculations. . . . [A]nalysts do it in their own

25

way . . . . All of the numbers are reported . . . . So we feel people should do their analysis independently on their own . . . ." [22] at 130-131.

E.    *Truth Emerges in the Market*

On March 24, 2011, *Seeking Alpha* blog published a report on Ebix by Copperfield Research.  The report was also covered by *Bloomberg* in an article entitled "Ebix: Not a Chinese Fraud, but a House of Cards Nonetheless."  The Copperfield report stated: "We believe that Ebix is nothing more than a roll-up that has materially misrepresented its business (relative to the CEO's buzz words) as well as its organic growth." [22] at 136.  The report goes on: "[Ebix's] business model is predicated on two principals: tax arbitrage and dramatic cost cuts (headcount reductions and offshoring), neither of which is sustainable.  Further, the company's tax arbitrage may be more than 'just' unsustainable, it may actually be illegal." [22] at 136.  The report indicates that Copperfield notified the IRS and the SEC of "material abuses" at Ebix. [22] at 136-137.

The Copperfield report highlighted Ebix's auditor turnover and abnormally low audit fees for a firm of its size.  By Copperfield's calculations, Ebix's organic growth was far less than 10%, as reported by Defendants.  Additionally, Ebix's foreign tax strategy was criticized heavily in the report.

26

The report concluded that removing the tax strategy "dramatically changes the economics of Ebix's business, significantly impairs its earnings expectations, and could subject the company to significant fines, penalties and back taxes." [22] at 137-138.  Copperfield also questioned Ebix's earnings and Defendants' manipulation of accounts receivable and allowances for doubtful accounts.  The day *Seeking Alpha* published the Copperfield report, Ebix's shares declined $7.20 per share (over 23% from the stock's high of $30.35 per share) to close at $22.52 after nearly 15 million shares were traded.

Defendants responded to the Copperfield report in a press release issued on March 25, 2011.  The press release stated Defendants' belief that "it [was] the author's intention to advance his interests, and the interests of other investors that have taken a position adverse to the long-term growth prospects of the company." [22] at 138.  On June 3, 2011, Defendants confirmed Ebix's financial health in a public statement.  On June 30, 2011, however, *Bloomberg* published its story about the Peak shareholders' lawsuit against Ebix.  The complaint in that case contained allegations similar to those in the *Seeking Alpha* publication regarding Ebix's internal control failures, sham tax strategy, and lack of organic growth.  The *Bloomberg* story also mentioned a similar suit filed in California in April 2010 alleging that Ebix had lost control of its

27

accounts receivable.  Following *Bloomberg's* story, Ebix's stock price fell again (by $1.30 per share to close at $19.05).

### Discussion

## I.    Legal Standards

A.    *Motion to Dismiss*

Normally, a complaint should be dismissed only where it appears that the facts alleged fail to state a plausible claim for relief.  <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544 (2007); Fed. R. Civ. P. 12(b)(6).  However, complaints alleging fraud must meet the heightened pleading standards of Federal Rule of Civil Procedure ("Rule") 9(b), which requires the circumstances constituting fraud to be stated with particularity.  "A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral representations, who made the statements, the time and place of the statements, the content of the statements and the manner in which they misled the plaintiff and what benefit the defendant gained as a consequence of the fraud." <u>In re Theragenics Corp. Sec. Litig.</u>, 105 F. Supp. 2d 1342, 1347 (N.D. Ga. 2000) (citing <u>Brooks v. Blue Cross and Blue Shield of Fla., Inc.</u>, 116 F.3d 1364, 1371 (11th Cir. 1997)).

28

The Private Securities Litigation Reform Act of 1995 (hereinafter "PSLRA"), 15 U.S.C. §§ 78u-4, *et seq.* (2010), imposes additional heightened pleading standards on Exchange Act §10(b) and Rule 10b-5 actions. "The complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15. U.S.C. § 78u-4(b)2). If the PSLRA's requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

In a ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983).

B.     *Exchange Act Violations*

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national

securities exchange . . . , any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15

U.S.C. § 78j(b).  SEC Rule 10b-5 promulgated thereunder forbids any person,

directly or indirectly, . . . (a) To employ any device, scheme, or artifice to

defraud, (b) To make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading, or (c) To engage in

any act, practice, or course of business which operates or would operate as a

fraud or deceit upon any person, in connection with the purchase or sale of any

security. 17 C.F.R. § 240.10b-5.  Therefore, to state a claim under § 10(b) and

Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or

omission; (2) made with scienter; (3) a connection with the purchase or sale of a

security; (4) reliance on the misstatement or omission; (5) economic loss; and

(6) a causal connection between the material misrepresentation or omission and

the loss (i.e., loss causation). Mizzaro, 544 F.3d at 1236-37 (11th Cir. 2008)

(citing Dura Pharm. V. Broudo, 544 U.S. 336, 341-42 (2005)).

      Section 10(b) regulates material misrepresentations or omissions made

with scienter in connection with the purchase or sale of a security.  The

"fundamental purpose" of § 10(b) is to implement a "philosophy of full

disclosure." <u>Santa Fe Indus. v. Green</u>, 430 U.S. 462, 478 (1977).  The federal

securities laws do not reach breaches of corporate fiduciary duty. <u>In re Premiere</u>

<u>Techs., Inc. Sec. Litig.</u>, 2000 WL 33231639, at *14 (N.D. Ga. Dec. 8, 2000)

(citing <u>Santa Fe</u>, 430 U.S. at 477).  Under the *Santa Fe* doctrine, § 10(b) does

not regulate "transactions which constitute no more than internal corporate

mismanagement." <u>Santa Fe</u>, 430 U.S. at 479.  However, "false or misleading

statements or omissions concerning material facts about management or internal

operations may be actionable," such as when a defendant "makes certain

statements while that defendant knows that existing mismanagement makes

those statements false or misleading." <u>In re Premiere Techs.</u>, 2000 WL

33231639, at *14 (citing <u>Gross v. Medaphis Corp.</u>, 977 F. Supp. 1463, 1473

(N.D. Ga. 1997)) (internal quotations omitted).

Section 10(b) and Rule 10b-5 require a showing of scienter -- either an

intent to deceive, manipulate, or defraud, or severe recklessness. <u>Mizzaro v.</u>

<u>Home Depot, Inc.</u>, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting <u>Bryant v.</u>

<u>Avado Brands, Inc.</u>, 187 F.3d 1271, 1282 (11th Cir. 1999)) (quotation marks

omitted).  "Severe recklessness" is "limited to those highly unreasonable

omissions or misrepresentations that involve not merely simple or even

inexcusable negligence, but an extreme departure from the standards of

AO 72A
(Rev.8/82)

ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Id. A "strong inference" of scienter means "an inference that is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007)) (internal quotations omitted). "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, 551 U.S. at 323-24.

        To prove loss causation, a plaintiff must show "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." In re Premiere Techs., 2000 WL 33231639, at *11 (quoting Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997)). "The plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered. Rather, he need only show that it was substantial, i.e., a significant contributing cause. In other words, plaintiff mush show that the misrepresentation touches upon the reasons for the investment's decline in value." Id. (internal citations omitted).

AO 72A
(Rev.8/82)

Section 20(a) of the Exchange Act imposes derivative liability on persons that, directly or indirectly, control primary violators of the Act. 15 U.S.C. § 78t(a); see Mizzaro, 544 F.3d at 1237.  To state a claim under § 20(a) of the Exchange Act, a plaintiff must show: (1) a primary violation of the securities laws; (2) that the individual defendants had the power to control the general business affairs of the primary violator; and (3) that the individual defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." Id. (quoting Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001).  "Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim, . . . a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded." Id.

## II.    Analysis

The CAC alleges that each of the Defendants violated § 10(b) of the Exchange Act and Rule 10b-5.  Plaintiffs further allege that Individual Defendants, as "controlling persons" of Ebix, are individually liable under § 20(a) of the Exchange Act.  Defendants move to dismiss Plaintiffs' CAC with prejudice for failure to satisfy the heightened pleading requirements under the PSLRA [28-1].  Specifically, Defendants argue: (1) the CAC fails to allege any

misrepresentation or omission of material fact pursuant to the PSLRA pleading

standards and merely complains of inactionable mismanagement; (2) the CAC

contains only conclusory statements regarding scienter, which do not satisfy the

PSLRA's requirements; and (3) the CAC does not adequately allege loss

causation. [28-1] at 3.  For the reasons discussed below, the Court finds that

Plaintiffs have satisfied all applicable pleading requirements.

A.    *False and Misleading Statements*

The starting point for any § 10(b) claim is materially misleading

statements or omissions.  Under the PSLRA, in an action premised on an untrue

statement or omission of material fact, "the complaint shall specify each

statement alleged to have been misleading, the reason or reasons why the

statement is misleading, and if an allegation regarding the statement or omission

is made on information and belief, the complaint shall state with particularity all

facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  The PSLRA's

heightened pleading requirements are intended to prevent abusive suits where

plaintiffs bring an action in hopes of using the discovery process to uncover

evidence of fraud not alleged in the complaint. In re Theragenics Corp. Sec.

Litig., 105 F. Supp. 2d 1342, 1355 (N.D. Ga. 2000) (Thrash, J.).  Here, the CAC

identifies numerous statements that Plaintiffs contend were false or misleading, along with specific facts to support the allegations of falsity.

First, Plaintiffs allege that Defendants made false or misleading statements regarding the effectiveness of Ebix's internal controls and financial reporting procedures.  On SEC quarterly and annual reports throughout 2009 and 2010 Defendants represented that the company's internal controls were "effective to provide reasonable assurance" that the information reported to the SEC and investors was accurate and properly recorded. [22] *passim*.  With regard to internal controls, Defendants made misrepresentations about the soundness of the company's billing and collection procedures, and allowance for doubtful accounts.  For instance, during the earnings conference call for the fourth quarter of 2009, Defendant Raina discussed an "almost perfect customer retention rate, "excellent customer relations, and "no material collection issues over the last decade." [22] at 93.  And even though Ebix changed auditing firms several times between 2003 and 2008, when questioned by an analyst about these changes in early 2010, Defendant Raina responded, "our audit firms haven't really changed . . . .  I think we are one of the few firms who continues to use all the past firms we have used across – forget three years – across the last seven years, I would say." [22] at 93.

35

Another analyst inquired about Ebix's 55% growth in revenue between the fourth quarter of 2008 and the fourth quarter of 2009, but its 85% growth in accounts receivable during that same period.  Defendant Kerris described the situation as "a temporary matter as we continue to integrate our acquired customer bases into the Company and into our processes." [22] at 94. Defendant Raina added, "if you look at our history and you forget one or two years, to look at a decade and look at our collection record, we've never had any material issue on anything. . . . We do not spend any time internally worrying about collection issues in this Company." [22] at 94.  Defendant Kerris stated in a November 9, 2010 press release that "virtually all of [Ebix's] operating revenues are realized in the form of cash inflows within our annual reporting period." [22] at 115.  On that same day, Defendant Raina boasted about Ebix's "exemplary" record regarding accounts receivable. [22] at 115.

Specific facts alleged in the CAC contradict these representations by Defendants about the strength of Ebix's internal controls and the company's accounting and billing practices.  Generally, Plaintiffs maintain that Ebix's controls could not keep pace with its growth.  Between 2004 and 2010, Ebix's revenue grew from $14.4 million to $132.2 million.  However, during that time,

AO 72A
(Rev.8/82)

Ebix's auditing fees increased by only about $50,000.[5] [22] at 26.  The CAC

details specific internal control and integration problems related to companies

Ebix acquired.

　　　As Ebix rapidly expanded, the company staffed only two billing analysts

in the United States. [22] at 34.  One senior billing analyst[6] described delays in

posting cash received because there were no company mandates regarding how

quickly cash should be posted and her billing responsibilities were to take

priority. [22] at 34.  These policies came directly from Defendant Raina.

According to the billing analyst, delays in cash posting were especially

problematic with the companies acquired by Ebix.

---

[5] This is particularly problematic given that auditing firms previously hired by
Ebix had identified serious concerns with Ebix's internal controls.  These concerns are
addressed more fully below in the discussion on scienter.

[6] There is no *per se* rule requiring securities fraud complaints to name
confidential sources.  "The weight to be afforded to allegations based on statements
proffered by a confidential source depends on the particularity of the allegations made
in each case, and confidentiality is one factor that courts may consider. Confidentiality
, however, should not eviscerate the weight given if the complaint otherwise fully
describes the foundation or basis of the confidential witness's knowledge, including
the position(s) held, the proximity of the offending conduct, and the relevant time
frame." Mizzaro, 544 F.3d at 1240.  Here, when relying on statements of confidential
witnesses, the CAC identifies the position(s) and responsibilities of the witnesses,
their term of employment, and the witness' direct observations of the offending
conduct.

37

The CAC also alleges problems with accounts receivable. The anonymous senior billing analyst compiled a spreadsheet with 26 "problem" accounts and sent it to Ebix's controller in March 2010. The spreadsheet detailed accounts with extreme delays in collections, prolonged collection attempts with at least one company that claimed to have terminated its relationship with Ebix, and repeated invoicing of at least one customer that had already paid all of its bills. Additionally, an internal email sent to Defendant Kerris and other personnel said, "as of last quarter, our accounts receivable area became a major concern to senior management and to our stockholders." [22] at 35. The CAC alleges that Ebix could not keep track of billing or revenue for its acquired companies. Former shareholders of Peak Performance Solutions sought revenue figures for Peak from Ebix. Defendant Kerris, Ebix's controller, and Ebix's own billing records produced different figures. [22] at 41-42. Plaintiffs allege that because Ebix was unable to accurately manage Peak's billing, Ebix bounced several checks in March 2010 and lost at least one long-term customer for failing to pay mandatory insurance premiums. [22] at 43. According to the CAC, Defendants took no steps to resolve Ebix's issues with cash posting or accounts receivable.

38

Second, Plaintiffs allege material misrepresentations and omissions by Defendants regarding Ebix's tax strategy and effective income tax rate. Defendants reported very low effective income tax rates for Ebix in 2009 and 2010 (2.5% and 1.1%, respectively), which Defendants attributed to Ebix's operations in low-tax and tax-free jurisdictions abroad. [22] *passim*. Individual Defendants were questioned about Ebix's unusually low effective tax rate during multiple quarterly earnings calls. One investor noted that the tax rate enjoyed by Ebix appeared to be temporary and asked whether investors could expect a more normal rate of 30%-40% in the future. Defendant Raina said that the rates could possibly go up to 10% or 11%, but because Ebix has "a tax worldwide that takes advantage of India," those rates would not go up to 25% or 30%. In November 2010 Individual Defendants were again questioned about when Ebix's tax rate might normalize. Defendant Raina and Defendant Kerris continued to guide investors and analysts to a 10-12% rate for 2011.

Again, the CAC alleges specific facts that call into question the veracity of Defendants' representations. Plaintiffs allege that Ebix's operating units were buying services and software from Ebix's subsidiaries in India and Singapore in order to shift earnings to these low-tax or tax-free countries. [22] at 48-49. But GAAP required Ebix to record a deferred tax liability for

39

intercompany transactions if Ebix did not permanently re-invest the foreign

earnings in India and Singapore.  Defendants disclosed on Ebix's 2010 Form

10-K that "the Company has not provided deferred U.S. taxes on its unremitted

foreign earnings because it considers them to be permanently reinvested." [22]

at 49-50.  However, Plaintiffs allege, the operating units were not actually

paying their bills to the foreign subsidiaries.  Ebix's filings in India showed

balances owed by Ebix U.S. to its Indian subsidiaries equal to revenues.

Additionally, the *Barron's* article discussing Ebix's Indian filings stated, "at

one point in 2010 . . . receivables due from the U.S. parent ballooned to almost

three years' worth of one Indian subsidiary's sales." [22] at 50.[7]  Plaintiffs

allege that based on these figures, the foreign subsidiaries' income consisted

almost entirely of paper gains that could not possibly have been permanently

reinvested abroad. [22] at 50.  Therefore, Defendants failed during the Class

Period to record an adequate tax expense and misled investors about Ebix's

foreign tax holiday benefits.

---

[7] When Defendant Raina responded to the *Barron's* article, he represented that "receivables in India are now down to $2 million." However, Ebix had purchased derivative instruments "to hedge the intercompany receivables originated by our Indian subsidiary," which Defendants valued at $23.7 million in the second quarter of 2011. [22] at 51-52.

Finally, Plaintiffs allege material misrepresentations and omissions by Defendants regarding Ebix's organic growth rate. Defendants consistently represented in filings and in public statements that Ebix was growing organically, not just through acquisitions. Investors and analysts questioned Individual Defendants about the company's organic growth rate during the Class Period and Defendant Raina provided positive organic growth numbers on multiple earnings conference calls. His organic growth numbers ranged from 11% all the way up to 27%. [22] at 69, 95, 123. In an August 9, 2010 press release Defendant Raina said: "We have continued to substitute production drops in the industry through organic growth means by bringing new clients to our Exchanges." [22] at 107. Defendants represented: "The increase in revenues is a result of both the impact of strategic business acquisitions made during 2009 and 2008 particularly in the area of exchanges, and in our BPO channel, as well as organic growth realized in our BPO and exchange channels. We are able to quickly integrate business acquisitions into our existing operations and thereby rapidly leverage product cross-selling opportunities." [22] at 96.

However, facts alleged in the CAC indicate that Ebix's organic growth was not nearly that strong, if it was occurring at all. Witnesses allege that Ebix

41

was not successfully transitioning or growing its acquired companies, nor was it successfully leveraging economies of scale or cross-selling opportunities. A former E-Z Data employee who worked for Ebix as an account manager "departed Ebix because he saw no growth opportunities for himself or the company. Having been with the company for three years, he saw little noticeable organic growth." [22] at 60. Similarly, a senior application developer with Infinity Systems confirmed that Infinity was not experiencing organic growth and was not getting new clients because Ebix's sales staff was not selling Infinity Systems products. [22] at 60-61. In fact, the developer was let go in May 2011 because there were not enough sales to support current staff levels. [22] at 60-61.

A former senior executive of Connective Technologies said he confronted Defendant Raina directly about plans to grow the company in the face of a dramatically understaffed marketing department and Defendant Raina could not provide a plan. [22] at 63. Defendant Raina did promise the executive that Ebix would hire additional marketing staff, but the hires were never made. [22] at 62-63. Finally, the report published in *Seeking Alpha* said that "the REAL organic growth over the past two years appears to be relatively minimal." The report went on to caution analysts: "estimating the contributions

42

of acquired businesses leads to the conclusion that Ebix has no growth." [22] at 57.

Based on the foregoing, the Court concludes that Plaintiffs have pled misrepresentations and omissions of material fact with sufficient particularity to satisfy the PSLRA's standards.

B.    *Scienter*

Next, the Court must consider whether Plaintiffs have pled scienter with sufficient particularity.  To satisfy the PSLRA, Plaintiffs must allege with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15. U.S.C. § 78u-4(b)2).  To determine whether scienter has been adequately pled, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 323.  Plaintiffs' pleadings are sufficient in this circuit if the facts alleged raise a strong inference of severe recklessness. Bryant, 187 F.3d at 1283.  With regard to Individual Defendants, the question is "whether a reasonable person *would* infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were

43

severely reckless in not knowing about it) based on its nature, duration, or amount." Mizarro, 544 F.3d at 1249.

The CAC alleges that Defendants knew about persistent internal control problems before and during the Class Period and intentionally misrepresented the strength of Ebix's internal controls to the public.  In 2003, KPMG, then Ebix's independent auditor, performed an audit of the company's internal controls and found several "reportable conditions."[8] [22] at 19-20.  Then in 2004, BDO, Ebix's new auditor, identified "significant deficiencies" regarding Ebix's internal control over financial reporting. [22] at 21-22.  In 2005, without engaging BDO to perform audits of the company's internal controls, Defendants began representing in public filings and statements that Ebix's internal controls were "effective." [22] at 24.[9]  Despite indications that its

---

[8] Allegations concerning conduct occurring before the Class Period are not fatal to Plaintiffs' claims regarding scienter. See In Re Friedman's Inc. Secs. Litig., 385 F. Supp. 2d 1345, 1366 (N.D. Ga. 2005) (Duffey, J.).

[9] An individual defendant's certification of a company's financial statements "is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." Garfield v. NDC Health Corp., 466 F.3d 1255, 1265 (11th Cir. 2006).  This requirement is satisfied "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions. Id.  Here, "red flags" existed before and during the Class Period.  Defendants knew that KPMG and BDO found significant problems with Ebix's internal controls.  Additionally, Defendants were alerted to problems during the Class Period by internal sources.

internal controls were inadequate, Ebix did not engage a firm to perform another audit of its internal controls until 2008.

In the years following KPMG's and BDO's negative findings regarding Ebix's internal controls, Defendants hired progressively smaller auditing firms. By 2008, Ebix settled on CBH, a relatively small southeast-based firm with very little international expertise (even though Ebix was acquiring more companies abroad). Between 2004, when Ebix was alerted by its auditors that internal controls were a problem, and 2010, Ebix's revenue grew from $14.4 million to $132.2 million, but its auditing fees increased by only about $50,000 (from approximately $290,000 for the KPMG 2003 audit to $339,600 for CBH's 2010 audit).  In 2008, 2009 and 2010 CBH performed audits of Ebix's internal controls and found that they were "effective" in all material respects. However, the CAC alleges, CBH had its own problems regarding its audit practices.  On two occasions (in 2007 and 2010) the Public Company Accounting Oversight Board found deficiencies in audits performed by CBH. Specifically, CBH was faulted for failure to obtain sufficient competent evidential matter to support its opinions and procedures. [22] at 27-28.

These facts, along with internal sources' reports of billing and accounting problems throughout the Class Period, give rise to a strong inference that

45

Defendants were severely reckless regarding their representations about the

strength of Ebix's internal controls.

Under GAAP, to benefit from the tax holiday in India and avoid reporting

deferred tax liability on intercompany transactions, Ebix had to permanently

reinvest revenues in India Defendants knew about this requirement, as

evidenced by Ebix's 2010 Form 10-K, which said the Company had not

provided deferred U.S. taxes on its unremitted foreign earnings because it

considered them to be permanently reinvested.[10] [22] at 49-50.  However,

Defendants' public filings in India for 2010 revealed unpaid receivables of $38

million from Ebix's other operating units, the same amount as reported

revenues in India that year.  According to the *Barron's* article, the practice of

Ebix U.S. not paying its bills to the Indian subsidiaries went on for several

---

[10] While alleged GAAP or GAAS violations do not alone create a strong
inference of recklessness, when combined with a "drastic overstatement of accounts"
or other "red flags," there may be enough to establish the requisite level of scienter.
Garfield, 466 F.3d at 1268-70; see also In Re Friedman's, 385 F. Supp. 2d at 1361
("Relevant facts are the magnitude of the accounting error, whether the defendants
had prior notice of the error, and whether the defendants played any role in calculating
and disseminating the financial statement.") (internal citations omitted).  The amount
of unpaid receivables from Ebix U.S. vis-a-vis revenue of the Indian subsidiaries
raises a serious accounting red flag.  And Defendants were aware of other red flags
regarding Ebix's tax strategy and income tax provisions.  In 2003, KPMG identified a
"reportable condition" with regard to "the lack of a complete understanding of the
Company's tax positions and related accounts." [22] at 20.  Then in 2004, BDO
identified as a "significant deficiency" a "lack of documentation to support the
Company's income tax provisions and related accounts." [22] at 22.

years. [22] at 51.  If Indian revenues were only paper gains, the funds were not

being permanently reinvested there and Ebix's effective income tax rate was

much higher than 2.5% (and certainly much higher than 1.1%).  Individual

Defendants were questioned repeatedly by investors and analysts about the

abnormally low tax rate.  Defendants consistently represented that the Indian

tax holiday was the explanation for the low rate, even though Ebix's own filings

in India suggest money was not flowing there for reinvestment.

These facts are sufficient to give rise to a strong inference of severe

recklessness on Defendants' part with regard to statements about Ebix's foreign

tax benefits and effective income tax rate during the Class Period.

Throughout the Class Period, Defendants represented that Ebix was

experiencing strong organic growth.  Plaintiffs allege that organic growth

figures are critical for investors in a rollup company like Ebix.  But in the first

quarter of 2009, Ebix changed its financial reporting practices and stopped

providing revenue figures that distinguished between revenue generated

through legacy operations and revenue generated through acquisitions. [22] at

58-59.  Additionally, despite reports from staff that the company was severely

understaffed in marketing and sales, and that companies acquired by Ebix were

not effectively integrated or growing at all, Individual Defendants reported

AO 72A
(Rev.8/82)

organic growth numbers as high as 27% on earnings conference calls during the Class Period.  In an August 9, 2010 press release, Defendant Raina stated: "We are presently in the process of hiring fifteen new sales people for our Exchange and CRM initiatives.  These additional resources should enable us to organically grow our revenues more dramatically over the coming months and years." [22] at 108.  Internally, Defendant Raina promised that he would hire additional marketing and sales personnel to help address the company's lack of growth.  But he never did. [22] at 62-63.  In fact, internal sources report that Ebix laid off sales staff en masse. [22] at 60.  Finally, the *Seeking Alpha* report suggests that, after accounting for the contributions of acquired businesses, Ebix was not growing organically *at all*, which is a far cry from 11% organic growth, let alone 27%. [22] at 57.

These facts give rise to a strong inference that Defendants were at least severely reckless in their representations about Ebix's organic growth rates.

The scienter allegations in the CAC apply to Ebix and Individual Defendants.  With regard to Individual Defendants, their roles within the company (CEO and CFO), their active participation in press releases, earnings calls, and SEC filings dealing with the issues focused on in the CAC, and the nature, duration and extent of the fraud alleged, would lead a reasonable person

48

to conclude that they knew about the fraud or were at least severely reckless in not knowing about it.  The issues addressed in the CAC – audit results, tax strategy, effective tax rates, internal controls, serious billing problems, and company growth rates – are naturally within the purview of the company's top executives.  The type and amount of fraud alleged here would not be hidden from the CEO or the CFO of the company.  Here, the CAC alleges specific communications to and from Individual Defendants regarding these issues. Compare with Mizzaro, 544 F.3d at 1250-1255 (court found scienter insufficiently pled as to individual defendants where complaint failed to cite any documentation, communication or conversation suggesting that individual defendants knew anything about the alleged fraud and where the type of fraud alleged would be difficult for senior management to detect).

C.      *Loss Causation*

   The loss causation element of Rule 10b-5 claims requires a showing that a defendant's fraud was the but-for and proximate cause of the plaintiff's losses. Loss causation pleading need only satisfy Rule 8 standards, not the heightened standards of Rule 9 or the PSLRA. In re Coca-Cola Enters. Inc., Sec. Litig., 510 F. Supp. 2d 1187, 1203-04 (N.D. Ga. 2007) (Thrash, J.) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346 (2005)).  Rule 8 is satisfied if plaintiff

provides "a short and plain statement adequate to give defendants some

indication of the loss and the causal connection that the plaintiff has in mind."

In re Coca-Cola, 510 F. Supp. 2d at 1203 (internal citations omitted).  Plaintiffs

need not show that the defendant's fraud was the "sole and exclusive cause" of

the injury. See Findwhat Investor Grp. v. Findwhat.com, 658 F.3d 1282, 1309

(11th Cir. 2011).  Rather, "plaintiff must show that the misrepresentation

touches upon the reasons for the investment's decline in value." Robbins v.

Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) (internal citations

omitted).

Upon publication of *Seeking Alpha's* post on March 24, 2011, which

Plaintiffs allege revealed the truth to the market regarding Ebix's inadequate

internal controls, sham tax strategy, and stagnated organic growth, share prices

declined over 23% on a relatively high trading volume of 15 million shares.

[22] at 138.  The CAC alleges that the stock price declined even further when

more information about these particular areas of Ebix's business was revealed

to the market in *Bloomberg's* story on the Peak shareholders' lawsuit. [22] at

139.  The Copperfield Report and the *Bloomberg* story showed deficiencies in

important business areas where Defendants had assured investors there were

strengths, and the market reacted promptly and dramatically to the new information.

The drop in Ebix's stock price was a foreseeable consequence of investors' reliance on Defendants' misrepresentations and omissions regarding Ebix's internal controls, tax strategy, and organic growth. When the truth was revealed to the market, the impact on Ebix's stock prices was immediate and significant. Therefore, Plaintiffs have adequately pled loss causation.

III.    Conclusion

The Court concludes that Plaintiffs have adequately pled material misrepresentations and omissions, scienter, and loss causation under the applicable pleading standards. In accordance with the foregoing, Defendants' Motion to Dismiss Consolidated Amended Complaint [28-1] is **DENIED**.

**SO ORDERED**, this 28th day of September, 2012.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)